FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

2015 APR 10  P 3: 37

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA, *ex rel.* )
CHRISTINE RIBIK, PATRICK GERARD )
CARSON, and MARIE SLOUGH )
                                )
        Plaintiffs, )
                                )
        v. )
                                )
HCR MANORCARE, INC., )
MANOR CARE INC., HCR MANORCARE )
SERVICES, LLC and HEARTLAND )
EMPLOYMENT SERVICES, LLC, )
                                )
        Defendants. )

CIVIL ACTION NUMBERS:
1:09cv13    (CMH/TCB)
1:11cv1054 (CMH/TCB)
1:14cv1228 (CMH/TCB)

False Claims Act Violations
Unjust Enrichment
Payment by Mistake

**JURY TRIAL DEMANDED**

## UNITED STATES' CONSOLIDATED COMPLAINT IN INTERVENTION

1.      This is an action brought by the United States of America ("United States") to recover treble damages and civil penalties arising from violations of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), and to recover damages under the common law theories of unjust enrichment and payment by mistake.

2.      Relators Christine Ribik, Gerard Carson, and Marie Slough originally filed separate actions, on behalf of the United States, pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1). The Ribik and Carson cases were consolidated by Order of this Court on June 13, 2012, and all three cases were consolidated by Order of this Court on November 4, 2014. The United States files this Consolidated Complaint in Intervention against HCR ManorCare, Inc., Manor Care, Inc., HCR ManorCare Services, LLC, and Heartland Employment Services, LLC (collectively "HCR ManorCare," "Company," or "Defendants") pursuant to 31 U.S.C. § 3730(b)(4)(A).

3.      HCR ManorCare operates a national chain of approximately 281 Skilled Nursing

Facilities ("SNFs"). This action arises out of HCR ManorCare's submission of false or fraudulent claims for payment to Medicare and TRICARE (collectively, "federal healthcare programs") for rehabilitation (also "rehab") therapy services.

4.     HCR ManorCare billed federal healthcare programs for services that were not reasonable and necessary, and/or were not skilled in nature and therefore did not meet the coverage requirements governing benefits related to SNF care (also known as the "SNF benefit"). HCR ManorCare knew or should have known that these services were not eligible for reimbursement under the SNF benefit.

5.     Medicare pays SNFs a daily rate to provide reasonable and necessary skilled nursing and skilled rehabilitation therapy services to qualifying Medicare patients. The daily reimbursement rate varies based on the level of nursing care and number of therapy minutes provided to the beneficiary. The highest daily rate that Medicare will pay a SNF for rehabilitation therapy is known as "Ultra High." This level of reimbursement is applicable to only those patients who require skilled rehabilitation therapy for a minimum of 720 minutes per week from at least two therapy disciplines.

6.     From at least October 1, 2006 through May 31, 2012, HCR ManorCare engaged in a nationwide scheme to bill federal healthcare programs at the Ultra High level without regard to its patients' actual conditions or needs. This plan to maximize revenue by billing at the Ultra High level originated in HCR ManorCare's corporate offices and was imposed on the administrators who ran HCR ManorCare's SNFs and on the therapists who treated the patients.

7.     As part of this scheme, HCR ManorCare set Ultra High billing targets for its SNFs without regard to patient's actual medical needs.

8.     HCR ManorCare's corporate managers threatened SNF administrators and

2

therapists with sanctions, including termination of their employment, if they did not meet these billing targets.

9.      In October 2006, according to its own data, HCR ManorCare billed Medicare at the Ultra High level for 38.8 percent of all days that it billed for rehabilitation therapy. In February 2010 the Company billed 81.3 percent of its rehabilitation days at the Ultra High level, or more than twice the October 2006 percentage. This increase in Ultra High billing was not due to a change in HCR ManorCare's patient population; rather, it resulted from a conscious decision by HCR ManorCare to increase revenues through Ultra High billing.

10.     During this time period, Ultra High billings at individual HCR ManorCare facilities increased dramatically.

11.     In October 2006, HCR ManorCare's Arlington, Virginia SNF billed 33.6 percent of its Rehab days at the Ultra High level. By April 2010, this facility had increased its Ultra High percentage to 85 percent. Similarly, HCR ManorCare's Stratford Hall, Virginia SNF increased its Ultra High level billings from 23.7 percent in October 2006 to 89.2 percent in March 2010.

12.     In October 2006, HCR ManorCare's Sunnyvale, California SNF billed 52.9 percent of its rehab days at the Ultra High level. By February 2010 this SNF had increased its Ultra High percentage to 91 percent, and by May 2012 it was billing 94 percent of its rehab days at the Ultra High level. In October 2010 the Sunnyvale SNF billed *100 percent of its rehab days* at Ultra High.

13.     In October 2006, HCR ManorCare's Wilmington, Delaware SNF billed only 14.4 percent of its rehabilitation days at the Ultra High level. By January 2010 the Wilmington SNF had increased this number to 92.3 percent.

3

14.     In October 2006, HCR ManorCare's Muskegon, Michigan SNF billed 8.4 percent of its rehabilitation days at the Ultra High level.  By October 2009, this facility had increased to 93.3 percent.

15.     In October 2006, HCR ManorCare's Whitehall, Michigan SNF billed 6.7 percent of its rehabilitation days at the Ultra High level.  By April 2010, this number had increased to 81.1 percent.

16.     As a result of the pressure to constantly impose enough rehabilitation therapy on patients to allow HCR ManorCare to bill at the Ultra High level, patients in HCR ManorCare's SNFs received unnecessary, unreasonable, unskilled, and sometimes even harmful treatment.

17.     In addition, from at least October 1, 2006 through May 31, 2012, HCR ManorCare routinely kept patients in its SNFs longer than was necessary in order to maximize the Medicare payments that HCR ManorCare received.  As a result of corporate pressure to achieve specific financial goals, HCR ManorCare administrators frequently kept patients in the Company's SNFs *despite* a recommendation from the treating therapist that the patient should be discharged.

18.     HCR ManorCare received numerous complaints that corporate pressure to meet Ultra High and length of stay targets was undermining therapists' clinical judgment at the expense of its patients' wellbeing.  These complaints came from both inside and outside the company.  HCR ManorCare made no changes in response to these complaints.

19.     From January 2006 through May 31, 2012, Medicare Part A paid HCR ManorCare over $6 billion for all inpatient SNF services.  During this same period, Tricare for Life paid HCR ManorCare more than $5.6 million for all inpatient SNF claims.

## I.    JURISDICTION AND VENUE

20.    This Court has jurisdiction under 31 U.S.C. § 3730 and 28 U.S.C. §§ 1331 and

1345, and supplemental jurisdiction to entertain the common law causes of action under 28

U.S.C. § 1367(a).  The Court may exercise personal jurisdiction over the Defendants because the

Defendants reside and/or transact business in this District, or committed proscribed acts in this

District.

21.    Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §

1391(b) and (c), as the place where Defendants reside and where a substantial part of the events

or omissions giving rise to the claims occurred.

## II.    PARTIES

22.    Plaintiffs in this action are the United States of America, suing on behalf of the

Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid

Services ("CMS"), which administers the Medicare program, and the Department of Defense,

including its component Defense Health Agency ("DHA"), formerly known as the TRICARE

Management Activity, which manages the TRICARE Program.

23.    Relator Christine Ribik is a licensed occupational therapist and former employee

of defendant Heartland Employment Services, LLC, which leases employees to HCR

ManorCare-owned SNFs including the following Virginia SNFs where Ms. Ribik provided

occupational therapy services:  ManorCare Health Services-Alexandria, ManorCare Health

Services-Arlington, and ManorCare Health Services-Fair Oaks.  On January 9, 2009, Ms. Ribik

filed a *qui tam* action against defendants HCR ManorCare, Inc. and Manor Care Inc., as well as

several HCR ManorCare facilities.  On or about April 20, 2011, Ms. Ribik filed an amended

complaint, which added other related corporate entities and HCR ManorCare facilities as defendants.

      24.     Relator Patrick Gerard Carson is a physical therapy assistant and former employee of defendant Heartland Employment Services, LLC, which also leases employees to the Mercy/Manor Partnership, located in Yeadon, Pennsylvania, where Mr. Carson provided physical therapy services. Mr. Carson filed a *qui tam* action against defendant HCR ManorCare, Inc. and other related corporate entities on September 28, 2011. On June 13, 2012, this Court granted the United States' request to consolidate Mr. Carson's and Ms. Ribik's *qui tam* actions.

      25.     Relator Marie Slough is a physical therapist and former employee of defendant Heartland Management Services, which also leases employees to Heartland-Briarwood MI, LLC, an HCR ManorCare-owned SNF at which Ms. Slough worked. On August 17, 2010, Ms. Slough filed a *qui tam* action in the United States District Court for the Eastern District of Michigan against defendant HCR ManorCare, Inc., as well as an HCR ManorCare facility and individual employees of HCR ManorCare. On November 4, 2014, this Court granted the United States' request to consolidate Ms. Slough's *qui tam* action with those of Ms. Ribik and Mr. Carson.

      26.     Defendant HCR ManorCare, Inc., a Delaware corporation with its principal place of business in Toledo, Ohio, sits at the top of the organizational chart of HCR ManorCare related entities. From January 1, 2006 through April 7, 2011, HCR ManorCare, Inc., through its subsidiaries, owned, operated, and managed approximately 281 SNFs in 30 states, including six facilities in Virginia. On April 7, 2011, HCR ManorCare, Inc. sold substantially all of its real estate assets to a real estate investment trust known as HCP Inc. ("HCP"). Following the sale of the properties to HCP, HCR ManorCare, Inc., through its subsidiaries, continued to operate and manage almost all of the 281 SNFs.

27.     Defendant Manor Care, Inc., a Delaware corporation with headquarters in Toledo, Ohio, is a wholly-owned subsidiary of HCR ManorCare, Inc.  Manor Care, Inc. is a predecessor in interest to defendant HCR ManorCare Inc., and was publicly traded under the symbol HCR until its December 21, 2007 acquisition by The Carlyle Group.  According to Manor Care, Inc.'s Form 10-K filing with the Securities and Exchange Commission for the period ending December 31, 2006, Manor Care, Inc., owned and operated 278 SNFs across the United States.

28.     Defendant Heartland Employment Services, LLC, an Ohio limited liability company with headquarters in Toledo, Ohio, is a wholly-owned subsidiary of both HCR ManorCare, Inc. and Manor Care, Inc.  Pursuant to an Employee Leasing Agreement, Heartland Employment Services, LLC leases employees, including therapists and other facility-level personnel, to HCR ManorCare's SNFs and to defendants HCR ManorCare Services, LLC and Manor Care, Inc.

29.     Defendant HCR ManorCare Services, LLC, a Michigan limited liability company with headquarters in Toledo, Ohio, is a wholly-owned subsidiary of both HCR ManorCare, Inc. and Manor Care, Inc.  HCR ManorCare Services, LLC was known as HCR ManorCare Services, Inc. until its status was changed to an LLC in 2009, and is referred to hereinafter as "HCR ManorCare Services."  Pursuant to a Corporate Services Agreement, HCR Manor Care Services, provides numerous services to HCR ManorCare's SNFs, including business development, marketing, regulatory compliance, reimbursement, strategic advising and management.

30.     Manor Care, Inc. files a single consolidated tax return, which encompasses all of the tax information for its 281 SNFs and for defendants HCR ManorCare, Inc., HCR ManorCare Services, and Heartland Employment Services, LLC.

31.     On September 10, 2008, Barry Lazarus, Vice President of Reimbursement at HCR

7

ManorCare, wrote to an official at CMS stating that HCR ManorCare Services has "ownership of and control over all of HCR ManorCare's provider entities." Mr. Lazarus requested that HCR ManorCare Services be designated as the "home office" for all of HCR ManorCare's SNFs. Upon information and belief, HCR ManorCare's home office is now HCR Manor Care Services, LLC.

32.     In 2007, 2008, 2010, and 2012 Mr. Lazarus reaffirmed to CMS that (1) all HCR ManorCare SNFs are part of the HCR ManorCare Services chain; (2) he is the "Point of Contact" for the "chain;" and (3) the home office address for the chain is 333 N. Summit Street Toledo, Ohio 43604.

33.     Upon information and belief, 277 of HCR ManorCare's 281 SNFs use a single HCR ManorCare address in Toledo, Ohio for correspondence with CMS and CMS' contractors. Of the remaining four SNFs, three use Toledo, Ohio correspondence addresses.

34.     Executives, Vice Presidents, Divisional-level personnel, and Regional-level personnel employed by defendants Heartland Employment Services, LLC and HCR ManorCare Services regularly make hiring, firing, disciplinary, and compensation decisions for SNF-level personnel.

35.     In February 2008, HCR ManorCare's then-Chief Operating Officer Stephen Guillard, an employee of HCR ManorCare Services, disseminated detailed "Levels of Authorization" that further demonstrate the control that defendants Heartland Employment Services, LLC and HCR ManorCare Services exert over HCR ManorCare's SNFs. For certain hiring and firing decisions, the Levels of Authorization mandate that facility-level Administrators must obtain approval from both the General Manager (a Vice President-level position) and Regional Director of Operations, both of whom are employees of Heartland

8

Employment Services, LLC. For certain compensation decisions, like market adjustments and higher starting salaries, facilities first must obtain the approval of the Corporate Compensation Department and Chief Operating Officer. Furthermore, capital projects other than non-routine items and contractual obligations under $1,000, required approval of at least two tiers of higher-level "management."

## III.    THE FALSE CLAIMS ACT

36.    The FCA provides, in pertinent part, that any person who:

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim...

\* \* \*

is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

31 U.S.C. § 3729(a)(1)-(2) (2006), as amended by 31 U.S.C. § 3729(a)(1)(A)-(B) (West 2010).

37.    The FCA further provides:

(1) the terms knowing and knowingly --

(A)    mean that a person, with respect to information-

(i)  has actual knowledge of the information;

(ii)  acts in deliberate ignorance of the truth or falsity of the information; or

(iii)  acts in reckless disregard of the truth or falsity of the information; and

(B)    require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b) (2006), as amended by 31 U.S.C. § 3729(b)(1) (West 2010).

38.    The FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,500 to $11,000 per violation. 31 U.S.C. § 3729(a)(1)(G).

9

IV.    FEDERAL HEALTHCARE PROGRAMS

A.    Medicare Coverage of SNF Rehabilitation Therapy

39.    Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions. *See* 42 U.S.C. §§ 426, 426A.

40.    The Medicare program is divided into four "Parts" that cover different services. Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

41.    In order for rehabilitation therapy to qualify for the Part A SNF benefit, the following conditions must be met: (1) the patient must require skilled nursing care or skilled rehabilitation services (or both) on a daily basis; (2) the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis; and (3) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay, or for a condition that arose while the patient was receiving care in a SNF (for a condition treated during the hospital stay). 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

42.    Subject to these requirements, Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c).

43.    Medicare requires that a physician or certain other practitioners certify that these requirements are met at the time of a patient's admission to the SNF and re-certify the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter. *See* 42

10

U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

44.     For a therapy service to be considered *skilled*, it must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." 42 C.F.R. § 409.32(a). Thus skilled therapy services can only be administered by, or under the supervision of, trained personnel such as physical therapists, occupational therapists, or speech language pathologists. *See* 42 C.F.R. § 409.31(a).

45.     Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitive exercises (*e.g.*, exercises to improve gait, maintain strength or endurance, or assistive walking). *See* 42 C.F.R. § 409.33(d); *see also* Medicare Benefit Policy Manual, Ch. 8 § 30.4.1.1 ("Skilled physical therapy services must . . . be of a level of complexity and sophistication, or the condition of the patient must be of a nature that requires the judgment, knowledge, and skills of a qualified physical therapist.").

46.     Medicare Part A will only cover those services that are "reasonable" and "necessary." *See* 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under part A or part B of this subchapter for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member").

47.     In the context of skilled rehabilitation therapy, this means that the services must be (1) consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; (2) consistent with accepted standards of medical practice; and (3) reasonable in duration and quantity. *See* Medicare Benefit Policy Manual, Ch. 8, § 30.

48.     In order to assess the reasonableness and necessity of skilled rehabilitation therapy services and determine whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries.  In particular, the Medicare statute provides that:

> The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit or settlement by the Government Accountability Office, from the Federal Hospital Insurance Trust Fund, the amounts so determined, with necessary adjustments on account of previously made overpayments or underpayments; **except that no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.**

42 U.S.C. § 1395g(a) (emphasis added).

**B.     Medicare Payment for SNF Rehabilitation Therapy**

49.     Under its prospective payment system ("PPS"), Medicare pays a nursing facility a pre-determined daily rate for each day of skilled nursing and rehabilitation services it provides to a patient. *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

50.     The daily PPS rate that Medicare pays a nursing facility depends, in part, on the Resource Utilization Group ("RUG") to which a patient is assigned.  Each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs.

51.     In general, there are five RUG levels for patients that require rehabilitation therapy:  Rehab Ultra High ("RU"); Rehab Very High ("RV"); Rehab High ("RH"); Rehab Medium ("RM"); and Rehab Low ("RL").

12

52.     The RUG level to which a patient is assigned depends upon both the number of skilled therapy minutes and the number of therapy disciplines the patient received during a seven-day assessment period.  The chart below reflects the requirements for the five rehabilitation RUG levels under the RUG-III classification system.

| Rehabilitation RUG Level | Requirements to Attain RUG Level |
|---|---|
| RU = Ultra High | 1. Minimum 720 minutes per week total therapy<br>2. At least two therapy disciplines<br>3. One discipline must be provided at least 5 days/week |
| RV = Very High | 1. Minimum 500 minutes per week total therapy<br>2. One therapy discipline must be provided at least 5 days/week |
| RH = High | 1. Minimum 325 minutes per week total therapy<br>2. One therapy discipline must be provided at least 5 days/week |
| RM = Medium | 1. Minimum 150 minutes per week total therapy<br>2. Therapy must be provided at least 5 days/week<br>3. Can be any mix of therapy disciplines |
| RL = Low | 1. Minimum 45 minutes per week total therapy<br>2. Therapy must be provided at least 3 days/week<br>3. Can be any mix of therapy disciplines |

Source: 63 Fed. Reg. 25,252 at 26,262 (May 12, 1998).

53.     Medicare pays the highest rate for those beneficiaries that fall into the Ultra High RUG level.  This level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." *Id.* at 26,258.

54.     Medicare reimbursement also varies within each RUG level depending on 1) the patient's ability to perform certain activities of daily living ("ADL"), such as eating, using the toilet, bed mobility, and transfers (e.g., from a bed to a chair), and 2) the extent to which the patient needs "extensive services" such as intravenous treatment, a ventilator, tracheostomy, or suctioning.

55.     ADL scores of A, B, C, L, or X are assigned to each patient.  A patient who can perform the activities of daily living without assistance would receive an "A," while a patient

who requires assistance with all of these activities, but does not require any of the extensive services would generally receive a "C." A patient who requires only one of the extensive services may receive an ADL score of "L," while a patient who requires several of the extensive services would generally receive an ADL score of "X."

56.     The summary charts below show the difference that a rehabilitation RUG level and ADL score have on the Medicare daily reimbursement rate. These charts reflect the adjusted rates that Medicare paid nursing facilities for rehabilitation beneficiaries in fiscal year 2006 and fiscal year 2012. Medicare adjusts base rates annually and based on locality. *See* 42 U.S.C. § 1395yy(e)(4)(E)(ii)(IV).

| RUG Rates:  Federal Rates for Fiscal Year 2006[1] | | | | | |
|---|---|---|---|---|---|
| | Rehab with Extensive Services | | Rehab without Extensive Services | | |
| RUG Level | X | L | C | B | A |
| RU | $ 564.83 | $ 496.04 | $ 479.53 | $ 439.62 | $ 418.99 |
| RV | $ 428.24 | $ 399.34 | $ 385.59 | $ 366.32 | $ 329.17 |
| RH | $ 363.02 | $ 356.14 | $ 335.50 | $ 320.36 | $ 296.97 |
| RM | $ 415.57 | $ 381.17 | $ 308.25 | $ 299.99 | $ 293.11 |
| RL | $ 295.03 | n/a | n/a | $ 271.64 | $ 231.74 |

| RUG Rates:  Federal Rates for Fiscal Year 2012[2] | | | | | |
|---|---|---|---|---|---|
| | Rehab with Extensive Services | | Rehab without Extensive Services | | |
| RUG Level | X | L | C | B | A |
| RU | $ 737.08 | $ 721.01 | $ 558.79 | $ 558.79 | $ 467.23 |
| RV | $ 656.06 | $ 588.60 | $ 479.38 | $ 415.13 | $ 413.52 |
| RH | $ 594.39 | $ 530.14 | $ 417.71 | $ 375.95 | $ 330.97 |
| RM | $ 545.24 | $ 500.27 | $ 366.95 | $ 344.47 | $ 283.43 |
| RL | $ 478.85 | n/a | n/a | $ 356.78 | $ 229.89 |

---

[1] 70 Fed. Reg. 45,025, 45,038 (Aug. 4, 2005).

[2] 76 Fed. Reg. 48,486, 48,501 (Aug. 8, 2011).

57.    Effective October 1, 2010 and October 1, 2011, CMS made certain modifications to the RUG-III reimbursement structure by implementing its RUG-IV classification system and other changes.  Among other revisions, CMS revised the rules pertaining to the delivery of concurrent therapy and group therapy.  74 Fed. Reg. 40,288 (Aug. 11, 2009); 76 Fed. Reg. 48,486 (Aug. 8, 2011).

###    C.    Medicare Claims for Payment of SNF Rehabilitation Therapy

58.    Medicare requires SNFs to periodically assess each patient's clinical condition and functional status, as well as their actual and expected use of services.  SNFs are required to report the results of these assessments using a standardized tool known as the Minimum Data Set ("MDS").[3]  The MDS is used as the basis for determining a patient's RUG level and, therefore, the daily rate that Medicare will pay the SNF to provide skilled nursing and skilled therapy to that patient.

59.    In general, a nursing facility must assess each patient and complete the MDS form on the 5th, 14th, 30th, 60th, and 90th day of the patient's stay in the facility.  The date the facility performs the assessment is known as the "assessment reference date."  A nursing facility may perform the assessment within a window of time before this date, or, under certain circumstances, up to five days after.  When a nursing facility performs its assessment (except for the first assessment), it looks at the patient for the seven days preceding the assessment reference date.  This seven day assessment period is referred to as the "look-back period."

---

[3] Effective October 1, 2010, CMS required SNFs to use a revised MDS form, known as MDS 3.0. The prior form was referred to MDS 2.0. Both forms collect substantially the same information. All references to the MDS herein shall apply equally to both MDS 3.0 and MDS 2.0, unless otherwise noted.

60.     Section P of the MDS is titled Special Treatments and Procedures and requires a SNF to report the number of minutes of skilled rehabilitation therapy the facility provided to a patient during the look-back period as well as the type(s) of therapy provided.  In particular, a SNF must report in Section P the number of days and minutes of therapy the SNF provided to a patient in each of the following skilled rehabilitation therapy disciplines:  physical therapy, occupational therapy, and speech-language pathology.  This information directly impacts the RUG level assigned to each patient and therefore the amount of reimbursement that the SNF will receive for that patient.

61.     In most instances, the RUG level determines Medicare payment prospectively for a defined period of time. *See* 63 Fed. Reg. at 26,267.[4]  For example, if a patient is assessed on day 14 of his stay, and received 720 minutes of therapy during days 7 through 14 of the stay, then the facility will be paid for the patient at the Ultra High RUG level for days 15 through 30 of the patient's stay.

62.     Prior to October 1, 2010, the nursing facility would transmit the MDS form electronically to the state's health department or other appropriate state agency, which in turn would transmit the data to CMS.  42 C.F.R. § 483.20(f)(3) (2009); 42 C.F.R. § 483.315(h)(1)(v) (2009).  Since October 1, 2010, nursing facilities transmit this information directly to CMS.  42 C.F.R. § 483.20(f)(3).

63.     Completion of the MDS is a prerequisite to payment under Medicare. *See* 63 Fed. Reg. at 26,265.  The MDS itself requires a certification by the provider that states, in part: "To the best of my knowledge, this information was collected in accordance with applicable

---

[4] Payment for days 1 through 14 is based on the number of therapy minutes provided through the five-day assessment, as well as an estimate of the number of minutes to be provided through day 14. *See* 63 Fed. Reg. at 26,265-67; 64 Fed. Reg. at 41,662.

Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds." MDS Versions 2.0 and 3.0 for Nursing Home Resident Assessment and Care Screening.

64.    A patient's RUG information is incorporated into the Health Insurance Prospective Payment System (HIPPS) code, which Medicare uses to determine the payment amount owed to the nursing facility. The HIPPS code must be included on the CMS-1450, which nursing facilities submit electronically to Medicare for payment. Medicare Claims Processing Manual, Ch. 25, § 75.5. Medicare payment will depend largely on the HIPPS code the nursing facility submitted as part of the CMS-1450. *See* 63 Fed. Reg. at 26,267; Medicare Claims Processing Manual, Ch. 25, § 75.5.

65.    SNFs submit the CMS-1450 electronically under Medicare Part A to Medicare payment processors known as Medicare Administrative Contractors ("MACs") (formerly known as Fiscal Intermediaries ("FIs")). MACs process and pay Medicare Part A claims for skilled nursing and rehabilitation therapy services in SNFs. From at least January 2006 to the present, SNFs owned or operated by HCR ManorCare have submitted Part A claims to the following FIs/MACs: Highmark; Novitas; National Government Services ("NGS"); and CGS Administrators, LLC ("CGS").

### D.    TRICARE Coverage of SNF Rehabilitation Therapy

66.    TRICARE is a federally funded medical benefit program established by statute. 10 U.S.C. §§ 1071-1110. TRICARE provides healthcare benefits to eligible beneficiaries, including active duty service members, retired service members, and their dependents.

17

67. TRICARE covers the same skilled nursing services as Medicare. The regulatory authority implementing the TRICARE program provides reimbursement to healthcare providers applying the same reimbursement scheme and coding parameters that the Medicare program applies. 10 U.S.C. §1079(j)(2) (2006), redesignated as §1079(i)(2), Pub. L. No. 113-291, Sec. 703 (Dec. 19, 2014) (institutional providers).

68. TRICARE, like Medicare, reimburses only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).

69. TRICARE follows Medicare's PPS and RUGs methodology and assessment schedule, and beneficiaries are assessed using the same MDS form used by Medicare. TRICARE Reimbursement Manual 6010.58-M, Ch. 8, § 2, 4.3.5 – 4.3.7, 4.4.3.

70. Under the TRICARE for Life program, certain beneficiaries who are enrolled in Medicare are still eligible for TRICARE benefits. For these individuals, known as "TRICARE dual eligible beneficiaries," TRICARE is the secondary payer to Medicare and is responsible to the SNF for any amounts not covered by Medicare. *Id.* at 4.4.

71. When TRICARE is the primary insurer for a beneficiary, TRICARE reimburses consistent with Medicare rules and regulations pertaining to SNFs. TRICARE Reimbursement Manual 6010.58-M, Ch. 8, § 2, 4.3.5 – 4.3.7, 4.4.3. When a TRICARE dual eligible beneficiary receives coverage under the Medicare program, Medicare is the primary payer and TRICARE pays the portion not paid by Medicare. 32 C.F.R. § 199.8.

72. Wisconsin Physicians Service ("WPS") administers the TRICARE for Life benefit and processes claims for TRICARE dual eligible beneficiaries. TRICARE dual eligible beneficiaries are not required to submit paper claims to TRICARE for Life, as long as the beneficiary uses a Medicare provider. The Medicare provider submits the claim to Medicare,

18

and after Medicare pays its portion of the Medicare-covered services, Medicare automatically forwards the claims data to WPS for processing. WPS then pays the claim on behalf of TRICARE.

73.     Under TRICARE regulations, providers of medical services must maintain accurate medical records that identify the specific treatment provided to the patient and the patient's response to that treatment. 32 C.F.R. § 199.7(b)(3). Providers of medical services must also provide information and records to TRICARE or its fiscal intermediaries on request in order to receive payment.

74.     TRICARE prohibits practices such as submitting claims for services which are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5).

75.     For TRICARE dual eligible beneficiaries, TRICARE follows Medicare's determination regarding medical necessity and TRICARE will make payment without further independent review of the claims. If services are determined not to be necessary under Medicare, they are not covered under TRICARE. TRICARE Reimbursement Manual 6010.58-M, Ch. 8, § 2, 4.3.16 (Note).

## V.     HCR MANORCARE CONTROLS THE OPERATIONS OF ITS SNFS

76.     HCR ManorCare's corporate Rehabilitation Services Department is organized in a pyramidal structure. The corporate office, at the top of the pyramid, is led by James Pagoaga whose title is Vice President of Rehabilitation.

77.     Below Mr. Pagoaga, are six geographic Divisions each of which is led by a Division Rehab Director who reports directly to Mr. Pagoaga. For most of the time period at

19

issue here the six HCR ManorCare Divisions were Central, Eastern, Mid-Atlantic, Midwest, Southeast, and West. Upon information and belief, in late 2011 HCR ManorCare reorganized its Divisions, removing the Mid-Atlantic Division, and adding the Atlantic Coastal Division.

78.     Each of the six Divisions is further subdivided into Regions. Each Region is managed by a Regional Rehab Manager who reports to the Division Rehab Director who oversees his or her Region.

79.     At the next level down, the Rehabilitation Department at each SNF is managed by a Director of Rehabilitation. These Directors of Rehabilitation are based in individual SNFs and report to the Regional Rehab Manager.

80.     HCR ManorCare's corporate Rehabilitation Services Department, led by Mr. Pagoaga, disseminated policies and procedures that all of HCR ManorCare's SNFs were expected to follow.

81.     Vice President of Rehab Pagoaga, the Division Rehab Directors, and the Regional Rehab Managers held authority over hiring, firing, and compensation decisions for the individual Directors of Rehab at each of HCR ManorCare's skilled nursing facilities.

82.     HCR ManorCare's corporate Operations Department is structured in a similar manner. Stephen Guillard sat at the top of the pyramid as the Executive Vice-President and Chief Operating Officer, until his retirement in December 2011. Steven M. Cavanaugh succeeded Mr. Guillard as the Executive Vice-President and Chief Operating Officer.

83.     At the next level down are the Vice Presidents ("VP") of Operations for each of the six geographic Divisions, who report directly to the Executive Vice President and Chief Operating Officer.

84.     Below the VP of Operations for each Division, there is a Regional Director of

Operations for each region within the Division. The Administrator for each SNF reports to his or her Regional Director of Operations.

85. The administrators at HCR ManorCare's SNFs generally had no clinical training or certification in the provision of skilled rehabilitation therapy. Nonetheless, HCR ManorCare actively encouraged them to participate in planning patient care. As a result, administrators often took an active role in enforcing HCR ManorCare's corporate targets for billing at the Ultra High level and extending the amount of time that patients stayed in HCR ManorCare's SNFs.

86. The therapy staff of each facility typically included physical therapists, physical therapy assistants, occupational therapists, certified occupational therapy assistants, and speech-language pathologists. Some rehabilitation departments also employed physical therapy aides.

87. Each HCR ManorCare SNF had at least one MDS coordinator. This individual, usually a registered nurse, was formally responsible for collecting all of the information needed for the MDS and determining the assessment reference date (and thus the seven-day look-back period that would be used to determine each patient's RUG level). In practice, however, the Director of Rehab at each facility would determine the assessment reference date, and would choose the days that would result in the highest RUG level, and thus, the highest payment to HCR ManorCare.

88. HCR ManorCare submitted the MDS forms to state agencies (prior to October 2010) and then to CMS directly (after October 2010) with the intention that Medicare would rely upon the MDS information to set patient RUG levels and pay HCR ManorCare's claims based on those patient RUG levels.

### A. HCR ManorCare is Actively Involved in the Claims Submission and Payment Process

89. HCR ManorCare Services has direct control over claims for services provided at

21

HCR ManorCare's SNFs, and for the receipt of payment for those services.

90.     HCR ManorCare Services operates and maintains a Central Billing Office in Toledo, Ohio, that bills Medicare and TRICARE on behalf of HCR ManorCare's SNFs.

91.     The Central Billing Office is staffed by employees of Heartland Employment Services, LLC who manage HCR ManorCare's centralized billing system, referred to as the ePremis system. The Central Billing Office is supervised by a Heartland Employment Services, LLC employee. Employees of the Central Billing Office regularly correspond with HCR ManorCare's SNFs from "@hcr-manorcare.com" email addresses, often with "HCR ManorCare" and "Central Billing Office" in the signature block.

92.     Upon information and belief, Central Billing Office employees used the ePremis billing system to generate claims, including the false or fraudulent claims described in this Complaint.

93.     When CMS contractors denied HCR ManorCare's SNFs' claims for payment or requested additional documentation to support the payment, employees of HCR ManorCare Services, including VP of Reimbursement Lazarus, assisted with the process of requesting reconsideration of the denial and subsequent appeal. Such requests for reconsideration or appeal were submitted using letterhead bearing the HCR ManorCare logo.

94.     HCR ManorCare regularly directed CMS contractors to forward communications relating to the SNFs to its Ohio headquarters and not to the SNFs themselves.

95.     HCR ManorCare controlled payments received from Medicare for services provided at its SNFs. On January 7, 2009, Chief Executive Officer Paul Ormond, signing as the "Chain Home Office Administrator of HCR Manor Care Services," and VP of Reimbursement Lazarus, signing as "Authorized Representative," authorized NGS, one of the MACs that

22

services HCR ManorCare's SNFs, to deposit Medicare funds for services delivered at the SNFs into the "Chain Home Office Bank Account." The same communication stated that "[t]he Provider of Services hereby acknowledges that payment to the Chain Home Office will be considered payment to the Provider." As such, HCR ManorCare Services received the proceeds of the false claims noted herein.

## VI.  HCR MANORCARE SUBJECTED ITS SNF PATIENTS TO UNNECESSARY AND POTENTIALLY HARMFUL TREATMENTS IN TO ORDER INCREASE REIMBURSEMENT

96.    From at least October 2006 through May 2012, defendants, through their executives, officers, managers, directors, and employees, systematically pressured SNF administrators and therapists to meet corporate targets for Ultra High therapy billing without regard to patients' actual needs.

97.    The corporate pressure to meet these targets caused HCR ManorCare therapists to provide excessive amounts of therapy that were not reasonable or necessary. In addition, the corporate pressure caused HCR ManorCare therapists to provide generic, non-individualized services – such as excessive group therapy – simply to meet the ever-increasing corporate demand for Ultra High billings.

98.    As a direct result of these practices, HCR ManorCare submitted false statements and false claims to federal healthcare programs and received millions of dollars in reimbursement to which it was not entitled.

### A.    HCR ManorCare Set Goals For Ultra High Therapy Without Regard To Clinical Need

99.    HCR ManorCare instructed that all new patients receive at least 720 minutes of therapy during their first week in the SNF, i.e. the minimum amount of time required to bill at the Ultra High level.

23

100.    In September 2007, Eastern Division Vice President/General Manager Susan Morey gave a presentation titled "Driving the P&L." In this presentation, Ms. Morey directed that therapists should "Consider each patient Ultra High and work down, not up as needed," and set an "Upper RUGs Goal" of "at least 80+%," for HCR ManorCare's Eastern Division.

101.    At least as early as 2007, HCR ManorCare used internally created metrics to monitor the Company's performance in billing Medicare for the highest-reimbursing RUG codes and ADL scores, and to set prospective billing goals divorced from the individualized needs of HCR ManorCare's patient population.

102.    HCR ManorCare's "Rehab Power Rating" reflected the frequency with which an individual facility, Region, or Division billed Medicare at the Ultra High or Very High RUG level.

103.    HCR ManorCare's "Nursing Power Rating" reflected the frequency with which a particular facility, Region, or Division billed Medicare at the highest reimbursing ADL scores.

104.    HCR ManorCare combined the Rehab Power Rating and Nursing Power Rating to determine an individual facility, Region, or Division's "Medicare Power Rating."

105.    HCR ManorCare disseminated Medicare Power Rating scores to the administrators and Directors of Rehab at its SNFs and to corporate executives, including, but not limited to, VP of Rehab Pagoaga, former COO Stephen Guillard, and VP of Reimbursement Barry Lazarus.

106.    HCR ManorCare Division Rehab Directors and Regional Rehab Managers set aggressive goals for its SNFs to increase Medicare Power Ratings.

107.    In 2008, Mid-Atlantic Division Rehab Director Kirsten Ferguson mandated that during the fourth quarter of that year, more than 50 percent of the Medicare beneficiaries in Mid-

24

Atlantic Division SNFs would receive therapy at the Ultra High level. This goal was not based on any clinical determination that the Medicare patients in Mid-Atlantic Division SNFs actually needed additional therapy.

108.    By the first quarter of 2009, HCR ManorCare had increased the goal for Ultra High billings at SNFs in its Mid-Atlantic Division to 72 percent or greater, and, by June 2009, to 75 percent or greater.

109.    In 2010, Mid-Atlantic Division Rehab Director Terri Russell sent a presentation to VP of Rehab Pagoaga titled the "HCR Manor Care Mid-Atlantic 2010 Therapy Goals & Expectations." The presentation set an Ultra High goal of 80 percent or higher and a Rehab Power Rating (Ultra High plus Very High) goal of 92 percent or higher. These goals meant that, prior to any determinations as to what particular patients actually needed, it was expected that at least 80 percent of the Division's Medicare rehab days would be billed at the Ultra High level and that 12 percent would be billed at the Very High level.

110.    In order to meet these goals, Mid-Atlantic division SNFs could not bill more than 8 percent of Medicare rehab days for the entire year at the High, Medium or Low levels. Stated differently, this mandate meant that only 8 percent of the patients in the entire Mid-Atlantic Division could receive less than 500 minutes of therapy per week.

111.    HCR ManorCare's Ultra High goal for the Mid-Atlantic Division rose by more than 30 percent between 2008 and 2010. This targeted increase in Ultra High billings was not based on any clinical study or other evidence that HCR ManorCare's patient population would have a medical need for increased rehabilitation therapy during this period.

112.    In 2010, Ms. Russell also served as Division Rehab Director for the Eastern Division, which consisted of approximately 46 SNFs. In that role, she created and sent to VP of

Rehab Pagoaga a presentation titled "HCR Manor Care Eastern 2010 Therapy Goals & Expectations." In this document, Ms. Russell set the Rehab Power Rating goal for the Eastern Division at 92 percent or greater and the Ultra High goal at 80 percent or greater. These revised goals represented a 10 percentage point increase over the Eastern Division's 2009 Ultra High goals -- again without any clinically-based determination that this increased therapy would be necessary for patients.

113.    In January 2010, Delaine Rice-White, Southeast Division Rehab Director, prepared a document titled "Therapy Strategic Plan Executive Summary 2010," which she sent to VP of Rehab Pagoaga. In this document, Ms. Rice-White set a 94 percent Rehab Power Rating and 82 percent Ultra High as "Operational Targets" for the Southeast Division. In order to meet these targets, no more than six percent of the RUG codes for the entire Division in 2010 could be billed in a category lower than Very High. In other words, 94 percent of the patients in the entire Southeast Division would be required to receive more than 500 minutes of therapy per week.

114.    HCR ManorCare's Regional leadership also set goals for Ultra High billings. For example, in June 2008, the West Region 2 Regional Rehab Manager mailed VP of Rehab Pagoaga an action plan designed to increase each SNF's Ultra High percentage to greater than 55 percent. Likewise, Midwest Region 6 leadership set the 2010 Rehab Power Rating and Ultra High goals at 93 percent and 83 percent, respectively.

**B.    HCR ManorCare Management Enforced Its Ultra High Billing Goals**

115.    In addition to its Medicare Power Ratings, HCR ManorCare communicated and enforced its ever-increasing goals for Ultra High billing through a variety of vehicles, such as

action plans, performance evaluations, facility visits and reviews, ranking reports, "Financial Analysis Worksheets," and "DOR [Director of Rehabilitation] Workbooks."

116.    Facilities that met or exceeded expectations were praised, whereas facilities and facility-level directors that failed to meet targeted levels for Ultra High were placed on "action plans" designed to increase Ultra High billing and Medicare Power Ratings.

117.    A June 2007 action plan for HCR ManorCare's Bethesda, Maryland SNF set the following objective: "Achieve targeted goal for RUG levels at Divisional average for RU and RV combined." Steps for achieving this goal included, among other things, a plan for 50 percent of Medicare Part A patients to get enough therapy at the first assessment reference date to allow the SNF to bill Medicare at the Ultra High level.

118.    A May 2009 action plan for HCR ManorCare's Midwest City SNF set a goal to "Increase [Ultra High] % to >70%."

119.    A January 2010 action plan for HCR ManorCare's Stratford, Virginia SNF identified as a "problem" the fact that the Director of Rehab was "not demonstrating an effective system to ensure full Medicare Entitlement related to service delivery." To address this issue, the action plan required, among other things, that the Director of Rehab email the Regional Rehab Manager every day the names of all patients *not* receiving Ultra High therapy so that the Regional Rehab Manager could review the number of patients not receiving the highest level of therapy services on a daily basis.

120.    Eastern Division Rehab Director Russell reviewed this action plan and directed the Regional Rehab Manager issuing the plan to: (1) include a signature line; and (2) ensure that the Director of Rehab "understand what the outcome will be if he does not achieve the goals...." The signature line that was ultimately included in the action plan reads as follows: "Failure to

meet the agreed upon outcomes in the timeline established, [sic] will lead to disciplinary actions up to and including termination."

121.    HCR ManorCare's Regional Rehab Managers constantly evaluated the Directors of Rehab at each SNF on their ability to achieve Ultra High and Medicare Power Rating targets. An August 2010 evaluation of an Eastern Division Director of Rehab noted: "Upper rug %'es have been consistently below targeted goals for this past year."

122.    Division Rehab Directors also evaluated Regional Rehab Managers on whether the facilities in their Regions met corporate Ultra High and Medicare Power Rating targets. In 2009, Eastern Division Director of Rehab Terri Russell wrote in his evaluation of one of his Regional Rehab managers that "[Ultra High billings] need to increase by 13.6% and RPR [Rehab Power Rating] by 7.5% to at least match [Company] average on these metrics." Mr. Russell insisted on this additional increase even though there already had been a 14 percentage point increase in Ultra High billings in that Region in 2009.

123.    HCR ManorCare's Regional Rehab Managers used facility-level tracking software systems to assess individual patients' RUG categories. In September 2009, Midwest Division Regional Rehab Manager Kathie Dell emailed the Director of Rehab for the West Des Moines, Iowa SNF demanding justification for why specific patients, whom she had likely never seen, met, or evaluated, did not receive enough minutes of therapy so that Medicare could be billed at the Ultra High level. Dell made no reference to whether the amount of therapy that would have triggered reimbursement at the Ultra High rate was actually necessary. Instead, she offered tips on how to reach the Ultra High level. For one patient, Ms. Dell wrote: "CAN'T OT [occupational therapy] DO AN INDIVIDUAL TREATMENT TODAY TO GET THE RU[?] YOU WILL MISS IT BY 27 MINUTES AND THAT IS NOT COOL" (emphasis in original).

28

124. Divisional and Regional management also sent annual, monthly, and sometimes weekly reports to facility-level Directors of Rehab and Administrators. These reports implied – and sometimes explicitly stated – that the company expected every Division, Region, or facility to raise its Ultra High percentages, Medicare Power Rating scores, and average length of stay up to the "company" average with no consideration for how the facility's patient population or staffing levels may differ from its purported "peers."

125. Eastern and Midwest Division leadership used "DOR Workbooks" to enforce corporate expectations for Ultra High and Medicare Power Rating. These Workbooks were spreadsheets which summarized the revenues and profitability of each facility in the Division and tracked metrics such as RUG levels, Medicare Power Ratings, rehab length of stay, and use of group therapy, among other things. One such Workbook sent to the Aberdeen, South Dakota, SNF states: "MPR= 160%. You've achieved our regional goal for Medicare Power Rating. Great job."

126. Similarly, Southeast and West Division leadership used "Financial Analysis Worksheets" to enforce corporate expectations for Ultra High levels and Medicare Power Ratings. These Worksheets were completed either at the facility or Regional level and sent to the Division Rehab Director. An October 2009 financial analysis worksheet for West Division Region 1, completed by Regional Rehab Manager Lynda Jennings, sets a "75% target for [Ultra High] & RPR of 85% or [greater]" for four identified SNFs. This goal for Ultra High billings is 15 percentage points higher than it had been in September 2008, just thirteen months earlier. Neither goal was accompanied by an explanation that the patients needed more therapy.

127. In addition to threatening employees with negative consequences if they did not increase the Medicare billings at facilities that fell short of the corporate goals, HCR ManorCare

gave positive recognition to facilities that billed Medicare at levels consistent with its corporate mandates. The Central Division, for example, awarded and published performance awards for Highest Percent Ultra High, Highest MPR, and Highest Medicare Length of Stay, in 2008 at an annual dinner. VP of Rehab Pagoaga was aware of this practice.

128.     The effect of HCR ManorCare's policies and practices was to impose pressure on facility-level Directors of Rehab and therapists to provide enough therapy to push their Medicare patients into the Ultra High payment level. As a result of this corporate pressure, facility-level Directors of Rehab would set revenue-based RUGs targets for patients instead of relying on the professional judgment of the therapists who were actually treating the patients.

129.     Therapists who worked in defendants' SNFs were expected to do whatever it took to achieve the corporate goals for RUGs billing. If a therapist requested permission to provide fewer minutes of therapy than HCR ManorCare needed to meet its pre-existing goals, the therapist would often be told to "think creatively" about how to get the minutes.

130.     If the number of minutes provided to a patient during a therapy session on an assessment day fell short of the amount needed for Ultra High reimbursement, therapists were instructed by management to "make up" those minutes later on, often returning three times a day and late into the evening.

131.     If a therapist in one discipline (e.g., physical therapy) refused to provide any more minutes of therapy, management would frequently instruct a therapist in a different discipline (e.g., occupational therapy) to make up whatever minutes were needed to move the patient into the Ultra High category.

132.     From at least 2006 through May 31, 2012, HCR ManorCare promoted its self-styled "Medicare Entitlement Philosophy" throughout its SNFs. In furtherance of this

philosophy, HCR ManorCare created a series of presentations for its staff on certain Medicare rules and regulations. These presentations, which were given by corporate staff, were called "Medicare Entitlement Training."

133.    HCR ManorCare's training materials boasted that the Company's "Medicare Entitlement Philosophy" was intended to ensure that Medicare beneficiaries had access to the benefits to which they were entitled by law. In practice, however, HCR ManorCare used Medicare Entitlement Training to bring underperforming centers into compliance with its financial expectations and to secure therapist "buy in" with respect to goals for Ultra High levels, Rehab Power Ratings, length of stay, and use of group therapy.

134.    In a May 2008 action plan, Mid-Atlantic Division Rehab Director Kirsten Ferguson ordered the Director of Rehab at one of the SNFs to " . . . effectively manage patient assignment, scheduling and minutes planning for Med[icare Part] A patients to support full Medicare Entitlement *as measured by* achieving operations targets for Rehab Power Rating and [Highest Practicable Level Length of Stay]." (emphasis added).

135.    A Midwest Division senior-level employee stated in 2009 that: "As our rates drop it is imperative we not just talk the talk but we continue to drive the philosophy of [Medicare Entitlement] down throughout your centers."

136.    HCR ManorCare received several complaints from its therapists and other employees regarding its interpretation of a beneficiary's "Medicare Entitlement." In January 2007, a departing therapist wrote the following comments:

> Your 'Medicare entitlement' philosophy is nothing more than institutionalized gouging. You're ripping off the patients and families with absolutely [sic] concern as to how your keeping patients as long as possible is financially impacting the families. No wonder Medicare is going bankrupt. Your practices border on fraud and you need to be investigated by Medicare.

31

These comments were sent to VP of Rehab Pagoaga. Nonetheless, HCR ManorCare continued to aggressively promote its Medicare Entitlement Philosophy throughout its organization.

C.   **HCR ManorCare Mandated Group Therapy Sessions to Boost Ultra High Billings**

137.   In group therapy, a single therapist conducts the same therapy exercises with two to four beneficiaries at the same time. Until October 1, 2011, if a therapist provided 60 minutes of the same therapy to two, three, or four beneficiaries at the same time, a SNF could attribute 60 minutes of time to each patient when determining that patient's RUG level. *See* FY 2000 SNF PPS final rule 64 Fed. Reg. 41662. On October 1, 2011, CMS began requiring SNFs to divide the amount of time spent administering group therapy among the number of beneficiaries in the group; thus, if 60 minutes of group therapy were provided to four beneficiaries, the SNF could attribute only 15 minutes to each beneficiary. *See* FY 2012 SNF PPS final rule 76 Fed. Reg. 48486.

138.   Concurrent therapy is the treatment of two residents at the same time who are not performing the same or similar activities. Until October 1, 2010, if a therapist provided 60 minutes of concurrent therapy to two beneficiaries at the same time, a SNF could attribute 60 minutes to each patient when determining each patient's RUG level. *See* FY 2010 SNF PPS final rule 74 Fed. Reg. 40288. On October 1, 2010, CMS began requiring SNFs to divide the amount of time spent administering concurrent therapy between the two beneficiaries serviced; thus, if 60 minutes of concurrent therapy were provided, the SNF could attribute only 30 minutes to each beneficiary. *See* FY 2011 SNF PPS final rule 75 Fed. Reg. 42886.

139.   From 2006 through September 2011, HCR ManorCare set aggressive goals for the amount of therapy to be given to beneficiaries in group settings. Because it was the patient's

time in therapy that counted towards the total number of therapy minutes, not the therapist's time, using group therapy provided HCR ManorCare with a means of easily increasing a patient's total therapy minutes, and thus, the RUG level for that patient. HCR ManorCare's aggressive group therapy goals resulted in the delivery of unnecessary group therapy to patients for whom group therapy neither related to their plans of care, nor included activities in which they could have reasonably been expected to participate.

140.    In 2008, an Eastern Division Regional Rehab Manager instructed a subordinate Director of Rehab as follows: "In times of low census, *group the crap out of every Medicare A you have* which will at least boost that number and DRIVE DRIVE those part b federal residents. This is what everyone will be looking at in times of low medicare A [sic] census." (Emphasis added).

141.    In May 2010, VP of Rehab Pagoaga reported to COO Guillard that the Company provided, on average, 15.4 percent of its therapy minutes in group settings. Anticipating CMS' October 2010 implementation of changes to its reimbursement for concurrent therapy, and attempting to find a way to offset the financial impact, VP of Rehab Pagoaga informed COO Guillard of his strategy to "[r]eview opportunity to increase group therapy in all markets with special focus in markets that provide higher concurrent therapy."

142.    A study done by HCR ManorCare in September 2010, just prior to the implementation of the changes in concurrent therapy reimbursement, found that the Company provided 39.5 percent of its minutes as concurrent therapy. The study determined that, as a result of CMS' October 1, 2010 changes, "All patients will drop 1 RUG level."

143.    After CMS implemented its October 2010 changes relating to concurrent therapy, the amount of concurrent therapy HCR ManorCare provided to beneficiaries dropped

dramatically. Correspondingly, between October 2010 and September 2011, the amount of group therapy HCR ManorCare provided increased.

144.    In response to the Company's call to maximize group therapy usage, Directors of Rehab frequently reported to their Regional Rehab Managers that they would increase the use of group therapy within their respective facilities. During this period, the Director of Rehab of the Willowbrook SNF, in Houston, Texas, reported that he would "[i]ncrease group therapy treatment time to expected expectation [sic] of 15%." Another West Division Director of Rehab stated that he would increase group therapy by requiring a group therapy session for each patient every week. Neither Director made any mention of whether these group sessions would be necessary, or whether the sessions would contribute in any way to the treatment of the patient.

145.    In October 2011 when CMS reduced the reimbursement for group therapy, the amount of group therapy that HCR ManorCare provided to its patients dropped precipitously.

146.    Patient A,[5] for example, was a long-term care resident with chronic health problems who was admitted to HCR ManorCare's Topeka, Kansas SNF three times in 2011 and twice in 2012 for therapy services. During the assessment periods of Patient A's admissions in 2011, HCR ManorCare provided between 87 and 180 minutes of group therapy per week to Patient A, in addition to individual therapy services; however, none of the HCR ManorCare therapists documented the types of services that they provided to Patient A in the group setting or how the group therapy services related to Patient A's plan of care, and thus, the group therapy services were not reasonable or necessary. During his 2012 admissions, Patient A received no group therapy at all. In addition, when HCR ManorCare no longer provided group therapy services in 2012, it increased the number of minutes of individual therapy provided to Patient A.

_____

[5] Individual beneficiaries are identified herein by letter only to protect patient privacy. *See* p.52, n.6, *infra.*

34

147.   In particular, for Patient A's third admission in 2011, which occurred between June 20, 2011 and August 1, 2011, HCR ManorCare recorded a total of 2,171 minutes of therapy services, of which 510 (or 23 percent) were group therapy minutes. Based on the total weekly minutes, HCR ManorCare billed Medicare at the Ultra High level, and Medicare paid HCR ManorCare $19,208.10 for the services provided to Patient A during this admission. However, 1,746 minutes, including all of the group therapy minutes, were unnecessary or unreasonable. If HCR ManorCare had billed Medicare only for reasonable and necessary therapy services provided to this patient, Medicare would have paid $9,234.25, and thus HCR ManorCare received $9,973.85 to which it was not entitled.

148.   ManorCare also submitted Ultra High claims, and one non-Ultra High claim, that were based on unnecessary and unreasonable therapy services delivered to this patient during other SNF admissions, as set forth in Exhibit A to the Complaint, described in ¶ 214, *infra*.

**D.   HCR ManorCare Increased Therapy During Assessment Reference Periods Without Clinical Justification to Increase Medicare Payment**

149.   HCR ManorCare therapists commonly "ramped up" the amount of therapy they provided to patients during assessment periods without clinical justification or support for the change. "Ramping" generally describes the practice of providing significantly more minutes of therapy during the assessment periods than outside of the assessment periods in order to maximize the RUG level at which the SNF can bill for a patient.

150.   ManorCare commonly provided less therapy to patients outside of assessment periods despite its purported focus on ensuring that patients received all of the services to which they were "entitled" by the Medicare program.

151.   In 2010, a physical therapist at one of HCR ManorCare's Pennsylvania SNFs described this problem in a document sent to HCR ManorCare's "Care Line" (a hot line for employee and patient complaints) as follows:

> Once a patient has attained the Ultra High Rug level for the highest third party payer reimbursement[,] having received in excess of 720 minutes in an assessment period, their treatments are then scheduled *for as little as 30 minutes per day or 150 minutes per week*. Concern: besides ethics, this could raise a red flag with the third party payer if investigated or audited.

(Emphasis added.)

152.   Patient B was a 63-year-old woman who underwent knee surgery.  She was admitted to HCR ManorCare's Oaklawn West SNF, in Oaklawn, Illinois, four times during 2011 for post-operative physical and occupational therapy.  During the assessment period, Patient B received enough minutes of therapy for ManorCare to be able to bill her therapy at the Ultra High level.  Outside the assessment periods, however, she received far less therapy.

153.   During her first admission in March 2011, Patient B was given 885 minutes of therapy during the first assessment period and 775 minutes of therapy during the second assessment period.  Once the assessments were over, however, she received between 550 and 650 minutes of therapy per week.  None of the therapists treating Patient B documented any clinical reasons to support the increase in her therapy minutes during the assessment periods or the reduction in therapy minutes once the assessment periods had ended.

154.   For this admission from March 4, 2011 to March 28, 2011, HCR ManorCare billed Medicare at the Ultra High level, and Medicare paid HCR ManorCare $15,282.16 for the services provided to Patient B during this admission.  However, of the 1,660 total minutes recorded for this patient during the assessment periods, 360 minutes were unnecessary or unreasonable based on the patient's overall clinical condition and needs, as well as the level of

therapy services provided to the patient outside the assessment periods. If HCR ManorCare had billed only for reasonable and necessary therapy services provided to this patient, Medicare would have paid $10,450.66, and thus HCR ManorCare received $4,831.50 to which it was not entitled.

155.    ManorCare also submitted Ultra High claims that were based on unnecessary and unreasonable therapy services delivered to this patient during other SNF admissions, as set forth in Exhibit A to the Complaint, described in ¶ 214, *infra*.

156.    During Patient B's fourth admission to the SNF in 2011, she received a total of 780 minutes of therapy during the first assessment period and 1,000 minutes of therapy during the second assessment period. Outside of these assessment periods, she received between 615 and 690 minutes of therapy per week. Once again, none of Patient B's treating therapists documented any clinical reasons to support these fluctuations in her treatment.

157.    For this admission from May 31, 2011 to June 26, 2011, HCR ManorCare billed Medicare at the Ultra High level, and Medicare paid HCR ManorCare $13,489.84 for the services provided to Patient B during this admission. However, of the 1,780 total minutes recorded for this patient during the assessment periods, 675 minutes were unnecessary or unreasonable based on the patient's overall clinical condition and needs, as well as the level of therapy services provided to the patient outside the assessment periods. If HCR ManorCare had billed only for reasonable and necessary therapy services provided to this patient, Medicare would have paid $8,493.24, and thus HCR ManorCare received $4,996.60 to which it was not entitled.

158.    ManorCare also submitted Ultra High claims that were based on unnecessary and unreasonable therapy services delivered to this patient during other SNF admissions, as set forth in Exhibit A to the Complaint, described in ¶ 214, *infra*.

159.    HCR ManorCare's leadership was well aware of ramping at its SNFs. In 2008, Rehabilitation Consultants hired by HCR ManorCare conducted an audit of 49 patients from HCR ManorCare's Glenside, Chevy Chase, Alexandria, Silver Spring, Charleston, Ranielle, Dulaney, Towson, and Hyattsville SNFs.  The consultants found that the vast majority of the patients audited were subject to ramping and that the fluctuations in their therapy were not justified by the patient's medical needs:

> The percent of patients with fewer minutes in the post assessment weeks ranged from 71% - 100% depending on the assessment week.  The average variance ranged from 146 to 167 minutes below the RUGs level they were in.  In summary, we have concerns about the practice of patients dropping below their achieved RUGs level without clinical reasons. . . .

160.    In 2009, HCR ManorCare's San Antonio SNF billed 95.7 percent of its "rehab days" at the Ultra High level.  Rehab days are the number of days billed for a patient while on a Medicare Part A stay in a SNF.  In June 2010, HCR ManorCare's Corporate Rehab Consultants audited this facility and found that "Medicare Part A service delivery drops in between assessments, at least one RUG level."

## E.    HCR ManorCare Made Treatment Decisions Based on Minutes Needed for Ultra High Rather Than Patient Needs

161.    Once a patient reaches the Ultra High level additional minutes of therapy do not result in any increase in Medicare payments.  As a result, HCR ManorCare's leadership actively policed against "overdelivery," the delivery of rehabilitation therapy minutes in excess of the 720-minute Ultra High threshold.

162.    HCR ManorCare's "Therapy Management Tips" instruct therapists to "Avoid delivery of therapy minutes above and below minute thresholds set within a RUG category."

163.    In October 2009, Midwest Division Rehab Director Cathleen Johnson stated in an email to her subordinate Regional Rehab Managers: "Eliminate over – delivery – I started writing the word manage instead of eliminate [but] that is not swift enough."

164.    HCR ManorCare's minute management to avoid "overdelivery" is contrary to CMS guidance. CMS 1999 Final Rule on Skilled Nursing Facilities states: "All of the groups were created based on a continuum of minutes being provided, including Ultra High.  Just as we expect to see beneficiaries in the High Rehabilitation sub-category receiving 450 minutes per week, we expect that as many minutes as are needed will be provided to beneficiaries in the Ultra High groups."  64 Fed. Reg. 41644, at 41663 (emphasis added).

F.    **HCR ManorCare's Ultra High Billing Increased Exponentially Between 2006 and 2012**

165.    As a result of the pressure it placed on SNF administrators and therapists to achieve corporate targets for Ultra High RUG levels, HCR ManorCare's Ultra High billings rose significantly between 2006 and 2012.

166.    In October 2006, according to its own data, HCR ManorCare billed Medicare at the Ultra High level for 38.8 percent of all rehab days.  In November 2009, HCR ManorCare billed 80.3 percent of its rehab days at the Ultra High level, more than doubling its October 2006 Ultra High percentage.  This change was not the result of a change in the characteristics of HCR ManorCare's patient population.

167.    Certain HCR ManorCare facilities billed at the Ultra High level for over 90 percent of their rehab days.  For example, HCR ManorCare's Peoria, Illinois, SNF went from billing 35.15 percent of its rehab days at the Ultra High level in October 2006 to billing 93.9

percent in May 2012. During the same time period HCR ManorCare's Whitehall Borough

facility in Pittsburgh, Pennsylvania, jumped from 17.4 percent Ultra High to 95 percent Ultra

High.

## VII. HCR MANORCARE BILLED FEDERAL HEALTHCARE PROGRAMS FOR UNNECESSARY, UNREASONABLE, UNSKILLED, AND POTENTIALLY HARMFUL THERAPY SERVICES

168.    Between October 2006 and May 2012, HCR ManorCare increased its revenues by

billing for Ultra High level therapy that was either unreasonable, unnecessary, and/or did not

constitute a skilled service. In many instances, HCR ManorCare imposed therapy services on its

elderly patients that did not take into account – or were contrary to – their clinical needs.

169.    When seeking payment from federal healthcare programs, it is the provider's

obligation to assure that services provided to beneficiaries are supported by evidence that the

services are necessary and reasonable. *See, e.g.,* ¶ 48, *supra.* HCR ManorCare also routinely

failed to provide support for the reasonableness and necessity of the skilled therapy services

provided to patients.

### A.    HCR ManorCare Billed for Therapy that was Excessive in Frequency, Duration, and Intensity

170.    HCR ManorCare subjected its patients to therapy services that were excessive in

frequency, duration, and intensity. At times, this excessive therapy was potentially harmful to

patients.

171.    For example, Patient C, an 84-year-old man admitted to ManorCare of Palos

Heights West in Illinois, received physical therapy, occupational therapy and speech-language

pathology during his 50-day stay at the SNF. After 30 days, the therapists and the nursing staff

began to document a decline in his medical condition, noting that he reported feeling tired all the

time, hurt all over, and was eating only half of his meals. HCR ManorCare therapists also noted that he was not making any progress in therapy.

172. Despite Patient C's documented decline, HCR ManorCare continued to provide him with enough therapy to qualify for Ultra High reimbursement and to bill Medicare for this excessive treatment. In one instance Patient C was put into group therapy on the same day that his physician ordered palliative care and comfort treatment only, and the therapists had noted on his chart that he had labored breathing and was not verbally responsive. Five days later, HCR ManorCare therapists once again attempted to provide therapy services to Patient C, and documented his refusal. The patient died later the same day.

173. HCR ManorCare billed all of Patient C's rehab days at the Ultra High level, and Medicare paid HCR ManorCare a total of $25,664.43 for the Ultra High level claims. However, Patient C received at least 1,290 therapy minutes that were not reasonable or necessary, which allowed HCR ManorCare to bill at the Ultra High level. If HCR ManorCare had billed only for reasonable and necessary therapy services provided to this patient, Medicare would have paid $7,636.57 for this patient's care. Thus, HCR ManorCare received $18,027.86 to which it was not entitled.

174. HCR ManorCare therapists frequently provided, or attempted to provide, excessive and unnecessary therapy services to other patients who received orders for palliative or hospice care.

175. Patient D, an 85-year-old man diagnosed with end stage cardiomyopathy, was admitted to ManorCare Health Services in Palm Harbor, Florida for rehabilitative therapy in February 2010, after a prior admission to the same facility in 2008. HCR ManorCare's medical record for Patient D indicates that he was to receive hospice care only, and *not* skilled

41

rehabilitative therapy. Despite his diagnosis of end stage cardiomyopathy and physician notes indicating that Patient D had a failure to thrive, HCR ManorCare provided physical therapy, occupational therapy and speech-language pathology services at the Ultra High level, including 75 minutes of physical therapy for each day during the first week of his stay.

176.    Patient D refused therapy on multiple occasions because he was too weak. One therapist even described him in the treatment notes as "medically fragile." Nonetheless, that same therapist often documented providing 70-80 minutes of occupational therapy per session to the patient, and HCR ManorCare billed Medicare for those services.

177.    A therapist or other employee of HCR ManorCare noted that Patient D would reach the 100 day limit for his Medicare SNF benefit on March 29, 2010, and on that date HCR ManorCare finally discharged him to hospice.

178.    For this 2010 admission, HCR ManorCare submitted two claims and billed all of Patient D's rehab days at the Ultra High level, and Medicare paid HCR ManorCare a total of $16,951.47 for the Ultra High level claims. However, Patient D received at least 1,600 unnecessary therapy minutes, without which HCR ManorCare could not have billed at the Ultra High level. If HCR ManorCare had billed only for reasonable and necessary therapy services provided to this patient, Medicare would have paid $11,755.06 for Patient D's care. Thus, HCR ManorCare received $5,196.41 to which it was not entitled.

179.    HCR ManorCare also submitted claims at the Ultra High level which were based on unnecessary and unreasonable therapy services delivered to Patient D for a prior admission to the SNF from July 9, 2008 to August 21, 2008, as set forth in Exhibit A to the Complaint, described in ¶ 214, *infra*.

**B.**   **HCR ManorCare Used Unnecessary Modalities To Increase Therapy Minutes**

180.    "Modalities" are treatments such as ultrasound, shortwave, and microwave diathermy (electrically induced heat) treatments, electrical stimulation (E-stim), hot packs, and whirlpool baths that are used as an adjunct to physical therapy exercises to help reduce pain and inflammation, or to strengthen, relax, or heal muscles.

181.    HCR ManorCare administrators pushed the use of modalities as a way of increasing therapy minutes in order to reach the Ultra High level of reimbursement. One Mid-Atlantic Division Regional Rehab Manager told her subordinate Directors of Rehab that she saw modality use as "minutes insurance."

182.    The unreasonable or unnecessary use of modalities is evident in some of ManorCare's patient files. For example, Patient E, a 65-year-old female had several admissions to HCR ManorCare's Heartland Health Care Center in Whitehall, Michigan. Patient E received physical and occupational therapy services in January 2011 after falling and suffering a foot sprain, which required hospitalization and some pain management. While E-stim and diathermy modalities were part of the physician orders, Patient E's record did not include documentation regarding the indication for use or how the modalities related to the plan of treatment and attainment of therapy goals.

183.    On several days, the minutes of modality treatment exceeded the time spent on therapeutic exercises. On one particular day, Patient E spent 25 minutes completing therapeutic exercises, 30 minutes receiving diathermy, and 20 minutes receiving E-stim. In total, the E-stim minutes accounted for 35 percent of the total physical therapy minutes rendered to Patient E. E-stim further accounted for 125 minutes each during the assessment periods. Without the

43

minutes attributable to the use of modalities, the total minutes for this patient would not have reached the Ultra High level during the assessment periods.

184.    For this particular admission, which lasted from January 21, 2011, until February 4, 2011, when Patient E was discharged to the hospital for surgery, ManorCare recorded a total of 725 minutes, and billed Medicare for the Ultra High level claim.  Medicare paid HCR ManorCare $8,762.18.  However, 480 of these minutes were unnecessary or unreasonable.  If HCR ManorCare had billed only for reasonable and necessary therapy services provided to this patient, Medicare would have paid $6,005.58, and thus HCR ManorCare received $2,756.60 to which it was not entitled.

185.    ManorCare also submitted Ultra High and non-Ultra High claims that were based on unnecessary and unreasonable therapy services delivered to this patient during other SNF admissions from February 5, 2011 to May 31, 2012, as set forth in Exhibit A to the Complaint, described in ¶ 214, *infra*.

186.    In some instances HCR ManorCare's use of unnecessary modalities was potentially harmful to patients.  Patient F, a 68-year-old woman, had three admissions to HCR ManorCare's Heartland of Marietta SNF in Ohio between October 1, 2006 and January 24, 2007, with chronic conditions such as Hepatitis C, cirrhosis, and diabetes.  Upon her first admission in October 2006, Patient F complained of fatigue, generalized pain, and limited mobility.  HCR ManorCare therapists treated Patient F with physical therapy, occupational therapy and diathermy.

187.    On one occasion, the SNF nurses documented that Patient F was lethargic and began heaving and vomiting when they attempted to give her medication at 5:45 a.m.  Two hours later, the nurses notified the physician that Patient F was extremely lethargic and minimally

responsive to stimuli. The patient's family was contacted at 10:05 a.m. and she was transferred
to the hospital. On this same morning, however, at some point between 5:45 a.m. and 10:05
a.m., the physical therapist documented 50 minutes of diathermy given to Patient F with a note
that she was lethargic, slow to respond, and claimed that she "hurt all over." ManorCare's
documentation in Patient F's medical record does not indicate that the use of diathermy was
appropriate or necessary given Patient F's condition.

188. During the period of the 30-day assessment for this admission, ManorCare
increased the minutes of diathermy given to Patient F, so that it could bill at the Ultra High level.
ManorCare recorded a total of 784 minutes, and billed Medicare for the Ultra High level claim.
However, 324 of these minutes were unnecessary or unreasonable.

189. Over the course of the three admissions, HCR ManorCare billed the majority of
the rehab days for Patient F at the Ultra High level by including minutes that were unnecessary
or unreasonable. Overall, Patient F received at least 969 unnecessary therapy minutes, which
allowed HCR ManorCare to bill at the Ultra High level and obtain payment of $18,798.17, of
which it was not entitled to $5,422.02.

## C. HCR ManorCare Billed for Services That Did Not Require the Skills of a Rehabilitation Therapist or That the Patient Did Not Need

190. In order to increase minutes and bill for Ultra High level services, HCR
ManorCare billed for services that did not require the skills of a rehabilitation therapist.

191. For example, Patient G, an 82-year-old woman with a history of uncontrolled
atrial fibrillation, diabetes and peripheral vascular disease, was admitted to ManorCare Health
Services in Kenosha, Wisconsin on six separate occasions. In July 2009, Patient G was admitted
to the SNF from the hospital with orders for physical and occupational therapy services. Upon
admission to HCR ManorCare's SNF, Patient G was evaluated for speech therapy services

despite the absence of an order from her doctor relating to speech therapy. Even though the evaluation showed that Patient G's speech was clear and she was able to make herself understood, a ManorCare speech-language pathologist provided speech therapy to Patient G, and ManorCare billed Medicare for those services.

192.    While Patient G was hospitalized, doctors performed a swallow study and concluded that no further treatment was indicated, except indirect supervision while eating. Notwithstanding this diagnosis, the HCR ManorCare speech-language pathologist altered Patient G's therapy goals to: "alternate solids/liquids, small bites, chew at slow rate," and billed for speech therapy services. The indirect supervision of Patient G's eating prescribed while she was hospitalized does not require the skills of a rehabilitation therapist and is not considered a skilled therapy service.

193.    For this particular admission, which lasted 17 days, HCR ManorCare billed all of the rehab days at the Ultra High level, and Medicare paid HCR ManorCare a total of $10,643.52 for the Ultra High level claims. However, the unnecessary speech therapy minutes were not reasonable or necessary and allowed HCR ManorCare to bill at the Ultra High level. If HCR ManorCare had billed only for reasonable and necessary therapy services provided to this patient for this admission, Medicare would have paid $8,418.51. Thus, HCR ManorCare received $2,495.01 to which it was not entitled.

194.    HCR ManorCare also submitted Ultra High-level and non-Ultra High-level claims that were based on unnecessary and unreasonable therapy services delivered to this patient for other admissions to the SNF on multiple occasions between December 13, 2006, and November 9, 2009, as set forth in Exhibit A to the Complaint, described in ¶ 214, *infra*.

46

195.    HCR ManorCare also billed for unreasonable and unnecessary therapy services delivered to TRICARE dual eligible beneficiaries.  For example, Patient H, a 71-year-old man admitted to ManorCare Health Services Wingfield Hills (Nevada) following a hospitalization for a urinary tract infection, was a TRICARE dual eligible beneficiary.  During his stay at the SNF from August 30, 2010 through September 30, 2010, Patient H received physical therapy, occupational therapy, and speech-language pathology services.  While the patient's plan of care for speech-language pathology included a swallowing evaluation and cognitive treatment, no nurse or physician documented any problems with swallowing, and the patient's record shows no indication that he had any mood, cognitive or behavioral factors that would require cognitive treatment.  Based on the patient's overall medical condition, speech-language pathology services were not reasonable or necessary, yet HCR ManorCare recorded minutes for this therapy, and as a result billed Medicare and TRICARE for Ultra High level claims.  Medicare paid HCR ManorCare a total of $15,558.72 for the Ultra High level claims and TRICARE paid a total of $4,400.  The claims submitted to Medicare and to WPS/TRICARE were false, and therefore HCR ManorCare was not entitled to the full amount it received as payment for these claims.

## VIII.   HCR MANORCARE KEPT PATIENTS IN ITS SNFS LONGER THAN WAS NECESSARY IN ORDER TO INCREASE REIMBURSEMENT

196.    HCR ManorCare set nationwide, Division-wide, Regional, and facility-level targets for length of stay for the purpose of increasing reimbursement.  These targets, and the policies that were implemented in order to reach them, were set by Vice Presidents, Division Directors and Regional Managers without regard to the actual needs of any patients.  The corporate length of stay targets were often communicated throughout HCR ManorCare in the same manner as the Company's goals for Ultra High billing.

47

197.   In June 2007, HCR ManorCare's Midwest Division Vice President of Operations, Dan Wood, put in place a policy that predetermined the number of patients that each facility could discharge per day. This policy prevented facilities from discharging patients who were medically ready to be released if the facility had already met its quota for the day. Midwest Division Rehab Director Cathleen Johnson disseminated this policy to all SNF Administrators and Directors of Rehab in the Midwest Division, among others.

198.   HCR ManorCare's policies created other impediments to discharging Medicare beneficiaries. For example, before discharging a beneficiary who had been in the SNF for less than 35 days, HCR ManorCare required its therapists to contact their Regional Rehab Manager to discuss possible ways to keep the patient longer. In most instances the Regional Rehab Manager had never seen the patient or had any prior discussion with the interdisciplinary team of clinicians and therapists treating the patient. The stated purpose of this policy was to "drive your team's results."

199.   Prior to discharging a Medicare beneficiary, HCR ManorCare a required its SNFs to obtain the approval, by telephone, of one of its "Medicare Operations Specialists." These individuals were often located many states away from the SNF. The stated purpose of this policy was "[t]o assure that you maximize coverage for each resident/patient . . . ."

200.   HCR ManorCare also developed "Hi/Lo-Level Checklists," which set forth several tests and assessments to be performed on a patient just prior to discharge. The Company used these Checklists to justify keeping the patient in the facility longer.

201.   HCR ManorCare disciplined a Midwest Division therapist for discontinuing therapy for patients whose length of stay was less than 35 days without approval by the Regional Rehab Manager or Director of Rehab. The therapist was subsequently counseled to "follow

48

ManorCare's policy and procedure regarding discontinuation of therapy services practices to achieve Medicare Entitlement," and was further notified that if her behavior continued, she would be subject to "further disciplinary action."

202.    In mid-2009, in anticipation of perceived reductions in Medicare payments to SNFs, HCR ManorCare undertook to analyze its "opportunities for enhancing Medicare [length of stay]" in its SNFs and calculated the financial impact of a one-day increase and a two-day increase in length of stay at select SNFs. The Company selected target facilities and implemented what it called "Project Reset." One of the express purposes of this project was to extend length of stay. These efforts were undertaken without regard to whether there was an actual clinical need to keep the patient in the facility.

203.    Project Reset was a success. An "Operations Summary" prepared for HCR ManorCare, Inc.'s January 26, 2010 Board of Directors meeting noted that the Company's fourth quarter 2009 length of stay for Medicare patients increased by 0.7 days over the fourth quarter of 2008. Similarly, in late-2009, VP of Rehab Pagoaga reported to CEO Paul Ormond and the Company's General Managers that 30 of the SNFs at which Project Reset was implemented had higher revenues as a result of Project Reset as well as improved Ultra High levels, noting that "[t]he RU % went up another 1% from prior month to 80.3% with YTD at 75.7%."

## IX.    HCR MANORCARE KNOWINGLY BILLED FEDERAL HEALTHCARE PROGRAMS FOR SERVICES THAT WERE NOT REASONABLE OR NECESSARY

204.    HCR ManorCare knew that federal healthcare programs only paid for skilled rehabilitation therapy services that were reasonable and necessary, consistent with the nature and severity of the patient's illness or injury and particular medical needs, and performed in accordance with accepted standards of medical practices.

A.      **HCR ManorCare Received Numerous Complaints From Its Employees About Corporate Targets And Pressure**

205.    HCR ManorCare knew that its push for increased Ultra High billings and longer patient stays compromised the professional judgment of its rehabilitation therapy staff and caused them to provide unreasonable, unnecessary and unskilled services.

206.    HCR ManorCare's own leadership acknowledged and expressed concerns with the pressure the Company placed on its employees to increase Ultra High billings. For example, on March 10, 2009, Division Rehab Director Rick Grahn sent the following email to VP of Reimbursement Lazarus:

> Barry, Please do not forward or act on this in any way. Below is an example of the pressure that is placed on folks to perform relative to Med[icare Part] A rate. . . . Additionally, it seems that often anything that results in not being above company average is due to 'excuses.' Central division operators have said many times that they refuse to accept the 'excuse' that patients are different. *If therapists suggest planned levels of therapy delivery that are anything other than ultra high, they are labeled as 'uncooperative.'* (Emphasis added.)

207.    Two days later, Division Rehab Director Grahn sent another email to VP of Reimbursement Lazarus (copying VP of Rehab Pagoaga) to inform Mr. Lazarus of a Regional Rehab Manager who had "expressed concern" about "the pressures" that HCR ManorCare's Regional administrators were putting on facility Directors of Rehab to bill all of their Medicare patients at the Ultra High level.

208.    HCR ManorCare received several other complaints from therapists that alleged, among other things, that therapists provided unnecessary therapy, that supervisors pressured employees to increase RUG levels, and that beneficiaries were not discharged until they had exhausted all 100 days of their Medicare Part A SNF benefit.

209.    Numerous therapists resigned due to the constant corporate pressure to provide excessive therapy. These therapists expressed to HCR ManorCare management their

unwillingness to subject Medicare beneficiaries to unnecessary rehabilitation therapy just to increase beneficiaries' RUG levels. Several therapists also stated that they refused to continue to work for HCR ManorCare because they were not allowed to exercise independent clinical judgment, and because they feared losing their licenses.

210.    In 2008, a therapist offered HCR ManorCare the following advice in an exit interview survey that was forwarded to VP of Rehab Pagoaga:

> [D]o not have so much pressure to constantly push [patients] into the highest possible rugs level even if their clinical presentation does not justify it, do not push to have every [patient] on modalities for the sole purpose of getting more minutes in order to up the rugs level. When [patients] are in assessment windows, they should get the same amount of rehab as they do every week as this is what [M]edicare is assuming.

211.    HCR ManorCare was on notice of its own aberrant billing. In July 2011, a private organization sent a letter to CEO Ormond urging "the board to appoint a Special Master expert in Medicare billing procedures to investigate the Company's disproportionate billing for the most highly reimbursed Medicare Resource Utilization Groups ('RUGs')."

212.    One month later, in August 2011, HCR ManorCare's Board of Directors met and discussed this letter.

213.    HCR ManorCare had actual knowledge, recklessly disregarded and/or remained in deliberate ignorance, of the truth or falsity of their claims, representations and certifications made to federal healthcare programs. HCR ManorCare knowingly made, or caused to be made, false or fraudulent claims, representations, and certifications, within the meaning of the FCA, 31 U.S.C. § 3729(b), to Medicare and TRICARE.

**B.      Specific Examples of False Claims**

214.    Attached to and made part of this Complaint is Exhibit A,[6] which contains a

summary chart of 50 false claims made by HCR ManorCare for the eight Medicare beneficiaries

discussed in this Complaint, one of whom is a TRICARE dual eligible beneficiary.  The claims

identified in Exhibit A are a representative sample of false claims submitted to Medicare and

TRICARE by HCR ManorCare between October 1, 2006 and May 31, 2012.  At the time of the

filing of this Complaint, the United States has identified at least 1,159 additional false claims

submitted by HCR ManorCare during the relevant time period.  The claims are false because

HCR ManorCare submitted the claims for payment for therapy services that HCR ManorCare

provided to patients when such services were ineligible for such payment or the patient was

eligible for a lower level of payment than claimed.

**Count I:  False or Fraudulent Claims**

(31 U.S.C. § 3729(a)(1)(A))
(previously 31 U.S.C. 3729(a)(1) (1986))
(All Defendants)

215.    The United States repeats and realleges paragraphs 1 through 214 above, as if

fully set forth herein.

216.    Defendants knowingly presented, or caused to be presented, to an officer or

employee of the United States Government, false or fraudulent claims for payment or approval,

in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), specifically, claims for payment

to Medicare and TRICARE for unreasonable, unnecessary and unskilled rehabilitation therapy.

217.    Because of the defendants' acts, the United States sustained damages in an

---

[6] Exhibit A identifies the beneficiaries by letter (as they are identified herein) and omits the
beneficiary identification numbers to protect patient privacy.  The United States will serve
Defendants with a copy of Exhibit A that identifies each patient by name and patient
identification number.

52

amount to be determined at trial, and therefore is entitled to treble damages under the False
Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation

## Count II: False Statements

(31 U.S.C. § 3729(a)(1)(B))
(previously 31 U.S.C. 3729(a)(2) (1986))
(All Defendants)

218.    The United States repeats and realleges paragraphs 1 through 214 above, as if
fully set forth herein.

219.    Defendants knowingly made, used, or caused to be made or used a false record or
statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C.
§ 3729(a)(1)(B), including false Minimum Data Sets.

220.    Because of the defendants' acts, the United States sustained damages in an
amount to be determined at trial, and therefore is entitled to treble damages under the False
Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

## Count III:  Unjust Enrichment

(All Defendants)

221.    The United States repeats and realleges paragraphs 1 through 214 above, as if
fully set forth herein.

222.    During the time period between October 1, 2006 and May 31, 2012, the United
States paid defendant HCR ManorCare Inc. reimbursements for Ultra High rehabilitation therapy
services when that level of care was neither necessary nor reasonable.

223.    By directly or indirectly obtaining federal funds from Medicare and TRICARE to
which they were not entitled between October 1, 2006 and May 31, 2012, defendants were
unjustly enriched at the expense of the United States, and are liable to account and pay to the

United States such amounts, or the proceeds therefrom, which are to be determined at trial.

### Count IV:  Payment By Mistake

(Defendant HCR ManorCare Services)

224.     The United States repeats and realleges paragraphs 1 through 214 above, as if fully set forth herein.

225.     Defendant HCR ManorCare Services submitted (or caused the submission of) claims for Ultra High rehabilitation therapy to Medicare and TRICARE when that level of care was not necessary, and such claims constitute misrepresentations of material facts in that Defendants misrepresented the level, and in some instances, the skilled nature of the services allegedly provided to Medicare and TRICARE beneficiaries.

226.     The United States paid more money to defendant HCR ManorCare Services than it would have based on the erroneous belief that the defendant was entitled to reimbursement and without knowing that the defendant submitted claims for unreasonable and unnecessary rehabilitation therapy.

227.     The United States, acting in reasonable reliance that the defendant's claims were accurate, complete, and truthful, paid defendant HCR ManorCare Services certain sums of money to which it was not entitled, and thus defendant HCR ManorCare Services is liable to account and pay to the United States such amounts, which are to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in favor of the United States as follows:

I.     On the First and Second Counts against Defendants HCR ManorCare Inc., Manor Care Inc., Heartland Employment Services, LLC, and HCR ManorCare Services, under the False

Claims Act, for the amount of the United States' damages, trebled as required by law, and such

civil penalties as are required by law, together with all such further relief as may be just and

proper.

II.      On the Third Count for unjust enrichment against Defendants HCR ManorCare

Inc., Manor Care Inc., Heartland Employment Services, LLC, and HCR ManorCare Services, for

the damages sustained and/or amounts by which Defendants were unjustly enriched or amounts

by which Defendants retained monies received from reimbursements paid by the United States to

which they were not entitled, plus interest, costs, and expenses.

III.     On the Fourth Count for payment by mistake against defendant HCR ManorCare

Services, for the amounts it obtained to which it was not entitled, plus interest, costs, and

expenses.

IV.      All other relief as may be required or authorized by law and in the interests of

justice.

Dated:  April 10, 2015                    Respectfully submitted,

                                          Benjamin C. Mizer
                                          Acting Assistant Attorney General

                                          *Monika Mine for*

                                          *David Wisem*
                                          _____
                                          MICHAEL D. GRANSTON
                                          ANDY J. MAO
                                          DAVID B. WISEMAN
                                          JESSICA J. WEBER
                                          ALLISON CENDALI
                                          AMY L. LIKOFF
                                          Attorneys, Civil Division
                                          United States Department of Justice
                                          P.O. Box 261, Ben Franklin Station
                                          Washington, D.C. 20044
                                          Tel: (202) 353-8297
                                          Fax: (202) 514-0280

Jessica.J.Weber@usdoj.gov

DANA J. BOENTE
United States Attorney

MONIKA L. MOORE
KEVIN MIKOLASHEK
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Ave
Alexandria, VA 22314
Tel: (703) 299-3779
Fax: (703) 299-3983
Monika.Moore@usdoj.gov
Kevin.Mikolshek@usdoj.gov

Counsel for the United States

**EXHIBIT A**

| Name | HCR ManorCare Facility | Medicare Claim Number | Date of Service on Claim | Thru Date | Date Claim Received | Date Claim Paid | RUG Code Billed | # Rehab Days | Amount Paid |
|---|---|---|---|---|---|---|---|---|---|
| Patient A | ManorCare Health Services - Topeka | 21112901286604OHA | 4/14/2011 | 4/30/2011 | 5/17/2011 | 5/31/2011 | RUC10 RUC20 | 14 days 3 days | $9,999.40 |
| | ManorCare Health Services - Topeka | 21115701765204OHA | 5/1/2011 | 5/31/2011 | 6/13/2011 | 6/24/2011 | RUC20 RUC30 | 13 days 18 days | $14,272.20 |
| | ManorCare Health Services - Topeka | 21118701283704OHA | 6/1/2011 | 6/3/2011 | 7/13/2011 | 7/26/2011 | RUC30 | 2 days | $893.40 |
| | ManorCare Health Services - Topeka | 21118701255004OHA | 6/10/2011 | 6/17/2011 | 7/13/2011 | 7/26/2011 | RVC10 | 7 days | $2,589.65 |
| | ManorCare Health Services - Topeka | 21118701244804OHA | 6/20/2011 | 6/30/2011 | 7/13/2011 | 7/26/2011 | RUC11 | 11 days | $4,913.70 |
| | ManorCare Health Services - Topeka | 21121601159304OHA | 7/1/2011 | 7/31/2011 | 8/10/2011 | 8/18/2011 | RUC11 RUC20 RUC30 | 3 days 16 days 12 days | $13,847.70 |
| | ManorCare Health Services - Topeka | 21125200983504OHA | 8/1/2011 | 8/31/2011 | 9/23/2011 | 9/26/2011 | RUC30 | 1 day* | $446.70 |
| | ManorCare Health Services - Topeka | 21205801173504OHA | 1/26/2012 | 1/31/2012 | 3/2/2012 | 3/12/2012 | RUC 10 | 6 days | $3,080.52 |
| | ManorCare Health Services - Topeka | 21206801022404OHA | 2/1/2012 | 2/29/2012 | 3/14/2012 | 3/22/2012 | RUC10 RUC20 RUC30 | 8 days 16 days 5 days | $12,721.68 |
| | ManorCare Health Services - Topeka | 21209601381004OHA | 3/1/2012 | 3/30/2012 | 4/11/2012 | 4/19/2012 | RUC30 RUC40 | 25 days 4 days | $10,698.68 |
| | ManorCare Health Services - Topeka | 21212801801604OHA | 4/3/2012 | 4/16/2012 | 5/11/2012 | 5/21/2012 | RUC11 | 13 days | $4,795.96 |
| * According to Patient A's medical record, he was admitted on 6/20/2011, and his last day of skilled care was on 8/1/2011 (only 1 day billed on this claim). | | | | | | | | | |
| Patient B | ManorCare of Oak Lawn West | 21109503205104MDA | 3/4/2011 | 3/28/2011 | 4/12/2011 | 4/19/2011 | RUB10 RUB20 | 14 days 10 days | $15,282.16 |
| | ManorCare of Oak Lawn West | 21112502059504MDA | 4/6/2011 | 4/30/2011 | 5/6/2011 | 5/19/2011 | RUB10 RUB20 | 14 days 11 days | $12,971.00 |
| | ManorCare of Oak Lawn West | 21116101705104MDA | 5/1/2011 | 5/19/2011 | 6/13/2011 | 6/24/2011 | RUB20 RUB30 | 5 days 13 days | $9,339.12 |

| Name | HCR ManorCare Facility | Medicare Claim Number | Date of Service on Claim | Thru Date | Date Claim Received | Date Claim Paid | RUG Code Billed | # Rehab Days | Amount Paid |
|---|---|---|---|---|---|---|---|---|---|
| Patient B (cont.) | ManorCare of Oak Lawn West | 21116101711104MDA | 5/20/2011 | 5/27/2011 | 6/13/2011 | 6/24/2011 | RUA10 | 7 days | $2,746.31 |
|  | ManorCare of Oak Lawn West | 21116502238104MDA | 5/31/2011 | 5/31/2011 | 6/15/2011 | 6/28/2011 | RUB10 | 1 day | $518.84 |
|  | ManorCare of Oak Lawn West | 21118702461904MDA | 6/1/2011 | 6/26/2011 | 7/7/2011 | 7/20/2011 | RUB10 RUB20 | 13 days 12 days | $12,971.00 |
| Patient C | ManorCare of Palos Heights West | 20918803272604MDA | 6/10/2009 | 6/30/2009 | 7/9/2009 | 7/21/2009 | RUX11 RUX07 | 14 days 7 days | $13,312.17 |
|  | ManorCare of Palos Heights West | 20921902118604MDA | 7/1/2009 | 7/29/2009 | 8/11/2009 | 8/21/2009 | RUX07 RUC02 | 9 days 19 days | $12,352.26 |
| Patient D | ManorCare Health Services Palm Harbor | 20821700033702 | 7/9/2008 | 7/31/2008 | 8/12/2008 | 8/18/2008 | RUL11 RUL07 | 14 days 9 days | $10,936.60 |
|  | ManorCare Health Services Palm Harbor | 20824701238502 | 8/1/2008 | 8/21/2008 | 9/6/2008 | 9/17/2008 | RUL07 RUB02 | 7 days 13 days | $6,556.13 |
|  | ManorCare Health Services Palm Harbor | 21006703395204MDA | 2/11/2010 | 2/28/2010 | 3/10/2010 | 3/22/2010 | RUX11 RUL07 | 14 days 4 days | $10,052.24 |
|  | ManorCare Health Services Palm Harbor | 21009201240104MDA | 3/1/2010 | 3/19/2010 | 4/6/2010 | 4/16/2010 | RUL07 RUB02 | 12 days 7 days | $6,899.23 |
| Patient E | Heartland Health Care Center - Whitehall | 21104100968104OHA | 1/21/2011 | 1/31/2011 | 3/9/2011 | 3/22/2011 | RUC10 | 11 days | $6,884.57 |
|  | Heartland Health Care Center - Whitehall | 21107000853004OHA | 2/1/2011 | 2/4/2011 | 3/25/2011 | 4/7/2011 | RUC10 | 3 days | $1,877.61 |
|  | Heartland Health Care Center - Whitehall | 21110201024004OHA | 2/5/2011 | 2/23/2011 | 4/19/2011 | 5/2/2011 | RVB10 RUB20 | 14 days 4 days | $7,268.72 |
|  | Heartland Health Care Center - Whitehall | 21111601081804OHA | 2/27/2011 | 2/28/2011 | 5/5/2011 | 5/18/2011 | RVC10 | 2 days | $805.42 |
|  | Heartland Health Care Center - Whitehall | 21111601080304OHA | 3/1/2011 | 3/31/2011 | 5/26/2011 | 6/8/2011 | RVC10 RUC20 RUB30 | 12 days 16 days 3 days | $14,035.55 |
|  | Heartland Health Care Center - Whitehall | 21112301030804OHA | 4/1/2011 | 4/20/2011 | 6/2/2011 | 6/15/2011 | RUB30 | 19 days | $9,203.03 |

**EXHIBIT A**

| Name | HCR ManorCare Facility | Medicare Claim Number | Date of Service on Claim | Thru Date | Date Claim Received | Date Claim Paid | RUG Code Billed | # Rehab Days | Amount Paid |
|------|------------------------|----------------------|--------------------------|-----------|---------------------|-----------------|-----------------|--------------|-------------|
| Patient E (cont.) | Heartland Health Care Center - Whitehall | 21200601167104OHA | 12/15/2011 | 12/30/2011 | 1/2/2012 | 1/20/2012 | RUC10 RUC20 | 14 days 1 day | $8,362.80 |
| | Heartland Health Care Center - Whitehall | 21203801150404OHA | 1/2/2012 | 1/22/2012 | 2/17/2012 | 2/21/2012 | RUC10 RUB20 | 14 days 6 days | $8,982.90 |
| | Heartland Health Care Center - Whitehall | 21205400866004OHA | 1/27/2012 | 1/31/2012 | 2/24/2012 | 3/8/2012 | RVB10 | 5 days | $1,348.40 |
| | Heartland Health Care Center - Whitehall | 21206701004704OHA | 2/1/2012 | 2/29/2012 | 3/8/2012 | 3/21/2012 | RVB10 RUB2D RVB3D | 3 days 14 days 12 days | $9,827.48 |
| | Heartland Health Care Center - Whitehall | 21209700714404OHA | 3/1/2012 | 3/15/2012 | 4/9/2012 | 4/20/2012 | RVB3D RUB0D | 2 days 12 days | $5,495.60 |
| | Heartland Health Care Center - Whitehall | 21216600990404OHA | 5/25/2012 | 5/31/2012 | 6/15/2012 | 6/28/2012 | RMB10 | 7 days | $2,405.83 |
| Patient F | Heartland of Marietta | 20632001122402 | 10/1/2006 | 10/31/2006 | 11/17/2006 | 12/4/2006 | RML11 RVB07 RUB02 | 12 days 16 days 3 days | $8,725.47 |
| | Heartland of Marietta | 20635301533302 | 11/1/2006 | 11/10/2006 | 12/19/2006 | 1/8/2007 | RUB02 | 9 days | $2,386.89 |
| | Heartland of Marietta | 20635301533402 | 11/14/2006 | 11/30/2006 | 12/19/2006 | 1/8/2007 | RUX05 RUC07 | 14 days 3 days | $6,145.20 |
| | Heartland of Marietta | 20701101826702 | 12/1/2006 | 12/31/2006 | 1/11/2007 | 1/29/2007 | RUC07 RUB02 | 13 days 18 days | $8,674.82 |
| | Heartland of Marietta | 20706600572502 | 1/1/2007 | 1/4/2007 | 3/8/2007 | 3/26/2008 | RUB02 | 3 days | $780.63 |
| Patient G | ManorCare Health Services - Kenosha | 20700903753502 | 12/13/2006 | 12/31/2006 | 1/10/2007 | 1/29/2007 | RVL11 RVL07 | 14 days 5 days | $8,171.71 |
| | ManorCare Health Services - Kenosha | 20703301837902 | 1/1/2007 | 1/12/2007 | 2/5/2007 | 2/19/2007 | RVL07 | 11 days | $3,490.99 |
| | ManorCare Health Services - Kenosha | 20921601538904OHA | 7/10/2009 | 7/27/2009 | 8/5/2009 | 8/18/2009 | RUX11 RUL07 | 14 days 3 days | $10,643.52 |
| | ManorCare Health Services - Kenosha | 20924700869804OHA | 8/2/2009 | 8/24/2009 | 9/8/2009 | 9/18/2009 | RUL05 RUL07 | 14 days 8 days | $9,825.74 |

**EXHIBIT A**

| Name | HCR ManorCare Facility | Medicare Claim Number | Date of Service on Claim | Thru Date | Date Claim Received | Date Claim Paid | RUG Code Billed | # Rehab Days | Amount Paid |
|---|---|---|---|---|---|---|---|---|---|
| Patient G (cont.) | ManorCare Health Services - Kenosha | 20927801936904OHA | 8/28/2009 | 9/28/2009 | 10/6/2009 | 10/19/2009 | RUL05 RUL05 RUL07 RUB02 | 10 days 4 days 16 days 1 day | $13,217.10 |
| | ManorCare Health Services - Kenosha | 20930801767404OHA | 10/8/2009 | 10/20/2009 | 11/5/2009 | 11/18/2009 | RUL05 | 12 days | $5,163.12 |
| | ManorCare Health Services - Kenosha | 20932101370004OHA | 10/23/2009 | 10/31/2009 | 11/18/2009 | 12/1/2009 | RUL35 | 9 days | $3,872.34 |
| | ManorCare Health Services - Kenosha | 20934201264504OHA | 11/1/2009 | 11/9/2009 | 12/9/2009 | 12/22/2009 | RUX35 RUX07 | 5 days 4 days | $4,536.36 |

| Name | HCR ManorCare Facility | Claim Numbers | Date of Service on Claim | Thru Date | Date Claim Received | Date Claim Paid | RUG Code Billed | # Rehab Days | Amount Paid |
|---|---|---|---|---|---|---|---|---|---|
| Patient H | ManorCare Health Services - Wingfield Hills | Medicare: 21025601234404OHA | 8/30/2010 | 8/31/2010 | 1/14/2011 | 1/27/2011 | RUX11 | 2 days | $983.70 |
| | ManorCare Health Services - Wingfield Hills | Tricare: 2011027NV979770632235 | same | same | 2/4/2011 | 2/11/2011 | same | same | $275.00 |
| | ManorCare Health Services - Wingfield Hills | Medicare: 21028001004904OHA | 9/1/2010 | 9/30/2010 | 1/24/2011 | 2/4/2011 | RUX11 RUX07 RUC02 | 12 days 16 days 2 days | $14,575.02 |
| | ManorCare Health Services - Wingfield Hills | Tricare: 2011035NV979290659415 | same | same | 2/4/2011 | 2/11/2011 | same | same | $4,125.00 |