# Exhibit A

# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

UNITED STATES OF AMERICA, REID
LAWSON, ex rel., AND STATE OF
GEORGIA, ex rel.,

     Plaintiffs,

     v.

AEGIS THERAPIES, INC., and
BEVERLY HEALTH & REHAB CENTER-
JESUP, d/b/a Golden Living
Center-Jesup,

     Defendants.

CV 210-072

## ORDER

In this False Claims Act action, the Government alleges that Defendant Aegis Therapies, Inc., through its skilled nursing facilities, submitted false Medicare claims to the Government. See Dkt. no. 28 (Compl.), Counts I and II. Relatedly, Plaintiffs bring claims for unjust enrichment and payment by mistake. Id. Counts III and IV. Defendants have filed a Motion for Summary Judgment. Dkt. no. 100. Also, both parties have filed Rule 72(a) Objections to the Magistrate Judge's Daubert Orders. Dkt. no. 144, Defs.' Obj. to Sept. 30, 2014 MJ Order; Dkt. no. 152, Pls.' Obj. to Nov. 13, 2014 MJ Order.

1

AO 72A
(Rev. 8/82)

For the reasons stated below, Defendants' Objections (Dkt. no. 144) are **SUSTAINED**, and Plaintiffs' Objections (Dkt. no. 152) are **OVERRULED**. Because Plaintiffs have failed to produce evidence creating a material issue of fact as to whether Defendants produced false claims to the Government or did so knowingly, Defendants Motion of Summary Judgment (Dkt. no. 100) is **GRANTED**.

### FACTUAL BACKGROUND

Plaintiffs allege that Defendants submitted false claims for reimbursement under Medicare, in violation of the False Claims Act ("FCA"). <u>See generally</u> Compl. The following factual summary is taken from the record, and is presented in a light most favorable to Plaintiffs.

Defendant Beverly Health and Rehab Center-Jesup ("Jesup") is a skilled nursing facility ("SNF") located in Jesup, Georgia. Compl. ¶ 6. Defendant Aegis is a rehabilitation therapy company that provides, under contract, rehabilitation services to residents at SNFs, and Aegis contracts with Jesup to provide rehabilitation services to Jesup's residents. <u>Id.</u> ¶ 8.

#### a. Medicare Coverage of Skilled Nursing Facilities

Medicare Part A covers up to 100 days of SNF care following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b) and (c). An SNF may provide skilled nursing services, skilled rehabilitation

AO 72A
(Rev. 8/82)

therapy services, or both. 42 C.F.R. §§ 409.32, 409.33. The
types of skilled rehabilitation therapy that Defendants offer,
including physical therapy, occupational therapy, and speech
therapy, are to be provided only when reasonable and necessary
to treat the patient's condition. 42 U.S.C. §§ 1395y(a)(1)(A),
1320c-5(a)(1).

Medicare pays SNFs a pre-determined rate for each day of
skilled services, and this rate depends in part on the Resource
Utilization Group (RUG) to which the patient has been assigned.
Compl. ¶ 25. The RUG levels themselves are determined by the
number of therapy disciplines and the number of minutes each
receives over a seven-day period. The various combinations of
disciplines and minutes are stratified into one of five RUG
levels, "Ultra High" being the highest, then "Very High," and so
on down to "Low." Thus, a patient receiving two disciplines of
rehabilitative therapy (such as speech therapy and occupational
therapy), one five days a week and the other three days a week
for a total of 720 minutes, would be in the "Ultra High"
category, whereas the same patient receiving any combination of
three disciplines, five days a week, for a total of 150 minutes
will only be in the "Medium" RUG level. Id.

**b. Allegations from Relator Lawson and the Government**

On April 29, 2010, relator William "Reid" Lawson filed an
FCA, 31 U.S.C. §§ 3729-3733, complaint against Aegis alleging

AO 72A
(Rev. 8/82)

that it provided medically unnecessary therapy services and
billed the Government for these services through Medicare. The
United States intervened in the case on January 10, 2013, and
filed its Complaint on March 11, 2013, against Aegis and Jesup.
See Dkt. nos. 27, 28. The complaint alleged that when Aegis's
therapists would meet with nursing staff to develop a patient
plan of care, it was assumed that patients should be subjected
to skilled services for the full period that Medicare would
cover the benefits (100 days), regardless of a patient's
condition, goals, or progress. Compl. ¶ 44. As specific examples
of medically unnecessary care, the Government contends that
Aegis provided group therapy by assembling a group of 6 to 15
patients to ride a stationary bicycle or participate in a "walk-
a-thon" without regard to outcome, performance, or medical
benefit. The Government also alleges that Aegis encouraged
therapists to provide Patterned Electrical Neuromuscular
Stimulation ("PENS") as a form of rehabilitation therapy, and
once even applied PENS on a comatose patient.[1] Id. ¶¶ 61-66.

Lawson recalls the details of these and other episodes.
Lawson worked for Aegis during the relevant time period in the
Complaint for about three to four months as a staff physical
therapist before his probationary period ended. Dkt. no. 131-8

---

[1] These allegations are discussed in further detail below, but the Court notes
here that these allegations were not fully supported by the evidence produced
during discovery.

(Defs.' Lawson Excerpts), 9:4-10; 10:15-19. In his deposition, he testified that there was a policy at the SNF that the director would need a week's notice before discharging a patient. Dkt. no. 123-8 (Pls.' Lawson Excerpts), 43:10-17. In Lawson's opinion, two or three days would have been enough time to prepare a resident for discharge. Id. Also, Lawson says that when he was working for Aegis "we always ran into this kind of resistance," and that he was under pressure to keep residents for as long as Medicare would pay. Id. at 43:18-44:2. Particularly, if he had a patient in the highest (and most heavily reimbursed) RUG level, he was under pressure to keep them at that level "for as long as you can as long as the bill was being paid." Id.

Additionally, while he does not say that PENS was provided to a comatose patient, he does say that it was provided to at least one patient who, in his judgment, did not need it. Id. at 21:22-22:6. When he inquired about this practice with his superiors, he was told that the method was based on proprietary research. Id. at 23:10-22. He also stated that once he saw "patients lined up around the room, some of them on arm bikes just going and going and going with somebody sitting in the corner for 30 minutes not even looking at them while they are on the phone or down the hall." Id. at 26:14-18.

AO 72A
(Rev. 8/82)

Despite these occurrences, though, Lawson testified that he could not identify a single patient who was kept in therapy so a higher RUG category than was medically necessary could be billed. Defs.' Lawson Excerpts 47:11-23. Additionally, he cannot identify a single patient who he witnessed receiving medically unnecessary services. Id. at 28:25-29:21. For his part, even in the face of the alleged pressure to overbill, Lawson says that all of the services he provided were medically necessary and he did not fabricate any documents. Id. at 19:19-22, 20:4-9.

### c. Aegis's Alleged Practice of Pressuring its Therapists to Maximize Medicare Billing

The Government alleges that Lawson's testimony regarding the pressure he felt to provide medically unnecessary services and the vague examples he provides illustrate Defendants' wider practice of pressuring therapists to bill at the highest RUG levels. As evidence of the allegedly fraudulent management practices, Plaintiffs point to the deposition of Tammy Paulk, Aegis's district manager who oversaw several SNFs where Aegis therapists provided services. See Dkt. nos. 123-7 (Pls.' Excerpts of Paulk Dep.), 107-5 (Defs.' Excerpts of Paulk Dep.) (SEALED). Paulk testified that Aegis tracked "RUG utilization" in RUG reports and set benchmarks for billing patients at certain levels. See, e.g., Paulk Dep. 61:11-64:5. Paulk variously characterized these standards as "benchmarks" and

AO 72A
(Rev. 8/82)

"goals," but she went on to explain that the "goals" were based
on historical data. "If we met it or didn't meet it, there was
no punitive action. It just helped us ask the question of what
changed and what's going on?" Id. Thus, Paulk says they would
compare each month's RUG utilization levels to the same month in
the previous year. If she or her team noticed any changes, it
would prompt them to ask what had changed, such as whether new
doctors have begun to refer patients or others have quit
referring patients, changes in the "hospital census," changes in
the diagnoses and types of patients being referred, changing
dynamics between therapists and nurses within the facility, and
other operational questions. Id.

     Paulk testified that Jesup currently had upper RUG
benchmarks of 75-80%. Id. 63:1-3. If the benchmark was not met
in a given week, Paulk would bring it up in her weekly
discussions with therapy teams in order to find out "what's
going on that would impact that number." Id. at 66:7-11. Paulk
emphasized, though, that the benchmark is not a number that
"must" be reached. Id. Also, she testified that Aegis never
dictates how many minutes of therapy a therapist must complete
for a resident, and that therapists are not compensated based on
how many minutes of therapy they provide. Id. at 85:5-12.

     Additionally, Plaintiffs claim that Aegis's instructional
material shows that it coached its therapists on how to maximize

Medicare billing. For example, a presentation explaining how Medicare examiners review a patient's medical documents for payment stated that "[d]ocumentation throughout the course of the therapy episode is a professional responsibility and a legal requirement," and "[d]ocumentation is necessary for reimbursement." Dkt. no. 123-9 (Documentation Review Training, "Presentation") p. 6. The presentation encouraged therapists to "sell to the reviewer" that the patient's condition required the skilled intervention of a therapist, and that "[d]ocumentation is more of an art than a science." Id. at 9, 11.

### d. Plaintiffs' Experts' Review

In addition to the above evidence, Plaintiff's retained two expert witnesses, Dr. Kenneth Nelson and Nurse Frosini Rubertino, to review what Plaintiffs' claim is a statistically-valid random sample of 30 patients from the Jesup facility. In their review, the experts concluded that 29 of the 30 patients received medically unnecessary care. See Expert Report. The experts noted a "pattern of unreasonable and unnecessary therapy services that are reflected in a practice of beneficiaries receiving all three disciplines (physical therapy, occupational therapy, and speech therapy) at alarmingly high levels of intensity and duration upon return from the hospital." Expert Report at 1. The experts based their findings on a review of the patients' SNF and hospital records. They claim to have routinely

identified conflicts between the types and amount of therapy provided and documented by the facility's therapists and the patient's clinical condition, as documented by the facility's nurses, which showed that the therapy was not reasonable or necessary. Id. at 5-6.

Based on these findings, Plaintiffs retained another expert, JoAnn Thompson, to extrapolate the experts' findings of unreasonable care from the 29 patients in the experts' study to a total of 80 patients at the Jesup facility. Plaintiffs allege that the services Defendants provided to these patients were medically unnecessary, and thus presentation of a claim for these services was false and in violation of the FCA.

### e. Defendants' Experts' Review and Therapists' Testimonies

Defendants also retained an expert, John Stearns, to evaluate the 30 patients that form the basis of the Government's report. See Dkt. no. 108 (Stearns Decl.) (SEALED). In his report, Stearns concludes that while the Government alleges that Defendants had a policy of keeping patients for the full 100 days that Medicare will pay for, only 16 (15.8%) of the 101 episodes of care resulted in 100 days of care. In 85 (84%) episodes of care, the patient did not exhaust his or her benefit before being discharged. Also, Stearns found no documentation for the residents identified in the Government's expert report indicating that 6-15 residents were assembled to use stationary

bikes or conduct a walk-a-thon, as Lawson suggests, and that none of the documentation for the 30 residents indicated that PENS had been provided to a comatose patient. Id. ¶¶ 17-19.

## DISCUSSION

The three motions ripe for the Court's consideration include two Rule 72(a) Objections to the Magistrate Judge's evidentiary Orders and Defendants' Motion for Summary Judgment. Because the resolution of the evidentiary objections will influence the summary judgment analysis, the Court will address those motions first.

### I.   Rule 72(a) Objections to the Magistrate Judge's Orders

Of the two Rule 72(a) motions, Defendants filed the first Objection, Dkt. no. 144, and argue that the Magistrate Judge incorrectly found that Dr. Nelson and Nurse Rubertino are qualified to review and testify as to Defendants' medical payment claims in his September 30, 2014 Daubert Order (Dkt. No. 143). Plaintiffs filed the second Objection, Dkt. no. 152, and argue that the Magistrate Judge incorrectly denied Plaintiffs' request to supplement their expert disclosures in his November 13, 2014 Order (Dkt. no. 148).

#### a. Standard of Review

When a magistrate judge rules on a non-dispositive pretrial discovery matter, parties may object to that ruling and seek review from the district judge under Federal Rule of Civil

AO 72A
(Rev. 8/82)

Procedure 72(a). See Fed. R. Civ. P. 72(a). In reviewing the
magistrate judge's order, the district judge must "modify or set
aside any part of the order that is clearly erroneous or is
contrary to law." Id. The clearly erroneous or contrary to law
standard "is exceedingly deferential." Jackson v. Deen, CV 412-
139, 2013 WL 3991793, at *2 (S.D. Ga. Aug. 2, 2013) (citing
Pigott v. Sanibel Dev., LLC, CV 07-0083-WS-C, 2008 WL 2937804,
at *5 (S.D. Ala. July 23, 2008)). "A ruling is clearly erroneous
where either the magistrate judge abused his discretion or the
district court, after reviewing the entirety of the record, is
left with a definite and firm conviction that a mistake has been
made." Id. (citations omitted). "A decision by the magistrate
judge is contrary to law where it either fails to follow or
misapplies the applicable law." Id. (citations omitted).

      **b. Aegis's Objection to the Magistrate Judge's Order
         Denying Aegis's Motion to Exclude the Testimony of Dr.
         Nelson and Nurse Rubertino**

    The Magistrate Judge has denied Defendants' Motion to
Exclude the Proposed Testimony of the Government's Purported
Experts, Dr. Kenneth M. Nelson, M.D., and Nurse Frosini
Rubertino (Dkt. no. 101). Dkt. no. 143. The Government seeks to
present Dr. Nelson's and Nurse Rubertino's testimony supporting
its claim that Defendants' rehabilitation therapy services were
not medically necessary. Particularly, Dr. Nelson and Nurse
Rubertino have prepared a report surveying the medical records

for 102 incidents of care for 30 of Defendants' residents. <u>See</u>
Expert Report. More often than not, the experts conclude that
the medical services Defendants performed for the patients and
billed to the Government were not medically necessary.

In <u>Daubert v. Merrell Dow Pharmaceuticals</u>, the Supreme
Court held that Federal Rule of Evidence 702 "compels the
district courts to perform the critical 'gatekeepeing' function
concerning the admissibility of expert *scientific* evidence."
<u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004)
(citing 509 U.S. 579, 590 n.7 (1993)). Federal Rule of Evidence
702 provides:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify
> in the form of an opinion or otherwise if: (a) the
> expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand
> the evidence or to determine a fact in issue; (b) the
> testimony is based on sufficient facts or data; (c)
> the testimony is the product of reliable principles
> and methods; and (d) the expert has reliably applied
> the principles and methods to the facts of the case.

Fed. R. Evid. 702. In the Eleventh Circuit, a party seeking
to proffer expert testimony under Rule 702 must satisfy a
three-part inquiry that evaluates whether:

> (1) the expert is qualified to testify competently
> regarding the matters he intends to address; (2) the
> methodology by which the expert reaches his
> conclusions is sufficiently reliable as determined by
> the sort of inquiry mandated in <u>Daubert</u>; and (3) the
> testimony assists the trier of fact, through the
> application of scientific, technical, or specialized

AO 72A
(Rev. 8/82)

expertise, to understand the evidence or to determine
a fact in issue.

<u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004).
Defendants object to the Magistrate Judge's denial of their
motion to exclude Dr. Nelson and Nurse Rubertino on the grounds
that the experts' testimony fails to satisfy each of these three
elements. Analytically, though, Defendants raise two main
points. First, Defendants argue that neither expert is qualified
to opine on appropriate rehabilitation therapies in a skilled
nursing facility. Second, Defendants argue that the standard Dr.
Nelson and Nurse Rubertino employed in evaluating the residents'
medical records is the wrong standard. This argument touches on
both the reliability of the experts' methodology and the
helpfulness of their testimony to the jury. Here, the Magistrate
Judge's determination that these experts employed the correct
standard is clearly erroneous, and thus the experts' testimony
must be excluded because it is not based on a reliable
methodology and it will not assist the trier of fact in
determining a material factual question.

A brief discussion of the relevant Medicare laws (under the
Social Security Act), regulations, and sub-regulatory guidance
is in order. Medicare requires that SNFs like Defendants'
provide "nursing services and specialized rehabilitative
services to attain or maintain the highest practicable physical,

mental, and psychosocial well-being of each resident." 42 U.S.C.
§ 1395i-3(b)(4)(A)(i). As to the provision of medically
necessary services, the Social Security Act mandates that "no
payment may be made . . . for any expenses incurred for items or
services—which . . . are not reasonable and necessary for the
diagnosis or treatment of illness or injury or to improve the
functioning of a malformed body member." Id. § 1395y(a). What
constitutes "reasonable and necessary" services is not defined
in the statute. Likewise, the governing regulation does not
state what, if any, level of improvement is necessary for a
health care service to be medically reasonable and necessary.
However, the regulations indicate that a skilled service may be
medically necessary even if improvement is not possible: "Even
if full recovery or medical improvement is not possible, a
patient may need skilled services to prevent further
deterioration or preserve current capabilities. For example, a
terminal cancer patient may need some of the skilled services in
§ 409.33 [discussing skilled rehabilitation services]." 42
C.F.R. § 409.32(c).

   However, where these statutes and regulations fail to give
a precise standard of what level of improvement is required for
a skilled service to be necessary, the Center for Medicare and
Medicaid Services ("CMS") provides that guidance. In
administering the Medicare program, CMS issues instructions on

14

how to complete the Minimum Data Sheets certifying that the appropriate medical care was provided when a healthcare provider requests reimbursement from government funds.[2] At her deposition, CMS's 30(b)(6) representative Jean Stone testified that CMS's Resident Assessment Indicator ("RAI") Version 3.0 Manual provides the information used to fill out an MDS. Dkt. no. 161-1 (excerpts from "Stone 30(b)(6) Dep."), 34:9-17. The RAI Manual provides that there must be a reasonable expectation of material improvement for speech-language pathology services, physical therapies, and occupational therapies that include skilled therapy services:

> the services must be provided with the expectation, based on the assessment of the resident's restoration potential made by the physician, that the condition of the patient will improve materially in a reasonable and generally predictable period of time, or the services must be necessary for the establishment of a safe and effective maintenance program.

Dkt. no. 161-2 (excerpts from CMS RAI Manual v. 3.0, Ch. 3, O-18).

Defendants argue that, here, part of the Government's accusation against them is that they submitted false Minimum Data Sheets. Compl. ¶ 40. Thus, the standard by which their allegedly "false" claims should be measured, they argue, is

---

[2] The MDS itself requires a certification by the provider that states, in part: "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicare requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds." See Compl. ¶ 36.

whether or not the services billed to the Government were provided "with the expectation, based on the assessment of the resident's restoration potential made by the physician, that the condition of the patient *will improve materially in a reasonable and generally predictable period of time.*" CMS Manual (emphasis added). However, Dr. Nelson and Nurse Rubertino's report, which Plaintiffs rely on to establish a pattern of fraud in Defendants' billing practices, is replete with the phrase "significant improvement" or "significant practical improvement." <u>See generally</u> Expert Report. The phrases occur in the expert report some 306 times, but the phrase "material improvement" is not used once. The experts employ the "significant improvement" and "significant practical improvement" standards on a form that they used to analyze each recorded episode of care for 30 patients at the facility. Some residents received multiple episodes of care, and there were thus a total of 102 episodes analyzed. For each episode, the form had sections where the experts could summarize their conclusions regarding the medical records for the patient under the headings "speech therapy," "occupational therapy," and "physical therapy." Under each of these headings, there is a field stating, for example, "documentation supports skilled therapy as realistic for significant practical improvement," next to which the experts would state "yes" or "no."

16

Throughout litigation, Defendants have highlighted in their various filings before the Court the Government's apparent reliance on the "significant practical improvement" standard as opposed to the "material improvement" standard. The issue first arose in Defendants' 12(b)(6) Motion to Dismiss. See Dkt. no. 66 (Order Granting in Part and Denying in Part Defs.' Motion to Dismiss), p. 17. The Court withheld judgment on the appropriate legal standard at that juncture, but stated that "this issue will be decided at a later stage of the litigation." Id. And it is in Defendants' Objections to the Magistrate Judge's Order that this question has come to fruition.

Because the Expert Report relies so heavily on the "significant improvement" standard, the relevant questions in reviewing the Magistrate Judge's decision will be: (1) legally, what is the correct standard in evaluating Defendants' Medicare claims, and (2) is the Expert Report's reliance on the "significant improvement" standard consistent with the appropriate methodology or potentially helpful to a jury?

As to the first question, this Court finds that the appropriate standard for evaluating Defendants' Medicare claims is the "expectation of material improvement" standard. As discussed above, this is the standard that the CMS provides to SNF providers, and Defendants thus have a right to rely on that

guidance. The Magistrate Judge also reached this conclusion.
Dkt. no. 143, MJ Order, p. 6.

The second question, though, depends on the relative
meanings of "material improvement" and "significant
improvement." Defendants argue that the plain meaning of these
phrases are inherently different: "material" improvement means
any measureable improvement, while "significant" improvement
would suggest a greater degree of improvement than "material."
Indeed, in her 30(b)(6) deposition on behalf of CMS, Stone
reached the same conclusion: "material improvement" means a
"measurable and individualized" improvement, whereas
"significant improvement" also means a measurable and
individualized improvement, but to a greater degree. Stone
30(b)(6) Dep. 23:25-25:4. And at oral argument on this issue,
the Government conceded that the words "material" and
"significant" occupy different points on a continuum of
improvement. When asked if the Government's position was that
"significant improvement" and "material improvement" were
synonymous, the Government stated that "According to CMS . . .
there is a difference between the word material and the word
significant on a continuum, in terms of matter of degree", and
"[s]ignificant is the higher standard." Dkt. no. 153 (Nov. 21,
2014 Hearing Trans.) 19:1-16.

AO 72A
(Rev. 8/82)

And aside from the differences in the plain meaning of the standards, the "material" and "significant" improvement standards also have different regulatory implications. The "material" standard comes from the CMS coverage requirements for SNFs under Medicare Part A. <u>See</u> Stone 30(b)(6) Dep. 23:21-24. The Medicare Part A standard is the appropriate standard at issue here. In contrast, the "significant improvement" standard comes from the CMS coverage requirements for outpatient therapy services, inpatient rehabilitation facilities, and for inpatient SNF services under Medicare Part B. According to Stone, the "significant" standard does not apply in the Medicare Part A side. <u>Id.</u>

Thus, Plaintiffs seek to proffer expert testimony based on a report that repeatedly uses (306 times) a standard of expected improvement that everyone agrees has a different meaning on its face than the applicable "material" standard and also hails from the Medicare Part B regulations, which are not applicable here.[3] Nevertheless, the Government argues that the experts applied the correct standard because Dr. Nelson and Nurse Rubertino, it

---

[3] In Plaintiffs' Response to Defendants' Motion for Summary Judgment, the Government suggests that "Defendants have not put forth any evidence showing that the use of the term 'significant improvement' in this case led to a different result than the term 'material improvement' would have. Nor can they." Dkt. no. 124, p. 15. Aside from the fact that it would be virtually impossible for the Defendants to prove that Plaintiffs' experts, in their subjective analysis, would have come to a different conclusion if they had used the correct standard, it is not Defendants' burden to prove that Plaintiffs' experts are unreliable. Establishing the experts' reliability is decidedly Plaintiffs' duty.

19

argues, were not using the phrase "significant improvement" in the legal sense, but rather in its ordinary sense, to convey that some level of improvement above *de minimis* must be expected in order to bill skilled services under Medicare Part A. <u>See</u> Dkt. no. 123-2 (excerpts from Rubertino Dep.) 40:22-24 (stating that the Report employs the appropriate standards under Part A). To support this argument, the Government presents a Declaration from Nurse Rubertino, where she states that she included the phrase "realistic for significant practical improvement" in the report as merely one factor in describing a resident's potential for improvement, and that based on her personal experience, "the meaning of that phrase is intended to be consistent with Medicare Part A SNF coverage, rather impose a heightened standard from another therapy setting." Dkt. no. 151-1 ("Rubertino Decl.") ¶ 6. Nurse Rubertino emphasizes that she "was not applying any heightened improvement standard used to evaluate inpatient rehabilitation facility claims or outpatient rehabilitation claims." <u>Id.</u>

In his Order denying Defendant's motion *in limine*, the Magistrate Judge accepted this argument and concluded that although "Defendants question whether Dr. Nelson and Ms. Rubertino apply the proper standard [in their Report], Medicare Part A, the Court finds persuasive Plaintiff's repeated assertions that the experts are following the relevant Medicare

Guidance and are not applying the Medicare Part B standard." MJ
Order 6. This holding, though, is inconsistent with Eleventh
Circuit case law on what makes expert opinions helpful to a
jury.

By repeatedly using a standard—either in its regulatory
sense or in its ordinary sense—that is decidedly at odds with
the actual governing standard, Plaintiffs' experts' analysis and
conclusions rest upon repeated and erroneous evaluations of
Defendants' billing practices. By evaluating the instances of
care under the "significant improvement" standard, the experts
analyze "the wrong problem and therefore do not assist the trier
of fact to determine a fact in issue in this case." See Winn-
Dixie Stores, Inc. v. Dolgencorp, LLC, 746 F.3d 1008, 1028 (11th
Cir. 2014). Furthermore, Nurse Rubertino cannot overcome this
flaw in the analysis simply by assuring the Court that she, in
fact, applied the correct standard. "The expert's assurances
that [s]he has utilized generally accepted scientific
methodology are insufficient. . . . Such statements can spring
just as quickly from the ipse dixit of the expert as some
ultimate opinion about causation or toxicity." McClain v.
Metabolife Intern., Inc., 401 F.3d 1233, 1244 (11th Cir. 2005).
Here, the proffered analysis does not "fit" the relevant
question: whether there was an expectation for material
improvement for each of the 102 incidents of care analyzed under

the Expert Report. <u>See</u> <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.").

In addition to not being helpful to the jury, Dr. Nelson's and Nurse Rubertino's testimony could confuse or mislead the jury. As all parties have acknowledged, the "significant improvement" standard is a higher standard than the "material improvement" standard. Thus, the experts' testimony, in the eyes of a jury, could condemn billing practices that are perfectly consistent with Medicare billing standards. <u>See</u> <u>Boca Raton Comm. Hosp., Inc. v. Tenet Health Care Corp.</u>, 582 F.3d 1227, 1233-34 (11th Cir. 2009) (affirming dismissal of an expert's testimony that held defendants to a stricter standard for injury that subsumed perfectly lawful billing practices). "Expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse." <u>Frazier</u>, 387 F.3d at 1263. Here, the experts' repeated conclusion that certain incidents of care lacked the potential for "significant improvement" offers little help to the jury in determining whether those incidents of care had the potential for "material improvement"—the lower standard. Furthermore, the repetition itself could confuse the jury, who may expect that the appropriate standard is actually the

AO 72A
(Rev. 8/82)

"significance" standard. The risk of confusing the jury clearly outweighs any potential benefit the jury would receive from Dr. Nelson's and Nurse Rubertino's testimonies.

Because the experts' testimonies are based on a report that, despite Plaintiff's assurances to the contrary repeatedly applies an incorrect and misleading standard for evaluating the incidents of care, the Magistrate Judge's admission of the experts' testimonies was clearly erroneous and must be set aside. Defendants' Objection to the Magistrate Judge's September 30, 2014 Order (Dkt. no. 143) is **SUSTAINED**, and Dr. Nelson and Nurse Rubertino's expert testimonies must be excluded.

### c. The Government's Objection to the Magistrate Judge's Order Denying the Government's Motion for Leave to Supplement Expert Disclosures

The Magistrate Judge has denied Plaintiff's Motion for Leave to Supplement Expert Disclosures (Dkt. no. 126) because the Government failed to show that the supplementation it requested was either substantially justified or harmless per Federal Rule of Civil Procedure 37(c)(1). Dkt. no. 148. The Government objects to the ruling, and argues that it is erroneous because it has shown that reopening a third round of discovery will not cause "profound" harm to Aegis. Dkt. no. 152.

The Government's request concerns its attempts to shore up its damages claim, which is based on a statistical extrapolation from a subset of the allegedly false claims for 30 residents to

AO 72A
(Rev. 8/82)

a larger set of 80 residents. This extrapolation, if supported, would mushroom the damages the Government seeks from $213,628.38 to about $1.2 million. The government listed Safeguard Services LLC employee JoAnn Thompson, in a supplement to its Rule 26 disclosures, as the expert who will testify on the statistical methods for the extrapolation on the last day of the initial discovery period. Dkt. no. 155-11, p. 2 (U.S.'s Supp. R. 26 Discs.). Because of the Government's dilatory discovery efforts regarding this and other matters, the Magistrate Judge reopened discovery, Dkt. no. 88, to allow Defendants the opportunity to learn more about the Government's extrapolation methods, which were ordered by Thompson and validated by Safeguard Service's Chief Statistician, Dustin Paisley.

Defendants also had the opportunity to depose Thompson, where they and, apparently, the Government learned that she knows little to nothing about the statistical reliability of the Government's extrapolation method. When asked questions about confidence intervals, confidence levels, and other statistician parlance, Thompson would respond that she is "not a statistician," "I do not know the answer to that," "This is all statistician stuff. I do not know what any of this stuff means," ". . . they do their statistician magic and that determines the confidence level." See generally Dkt. no. 155-12 (Thompson Dep. Excerpts), pp. 52-54.

Later, Defendants filed a Motion for Summary Judgment challenging the statistical extrapolation and seeking partial summary judgment on Plaintiffs' damages claim. Dkt. no. 100, pp. 24-25. Realizing that they must now conjure an expert statistician if their extrapolation is to survive summary judgment, Plaintiffs filed a Motion for Leave to Supplement Expert Disclosures in order to designate Paisley as an expert statistician under Rules 26(a)(2) and 37(c)(1). Dkt. no. 126. Plaintiffs requested that the Magistrate Judge open a third round of discovery, for a short spell, for the limited purpose of allowing Defendants the opportunity to depose Paisley and designate a rebuttal witness. Id. at 4. The Magistrate Judge rejected this procedural maleficium because Plaintiffs failed to make any argument that supplementing the expert report was substantially justified under the circumstances, and because Plaintiffs' argument that their failure to properly disclose Paisely was harmless ignored the fact that a third round of discovery would cause significant expense and delay in a case that had already been drawn out for four years. Dkt. no. 148, pp. 4-5.

Plaintiffs argue that the Magistrate Judge's conclusions are erroneous because no trial date has been set, and thus Defendants would have ample time to depose Paisley and prepare a rebuttal witness. Dkt. no. 152, p. 3. Plaintiffs cite two cases

25

where courts allowed parties, under Rule 37(c)(1), to reopen discovery for the limited purpose of adding a previously undisclosed expert where no trial date had yet been set. Id. at 3-4 (citing Vaughn v. United States, 542 F. Supp. 2d 1331, 1337-38 (S.D. Ga. 2008); Richardson v. Korson, 905 F. Supp. 2d 193, 198-200 (D.D.C. 2012)). These cases are distinguishable from the present circumstances. In Vaughn, the court allowed a physician, previously disclosed as a lay witness, to later be disclosed as an expert because the later disclosure was technically timely and did not violate the court's Scheduling Order. Vaughn, 542 F. Supp. 2d at 1336-37. Here, though, Plaintiffs' disclosure of Paisley runs afoul of the Scheduling Order. Likewise, in Korson, the court briefly reopened discovery to allow the defendant to depose a previously disclosed expert whom he initially elected not to depose after the plaintiff filed an "addendum" to the expert report. 905 F. Supp. 2d at 195-96, 99. Here, though, Defendants had no similar opportunity to depose Paisley before discovery closed in order to incorporate his viewpoints in their Daubert and summary judgment briefing.

The Magistrate Judge's Order denying Plaintiffs' request to supplement expert disclosures is not clearly erroneous or contrary to law, and Plaintiffs' Objections to that Order (Dkt. no. 152) are **OVERRULED**.

## II. Defendants' Motion for Summary Judgment

Having determined what evidence will be available at trial, the Court now proceeds to the summary judgment analysis.

### a. Legal Standard

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000). However, where the nonmovant's own sworn testimony contradicts the more favorable testimony of another witness, the court must accept the nonmovant's version of the events. Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material

AO 72A
(Rev. 8/82)

fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. <u>Id.</u> at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. <u>Anderson</u>, 477 U.S. at 257.

### b. The False Claims Act (Counts I and II)

"To establish a cause of action under the False Claims Act, a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." <u>United States ex rel. Walker v. R&F Props. of Lake Cnty., Inc.</u>, 433 F.3d 1349, 1355 (11th Cir. 2005). Here, Defendants argue that Plaintiffs have failed to satisfy the first and third elements.

### i. Falsity

The FCA requires "'proof of an objective falsehood' to show falsity." <u>United States v. AseraCare Inc.</u>, 2:12-CV-245, 2014 WL 6879254, at *9 (N.D. Ala. Dec. 4, 2014) (quoting <u>United States ex rel. Parato v. Unadilla Health Care Ctr., Inc.</u>, 787 F. Supp. 2d 1329, 1339 (M.D. Ga. 2011)); <u>see also</u> <u>United States ex rel. Yannacopoulos v. Gen. Dynamics</u>, 652 F.3d 818, 836 (7th Cir. 2011) ("A statement may be deemed 'false' for the purposes of

28

the False Claims Act only if the statement represents 'an objective falsehood.'") (quoting <u>United States ex rel. Wilson v. Kellogg Brown & Root, Inc.</u>, 525 F.3d 370, 376 (4th Cir. 2008)).

Additionally, true to its title, "the submission of a false claim is the '<i>sine qua non</i> of a False Claim Act violation.'" <u>Hopper v. Solvay Pharms., Inc.</u>, 588 F.3d 1318, 1328 (11th Cir. 2009) (quoting <u>United States ex rel. Clausen v. Lab. Corp. of Am., Inc.</u>, 290 F.3d 1301, 1311 (11th Cir. 2002)). "Improper practices standing alone are insufficient to state a claim under either § 3729(a)(1) or (a)(2) absent allegations that a specific fraudulent claim was in fact submitted to the government." <u>Id.</u>

Here, absent the Government's expert testimony from Dr. Nelson and Nurse Rubertino, there is no evidence in the record that a specific claim presented to the Government by Defendants was false—objectively or otherwise. The allegation that Defendants provided PENS therapy to a comatose patient was not borne out in discovery. Lawson testified that he saw a patient receive PENS therapy when, in his judgment, the patient should not have received that therapy. But this allegation is not tethered to a specific claim presented to the Government. Furthermore, neither the Government nor Lawson was able to connect the alleged group therapy biking/walk-a-thon incident to

29

any particular patients, much less particular claims.[4] Finally, even after the case had progressed for years and Defendants deposed Lawson on the cusp of discovery's close, he was still unable, with a list of the 30 residents in question before him, to identify a single resident or episode of care for which Defendants provided medically unnecessary care or submitted a false claim through Medicare. Lawson Dep. 28:25-29:21.

In short, Plaintiffs have not come forward with admissible evidence of a single claim and said "this one is objectively false." Vague allegations of debatably improper therapy provided to unidentified patients do not create a material issue of fact for an FCA action. Thus, Plaintiffs have failed to establish the "falsity" of any claim Defendants presented to the Government for repayment, and Defendants' motion for summary judgment must be granted.

### ii. Knowledge

While Plaintiffs' failure to satisfy the "falsity" prong would alone be reason enough to grant Defendants' motion for summary judgment, their failure to satisfy the "knowledge" element would also be an alternative and independent ground for granting Defendants' motion.

---

[4] And even if Plaintiffs had identified the participants in this group therapy activity, Plaintiffs never clarified in the record or their pleadings how this type of therapy would give rise to a false claim.

"Knowledge," for purposes of the FCA, means that a person, with respect to information: "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). No proof of a specific intent to defraud is required. Id.

The Government offers the evidence of Aegis's RUG utilization benchmarks and its documentation instructions to therapists as evidence of Defendants' "knowledge" that it was presenting false claims to the Government. However, even when considered in a light most favorable to Plaintiffs, this evidence establishes nothing more than the fact that Aegis implemented prudent business practices.

First, the Government's contention that Paulk "set a goal for billing most patients at the high RUG level" is not supported by any evidence in the record. In her deposition, Paulk made clear that the RUG "goals" were simply historical benchmarks, and were not aspirational. If they were not met, no one was punished or reprimanded. The mere fact that failure to meet the historical benchmark triggered some discussions is not evidence of "pressure" to achieve those benchmarks. Rather, just as Paulk explained in her deposition, the historical benchmarks helped Aegis compare its current "hospital census" to previous

31

months and years. A deviation from past statistics could signal
a change in one of several important variables to the SNF's
business climate, such as doctor referrals, changing patient
demographics, and the relational dynamics between therapists,
physicians, and nurses who work together to create patient plans
of care. The benchmarks, then, were simply a business metric
that allowed Paulk to monitor the facility's pulse. Plaintiffs
have presented no evidence that these metrics were used to
promote or demote therapists, determine bonuses, or provide any
other type of incentive to the therapists. And relatedly,
although Plaintiffs and their experts decry that this 75-80%
benchmark is "alarmingly high," there is absolutely no evidence
in the record from which a jury could base this same conclusion.

     Second, the presentation instructing therapists to "sell"
their services to the Medicare examiners does not, in any way,
establish that Defendants pressured their therapists to present
false claims or provide medically unnecessary care. Plaintiffs
have not pointed to any language or suggestion in the
presentation from which a jury could conclude that Aegis was
pressuring its therapists to make false, as opposed to accurate
and thorough, documentations of each episode of care.

     The Government attempts to transmute evidence of
Defendants' efforts to measure trends in its billing and to
instruct its therapists on effective Medicare documentation into

evidence of a nefarious plan to defraud the Government. However, this evidence merely establishes that Defendants employed prudent business practices, and does not create a material issue of fact as to whether Defendants' knew they or their therapists were submitting false claims to the Government. But even if Plaintiffs had established a question of material fact on this point alone, they still would not be entitled to proceed to trial because "[i]mproper practices standing alone are insufficient to state a claim under either § 3729(a)(1) or (a)(2) absent allegations that a specific fraudulent claim was in fact submitted to the government." Hopper, 588 F.3d at 1328.

Plaintiffs have failed to point to a material question of fact regarding Defendants' "knowledge" that they or their therapists were presenting false claims to the Government. For this reason, the Court must grant Defendants' motion for summary judgment.

### c. Related Claims (Counts III and IV)

Plaintiffs also bring claims for unjust enrichment (Count III) and payment by mistake (Count IV). These claims are purely derivative of the FCA claims. See Compl. ¶ 83 (alleging that Defendants were unjustly enriched by the payments they received based on false claims); ¶ 85 (alleging that the United States mistakenly overpaid Defendants because of their alleged false

AO 72A
(Rev. 8/82)

claims). Because summary judgment was granted as to the FCA claims, summary judgment is due for these claims as well.

**CONCLUSION**

Due in part to their failure to show that their experts would provide a reliable opinion that would assist the trier of fact, Plaintiffs have failed to produce evidence from which a reasonable juror could find that Defendants submitted false claims to the Government under its Medicare program. For this reason and others explained above, Defendants Objections (Dkt. no. 144) to the Magistrate Judge's September 30, 2014 Order are **SUSTAINED**, Plaintiffs' Objections (Dkt. no. 152) to the Magistrate Judge's November 13, 2014 Order are **OVERRULED**, and Defendants' Motion for Summary Judgment (Dkt. no. 100) is **GRANTED**. The Clerk of Court is directed to enter the appropriate judgment.

**SO ORDERED**, this 31ST day of March, 2015.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)