IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | ) | |
| CHRISTINE RIBIK, PATRICK GERARD | ) | |
| CARSON, and MARIE SLOUGH | ) | CIVIL ACTION NUMBERS: |
| | ) | 1:09cv13    (CMH/TCB) |
| Plaintiffs, | ) | 1:11cv1054 (CMH/TCB) |
| | ) | 1:14cv1228 (CMH/TCB) |
| v. | ) | |
| | ) | |
| HCR MANORCARE, INC., | ) | |
| MANOR CARE INC., HCR MANORCARE | ) | |
| SERVICES, LLC and HEARTLAND | ) | |
| EMPLOYMENT SERVICES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' MEMORANDUM IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...............................…..................................................... 1

I.      Legal Standard Governing Motion to Dismiss .……………….…………….. 1

II.     The United States' Complaint States Plausible Claims for Violations of the
        False Claims Act ...…………………………………………………..…………. 2

        A.   Claims For Unnecessary Services Can Give Rise to FCA Liability …....…… 4

        B.   Physician Orders for Therapy Do Not Insulate Defendants From Liability
             for Unnecessary Services ……….……………….…..……………………… 8

        C.   The United States Sufficiently Alleges that HCR ManorCare Knowingly
             Submitted False Claims …………….....………………………..….……… 9

        D.   The Complaint's Representative Examples of False Claims Meet the
             Pleading Standards Under Federal Rules 9(b) and 12(b)(6) ….....…………. 12

        E.   The Complaint Alleges Both a Fraudulent Corporate Scheme and the
             Submission of Specific False Claims With Requisite Particularity ...……… 18

        F.   The Complaint Satisfies Rule 9(b) by Adequately Pleading Scienter ………. 21

III.    The Complaint Sufficiently Informs Each Defendant of Its Role in the
        Alleged Scheme …………..….……………..….………………………………… 25

IV.     The United States has Made Cognizable Claims for Unjust Enrichment
        (Count III) and Payment by Mistake (Count IV) ……………….…………………. 27

CONCLUSION …………………………………………………………………………… 29

## INTRODUCTION

The United States' Consolidated Complaint in Intervention ("Complaint") alleges, in significant detail and with illustrative examples, how HCR ManorCare, Inc., Manor Care, Inc., HCR ManorCare Services, LLC, and Heartland Employment Services, LLC (collectively "HCR ManorCare," "Company," or "Defendants") – which own, operate, control, and staff skilled nursing facilities ("SNFs") around the country – provided excessive rehabilitation (also "rehab") therapy services to patients without regard to the individual patients' medical conditions or needs and for the purpose of billing Medicare and TRICARE at the highest level of reimbursement. The excessive rehab therapy services were not reasonable or necessary, and at times were not skilled in nature, as the regulations require.  As a result, the services failed to meet the coverage requirements governing benefits related to SNF care (also known as the "SNF benefit") and the claims that Defendants submitted or caused to be submitted to Medicare and TRICARE seeking reimbursement for those ineligible services were false.  In addition, Defendants knew or should have known that these services were not eligible for reimbursement under the SNF benefit.

Defendants' motion to dismiss asserts that the Complaint fails to meet the pleading requirements of Federal Rules of Civil Procedure 12(b)(6) and 9(b).  However Defendants' motion fails to demonstrate any pleading deficiencies in the Complaint, and therefore Defendants' motion must be denied.

## I.      Legal Standard Governing Motion to Dismiss

"In reviewing a motion to dismiss, the Court will 'accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff.'"  *Baldino's Lock & Key Serv., Inc. v. Google, Inc.*, No. 1:14-CV-00636, 2015 WL 402927, at *2 (E.D. Va. Jan. 27, 2015) (Hilton, J.) (quoting *Coleman v. Maryland Court of Appeals,* 626 F.3d 187, 190 (4th

Cir. 2010).  Therefore, "[i]n order to avoid dismissal, the Complaint 'need only give the defendant fair notice of what the claim is and the grounds upon which it rests.'"  *Id.* (quoting *Erickson v. Pardus,* 551 U.S. 89, 94 (2007)).  In light of these standards, a motion to dismiss must be denied where the complaint "state[s] a plausible claim for relief that permits the court to infer more than the mere possibility of misconduct."  *Coleman*, 626 F.3d at 190 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

## II.     The United States' Complaint States Plausible Claims for Violations of the False Claims Act

To establish a claim under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, the United States must show: "(1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite intent, *i.e.,* with actual knowledge or deliberate ignorance or reckless disregard of the truth or falsity of the information; (3) that was material; and (4) caused the government to pay out money or forfeit money due."  *United States ex rel. Ahumada v. Nat'l Ctr. for Employment of the Disabled*, No. 1:06-CV-713, 2013 WL 2322836, at *2-3 (E.D. Va. May 22, 2013) (Hilton, J.), *aff'd sub nom. United States ex rel. Ahumada v. NISH*, 756 F.3d 268 (4th Cir. 2014) (citing *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 788 (4th Cir. 1999) ("*Harrison I*")).  As discussed below, the Complaint asserts valid claims against all Defendants under the FCA.

The United States' FCA claims arise from HCR ManorCare's false or fraudulent claims for payment to Medicare and TRICARE for rehab therapy services that were not reasonable or necessary, and at times were not skilled in nature.  In order for rehab therapy services to be covered and reimbursable, those services must meet statutory and regulatory requirements.  In

particular, rehab therapy services must be "reasonable and necessary."[1]  Compl. ¶¶ 46, 68.  In addition, the rehab therapy services must be "skilled."[2] *Id.* ¶¶ 44-45.

In its detailed complaint, the United States alleges that HCR ManorCare engaged in a nationwide scheme from 2006 to at least 2012 to bill Medicare and TRICARE for services that were not reasonable and necessary and/or were not skilled in nature.  *Id.* ¶¶ 4, 6.  The United States alleges that this scheme originated at HCR ManorCare's corporate level, where executives set prospective billing targets at the highest level of reimbursement (known as the "Ultra High" level) and required that all new patients receive enough minutes of therapy during their first assessment period to qualify for Ultra High billing.  *Id.* ¶¶ 59, 99,100, 106-114.  The scheme was implemented through pressure that extended from the corporate level to the SNF administrators, who were threatened with adverse consequences, including termination, if their facilities did not meet the corporate billing goals.  *Id.* ¶¶ 116, 119-124.  HCR ManorCare's SNF administrators, in turn, pressured individual therapists to provide patients with treatment that was neither reasonable nor necessary, for the sole purpose of allowing HCR ManorCare to bill as many patients as possible at the Ultra High level.  *Id.* ¶¶ 128-131.  As a consequence of this pressure, HCR ManorCare's Ultra High billings increased dramatically from 2006 to 2012.  *Id.* ¶¶ 7-16.

---

[1] For rehab therapy services, Medicare only covers claims that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(l)(A).  TRICARE likewise reimburses only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(l)(i).

[2] "Skilled" means that "the service must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel," such as physical therapists, occupational therapists, or speech language pathologists.  42 C.F.R. §§ 409.31(a), 32(a).

Defendants contend that the United States has not stated plausible claims for relief for several reasons.  Defendants argue that the claims cannot be false as a matter of law under the applicable regulations, which Defendants assert are too ambiguous to follow.  Defendants further contend that the Complaint fails to establish the submission of a single false claim or any causal link between the alleged corporate scheme and a single false claim.  Defendants also assert that the Complaint fails to plead the requisite scienter.  In making such arguments, Defendants mischaracterize the United States' allegations and misstate the applicable law.  As set forth below, none of Defendants' arguments provide a basis for the Court to dismiss the United States' FCA or common law claims.

### A.        Claims for Unnecessary Services Can Give Rise to FCA Liability

Defendants contend that the United States' FCA allegations fail "as a matter of law," because the United States has failed to allege "an objectively false statement."  Defs.' Mem. at 13-14.  Specifically, Defendants assert that their claims to Medicare and TRICARE for therapy could not have been false because disagreement over the amount of therapy that is "reasonable and necessary" cannot give rise to an objectively false statement or a false claim.  *Id*. at 13-16. In making these assertions, Defendants ignore well-established case law holding that claims for unnecessary services are actionable as "false" under the FCA.  *See United States ex rel. Riley v. St. Luke's Episcopal Hosp*., 355 F.3d 370, 376 (5th Cir. 2004) ("[C]laims for medically unnecessary treatment are actionable under the FCA."); *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 700-701 (2d Cir. 2001) (claims for medically unnecessary services are "false" under the FCA); s*ee also Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468 (6th Cir. 2011) (adopting reasoning in *Mikes*); *United States ex rel. Augustine v. Century Health Servs.*, 289 F.3d 409, 415 (6th Cir. 2002) (claims for payment submitted in violation of Medicare regulations on which

4

payment is conditioned are "false" claims under the FCA).

Indeed, a court recently rejected the precise argument that Defendants make here in a case with identical facts.  In *United States ex rel. Martin v. Life Care Centers of America,* No. 1:08-cv-251 (E.D. Tenn.), the United States alleged that Life Care provided unnecessary therapy to SNF patients in order to increase its profits by billing more patients to Medicare at the Ultra High resource utilization group ("RUG") level.[3]  Life Care's motion to dismiss, like HCR ManorCare's, argued that the government's claims should be dismissed because a mere disagreement as to the appropriate amount of therapy provided to patients could not give rise to a false claim.  In denying Life Care's motion, the court held that the allegations in the United States' complaint sufficiently stated a plausible claim for relief:

> The Complaint contains many allegations regarding Defendant's actions to influence and direct its therapists, including setting corporate targets at the Ultra High RUG level, pushing for increased Medicare revenue, setting minimum therapy levels, measuring an employee's performance on his ability to bill at an Ultra High RUG level, and rewarding employees who billed at higher RUG levels. . . . The Complaint alleges that these actions, directing and pressuring therapists to bill at higher RUG levels, resulted in Life Care submitting Medicare billings which were knowingly false.  Further, for these allegations, the Complaint provides numerous examples of specific managerial employees who directed these actions and specific Life Care divisions in which these actions took place. Although the parties may dispute how the Medicare regulations should be interpreted, the Complaint itself provides sufficient detail regarding how Life Care allegedly effected FCA violations to survive Defendant's Motion to Dismiss.

*United States ex rel. Martin v. Life Care Ctrs. of America*, No. 1:08-cv-00251 (E.D. Tenn. Mar. 26, 2014) at 19-20.[4]

Other courts have also rejected the argument that because a medical determination is purportedly "subjective," the provider is insulated from FCA liability.  In *United States ex rel.*

---

[3] Life Care, like HCR ManorCare, owns or operates a nationwide network of SNFs.

[4] A copy of this opinion is attached as Ex. 1.

*Landis v. Hospice Care of Kansas, LLC*, No. 06-2455-CM, 2010 WL 5067614, at *4 (D. Kan.

Dec. 7, 2010), the United States alleged that defendants submitted false claims to Medicare for

hospice benefits because the underlying certification that the patients were terminally ill – and

therefore eligible for the hospice benefit – was knowingly false.  The district court denied

defendants' motion to dismiss and expressly rejected the argument that a subjective medical

determination could not give rise to a false claim:

> Defendants argue that a medical opinion regarding whether a patient is
> terminally ill . . . is a subjective medical opinion that cannot be false.  FCA
> liability must be based on an objectively verifiable fact; however, facts that
> rely upon clinical medical judgments are not automatically excluded from
> liability under the FCA.

*Id*. at *4.  *See also United States v. Vitas Hospice Servs., LLC*, No. 4:13-cv-00449-BCW, slip op.

at 9 (W.D. Mo. Sept. 30, 2014) ("The Government alleges that Vitas submitted claims . . . for

hospice services that were not medically necessary. With all reasonable inferences drawn in the

Government's favor, the allegations of the complaint plausibly state a claim for relief under the

FCA.");[5] *United States ex rel. Reid v. Aegis Therapies, Inc.*, No. 10-cv-00072, 2013 WL

5816501, at *7 (N.D. Ga. Oct. 29, 2013) (denying motion to dismiss FCA claims because

government's allegations that speech therapy was not reasonable and necessary "state[] a

plausible claim for relief against the Facility and Contractor under the FCA"); *cf. United States*

*ex rel. Morton v. A Plus Benefits, Inc.*, 139 F. App'x 980, 983 (10th Cir. 2005) (agreeing that

FCA liability must be predicated on objectively verifiable fact, but acknowledging that the court

was not "prepared to conclude that in all instances, merely because the verification of a fact

relies upon clinical medical judgments ... the fact cannot form the basis of an FCA claim").

Defendants rely on *United States v. Prabhu*, 442 F. Supp. 2d 1008 (D. Nev. 2006) for the

_____

[5] A copy of this opinion is attached as Ex. 2.

proposition that a claim is not false where "reasonable persons can disagree regarding whether the service was properly billed to the Government." Defs.' Mem. at 13. Defendants suggest that *Prabhu* supports the position that allegations of unnecessary treatment cannot establish FCA liability *as a matter of law*. This is manifestly incorrect. In *Prabhu*, the Court granted summary judgment on the United States' FCA claims because "[t]he Government has failed to adduce any evidence that . . . from a clinical standpoint—the services were medically unnecessary." *Prabhu*, 442 F. Supp. at 1032. *Prabhu* stands for the unremarkable proposition that, where there is no evidence in the record to support the allegation that the services provided were medically unnecessary, summary judgment is appropriate on claims that billing for those services violated the FCA.

 *Prabhu*, however, does not support the extraordinary assertion that Defendants make here, that *allegations* of billing for unnecessary services – even if proven – cannot support FCA liability. *Prabhu*'s holding is founded on the lack of evidence in the record to support the allegations that the services at issue were unnecessary *in that case*, rather than on the theory that such claims could never support FCA liability under any circumstances. As such, the *Prabhu* decision implicitly supports the United States' position here that such allegations pass muster under Rule 12(b)(6).

 Moreover, Defendants are asking this Court to hold that an allegation of unnecessary treatment cannot give rise to FCA liability, so long as the provider asserts that the treatment was necessary. As a matter of common sense, Defendants' position cannot be correct. If Defendants were correct, any treatment, no matter how unnecessary, could be charged to Medicare as long as the provider was willing to assert that the treatment was appropriate. This would render meaningless the statutory requirement that Medicare pays only for "reasonable and necessary"

treatment.  *See, e.g., Mount Sinai Hosp., Inc. v. Weinberger*, 517 F.2d 329, 334 (5th Cir. 1975) (explaining that the "reasonable and necessary" standard set forth in 42 U.S.C. § 1395y controls whether particular services are covered by Medicare).

HCR ManorCare may contend at trial that patients in HCR ManorCare's SNFs received reasonable and necessary services, and therefore, the alleged claims were not false.  Defendants may not contend, however, that the United States' allegations of unnecessary and unreasonable treatment cannot provide the underpinning for plausible allegations of FCA liability.

**B.     Physician Orders for Therapy Do Not Insulate Defendants From Liability for Unnecessary Services**

Defendants assert that the United States cannot properly allege false claims for unnecessary therapy services without alleging that doctors made false statements. Defs.' Mem. at 13.  This is incorrect.  Physician orders and certification forms merely identify the type of therapy to be provided (i.e., physical therapy, occupational therapy, or speech therapy) and the frequency of therapy (e.g., 5 days a week).  The forms do not include the amount of therapy (i.e., how many minutes of therapy) or the particular exercises to provide to the patient.  As a result, the United States need not allege that physician certifications were false in order to allege that Defendants submitted false claims for unnecessary services.

The Complaint alleges that doctors must certify the need for skilled rehabilitation therapy, Compl. ¶¶ 42-43, but does not allege that doctors prescribed or specifically approved the number of minutes of therapy each patient received.  Rather, the Complaint expressly alleges that HCR ManorCare determined the amount of therapy that patients received, and that these amounts were often unreasonable and unnecessary.  *Id.* ¶¶ 7-16.  These allegations are sufficient to withstand a motion to dismiss.  *See Life Care*, slip. op. at 19 (expressly rejecting defendant's argument that failure to allege false statements by physicians provides a basis for dismissal).

8

Defendants likewise contend that if a physician signs a certification ordering therapy for a patient, the level of therapy billed by the SNF for that patient is deemed by the Centers for Medicare and Medicaid Services ("CMS") to be reasonable and necessary.  Defs.' Mem. at 14 n.10.  This is incorrect as well.  As explained above, the fact that a physician certified the overall need for skilled therapy does not provide HCR ManorCare with a blanket justification for providing a patient with unnecessary and unreasonable amounts of therapy.  *See Life Care*, slip. op. at 19 ("the Medicare requirement that a physician certify services performed does not insulate Defendant from liability resulting from non-compliance with Medicare regulations."); *United States ex rel. Westmoreland v. Amgen, Inc*., 738 F. Supp. 2d 267, 277-78 (rejecting argument that drug company could not be liable for false claims where was drug prescribed by independent physicians).

Indeed, taken to its logical end, Defendants' argument would effectively insulate a SNF from FCA liability where its therapists provided 24 hours of therapy to a patient in a single day merely because the physician certified that the patient needed therapy.  Finally, to the extent that Defendants are contending that doctors, rather than HCR ManorCare managers, administrators or employees, determined the specific number of minutes of therapy that each patient received, that is a factual argument that is not properly resolved on a motion to dismiss.

## C.    The United States Sufficiently Alleges that HCR ManorCare Knowingly Submitted False Claims

Defendants contend that the "reasonable and necessary" standard is so vague and ambiguous that the United States cannot establish falsity "as a matter of law."  Defs.' Mem. at 17-20.  This extraordinary contention cannot be correct.  As the Complaint alleges, the Medicare Benefit Policy Manual describes what constitutes "reasonable and necessary" skilled rehab therapy.  Compl. ¶ 47.  In particular, "reasonable and necessary" means "(1) consistent with the

nature and severity of the patient's individual illness, injury, or particular medical needs; (2) consistent with accepted standards of medical practice; and (3) reasonable in duration and quantity."  *Id.* (citing Medicare Benefit Policy Manual, Ch. 8 § 30).  As a Medicare provider, HCR ManorCare would be familiar with both the Medicare Benefit Policy Manual and the accepted standards of medical practice.  Thus, it is disingenuous for Defendants to argue that the standard under which HCR ManorCare was required to provide therapy services was either "unknown" or too vague to be knowingly violated.  Again, Defendants take an extreme position that would effectively insulate all SNFs from FCA liability for all therapy services provided to patients no matter how unrelated those services are to the patients' individual needs or how inconsistent with standards of medical practice.

Moreover, as demonstrated in the previous section, numerous decisions support the proposition that the "reasonable and necessary" standard is sufficiently precise as to allow for "knowing" violations of the FCA.  *See, e.g., Riley*, 355 F.3d at 377 (allegations that defendants knew they were "rendering inordinate care in unnecessary circumstance" were sufficient to state FCA claims); *Mikes*, 274 F.3d at 700-701 (FCA violation may be based on assertion that claims for medically unnecessary services are false); *Chesbrough*, 655 F.3d at 468 (same).

The United States' Complaint contains numerous, detailed allegations that Defendants knew, or at a minimum recklessly disregarded, whether therapy services that they were billing to Medicare and TRICARE were reasonable and necessary.[6]  First, the United States specifically alleges that HCR ManorCare billed Medicare for therapy that was provided to patients in situations where the physician had not certified that the patient needed the particular type of treatment.  Compl. ¶¶ 172, 175, 191-92.  For example, the Complaint alleges that despite

---

[6] The FCA defines "knowingly" to include both "deliberate ignorance" and "reckless disregard" and "require[s] no proof of specific intent to defraud."  31 U.S.C. § 3729(b)(1).

physician notes indicating that Patient D had failure to thrive and no prescription for skilled

therapy, HCR ManorCare administered physical therapy, occupational therapy, and speech

therapy services to Patient D at the Ultra High level and billed Medicare for these services.

*Id*. ¶ 175.

Second, the Complaint alleges corporate-wide policies that encouraged, and arguably

required, HCR ManorCare SNFs to provide therapy without regard to the individual patients'

needs, thereby clearly demonstrating, again, at least reckless disregard for the truth or falsity of

Defendants' claims to Medicare.  *See, e.g*., *id*. ¶¶ 59, 99 (requirement that all SNF patients

receive enough therapy to be billed as Ultra High during their first assessment period); ¶¶ 116-24

(corporate pressure on individual SNFs to bill more of rehab days at Ultra High), and ¶¶ 120,

122-23 (threatening SNF administrators with negative consequences, including termination, if

they did not meet Ultra High billing targets that were set prospectively and without regard to

individual patient needs or particular patient populations).

Third, as discussed in Section F, *infra* at pp. 21-25, the Complaint alleges that HCR

ManorCare management was repeatedly put on notice that HCR ManorCare was billing federal

healthcare programs for unnecessary services.  As a whole, these allegations are more than

sufficient to state a claim that HCR ManorCare knew, or was in reckless disregard of, the truth or

falsity of its claims.  *See, e.g., United States ex rel. Kane v. Healthfirst*, No. 11-cv-2325,

2015 WL 4619686, at *18 (S.D.N.Y. Aug. 3, 2015) (denying motion to dismiss because "the

Government has pleaded facts that are consistent with recklessness or deliberate ignorance").

Defendants further assert that the United States' FCA allegations should be dismissed

because their interpretation of the Medicare regulations was "reasonable."  Defs.' Mem. at 17,

18, n.17.  This is nothing more than an assertion that the United States' allegations with regard to

Defendants' state of mind are incorrect.  As a result, this argument has no bearing on the resolution of a motion to dismiss.  *See, e.g., Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."); *Life Care*, slip op. at 19 (denying motion to dismiss because defendant's argument "invites the Court to interpret the Medicare regulations rather than attacking the sufficiency of the Government's Complaint").

The United States has made precise, detailed allegations that Defendants knowingly submitted or caused the submission of claims for unreasonable and unnecessary therapy services, and therefore possessed the requisite scienter under the FCA.  As a result, Defendants various scienter arguments do not provide the Court with any basis on which to dismiss the United States' claims.[7]

### D.    The Complaint's Representative Examples of False Claims Meet the Pleading Standards Under Federal Rules 9(b) and 12(b)(6)

Defendants erroneously contend that, although the Complaint sets forth 52 specific false claims for eight different patients, the Complaint lacks sufficient particularity under Rule 9(b).  *See* Defs.' Mem. at 20-22.  Defendants' selective and self-serving reading of the Complaint ignores the primary purpose of Rule 9(b), which is "to ensure[ ] that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . ." *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 921 (4th Cir. 2003) ("*Harrison II*") (citations omitted).  Moreover, Rule 9(b) does not require the United

---

[7] Defendants cite the settlement agreement in *Jimmo v. Sebelius*, No. 11-0017 (D. Vt. Oct. 16, 2012) as support for their argument that the reasonable and necessary standard is too vague to support even an allegation of FCA scienter.  Defs.' Mem. at 18.  As the court noted when the defendant in *Life Care* made the exact same argument, the settlement agreement in another case cannot have any bearing on the resolution of a motion to dismiss.  *See Life Care*, slip op. at 20.

States to plead its allegations with the level of detail required to prove its case, as Defendants seem to be contending.  *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 189 & n.29 (5th Cir. 2009) (Rule 9(b) "ought not to be read to insist that a plaintiff plead the level of detail required to prevail at trial") citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007).  The Complaint, including the representative examples of patients and false claims, easily passes muster under Rule 9(b), because the Government's allegations provide sufficient notice to Defendants of the precise misconduct alleged by the United States.

As its first example, the Government describes a scheme through which Defendants used group therapy to increase the number of minutes provided to patients, and thus increase the level of reimbursement.  Compl. ¶¶ 137-145.  As alleged in the Complaint, Defendants' practices "resulted in the delivery of unnecessary group therapy to patients for whom group therapy neither related to their plans of care, nor included activities in which they could have reasonably been expected to participate." *Id.* ¶ 139.  The United States also alleges that SNFs are required to ensure that their patients' medical records support that the therapy services provided, including group therapy, are necessary and reasonable.  *Id.* ¶¶ 48, 169.  Patient A is one such patient who received a high volume of group therapy services that were not reasonable or necessary, because Patient A could not benefit from the group therapy services, which were not related to his plan of care as reflected in his medical record.  *Id.* ¶ 146.

Defendants contend that they could not have violated the FCA because the Medicare payment rules did not require documentation of either group therapy activities or of how group therapy related to a plan of care at the time Patient A received services in 2011.  Defs.' Mem. at 22.  As support for this contention, Defendants cite to the final rule published on August 8, 2011, and effective October 1, 2011, which implemented certain changes relating to the payment for

13

group therapy services.  *See id.* (citing 76 Fed. Reg. 48,486, 48,512-17 (Aug. 8, 2011)).

However, Defendants conveniently overlook portions of the final rule in which CMS states:

> [W]e did not propose new documentation requirements for group therapy . . .
> In fact, these documentation requirements have been in place all along . . . The
> regulations at [42 C.F.R.] § 409.17(c) and § 409.23(c) require that, in order
> for Medicare to pay for therapy in a SNF, a therapy plan of care must be in
> place and that it must include certain information.

76 Fed. Reg. at 48,516.  As CMS noted in the proposed rule, "[b]ecause group therapy is not

appropriate for either all patients or all conditions . . . SNFs should include in the patient's plan

of care an *explicit justification for the use of group*. . . ."  76 Fed. Reg. 26,364, 26,388 (May 6,

2011) (emphasis added); *see also* 76 Fed. Reg. at 48,512.  Thus, at the time Patient A received

services at Defendants' SNF, it was indeed the rule that SNFs had to justify how group therapy

activities related to the patient's plan of care, and Defendants' assertion to the contrary lacks

merit.

       With respect to Patients B, E, and F, Defendants insist that, in order for the United States

to allege false claims, there needs to be some explicit statute or regulation requiring a provider

to: (1) explain when it provides variances in the number of minutes delivered during assessment

periods and (2) document the reasons for using modalities.  Defendants are incorrect, and the

United States need only plead that Defendants knowingly billed for services for which they were

not entitled to payment.  *See United States ex rel. Badr v. Triple Canopy, Inc.*, 775 F.3d 628, 636

(4th Cir. 2015), *petition for cert. filed,* (U.S. June 5, 2015) (No. 14-1440).  The Complaint

sufficiently alleges that Defendants made false statements and engaged in a fraudulent course of

conduct to increase the number of minutes delivered to patients and knowingly billed for

excessive and unreasonable therapy services for which they were not entitled to payment.

       Specifically, the Complaint alleges that, in order to be paid, Defendants – through their

SNFs – completed Minimum Data Set ("MDS") forms for each patient assessing the patient's

clinical condition, physical and mental functioning, and actual and *expected* use of services.

Compl. ¶¶ 58, 63 (emphasis added).  The number of therapy minutes administered to a patient

during an assessment period affects the payment prospectively until the next assessment date.

*Id.* ¶¶ 60-61.  In the MDS form, Defendants – through their SNFs – certified that the information

contained in the forms met all applicable Medicare requirements.  *Id.* ¶ 63.  This includes the

requirements that services rendered to patients are reasonable and necessary and that the provider

maintains a medical record that sufficiently supports the reasonableness and necessity of the

services provided.  *Id.* ¶¶ 46-48.

The Complaint further alleges that, in many cases, Defendants manipulated their

prospective payments by providing more therapy minutes during the assessment period (which

sets the payment level) and then decreasing the therapy minutes provided on days where the

minutes were not included in the calculation of the payment level (a practice known as

"ramping").  *Id.* ¶¶ 149-151.  For instance, Defendants recorded a significant number of therapy

minutes for Patient B during two assessment periods, but precipitously decreased therapy

minutes after the assessment periods had ended.  *Id.* ¶ 153.  There were no clinical reasons to

support the variances of the minutes provided during and after the assessment periods.

Defendants' statements in the MDS forms were false because they did not accurately support the

amount of therapy that was reasonably expected and necessary for Patient B's individual needs

as reflected in his medical record.  Moreover, in light of the absence of clinical justification in

the medical record to support the increase in therapy during the period of time when more

minutes would increase the payment level, the United States has plausibly alleged that the

deviation was not attributable to the individual patient's needs, but to the Defendants' interest in

increasing the payment.

Similarly, the Complaint sufficiently alleges that Defendants engaged in a fraudulent course of conduct in connection with modalities, which are treatments used as an adjunct to physical therapy exercises for such reasons as reducing pain or healing muscles.  *Id.* ¶ 180.  In particular, the Complaint alleges that Defendants used modalities as a way of increasing minutes delivered to patients during the assessment periods.  *Id.* ¶¶ 183, 188.  In Patient F's case, diathermy was administered while the patient was in distress and "minimally responsive to stimuli" so that Defendants could increase minutes and bill at the Ultra High level.  *Id.* ¶¶ 187-88.  Just like with group therapy or deviations of minutes during the assessment period, the use of modalities must be reasonable and necessary for the individual patient, and this must be supported by the medical record.  The Complaint alleges that Patient E's medical record does not contain such information and Patient F's medical record indicates that the modality was not appropriate or necessary based on the patient's medical condition.  *Id.* ¶¶ 182, 187.  The Complaint sufficiently pleads that the Defendants' use of modalities was not reasonable and necessary, and was not dictated by the individual patient's needs, but by Defendants' desire to increase the RUG level payment.

In challenging the representative examples of Patients C and D, Defendants misconstrue the allegations in the Complaint.  Defendants assert that, in order to properly plead a false claim, the United States was required to allege that these patients elected to receive hospice care and that "unnecessary rehabilitation continued thereafter."  Defs.' Mem. at 23.  Whether these patients elected hospice is irrelevant; what is relevant is that the Defendants subjected these patients–who were extremely ill and suffering from complicated medical conditions–to unreasonable amounts of physical, occupational, and speech therapy.  The Complaint alleges that these two terminally ill patients received therapy services that were excessive in frequency,

duration and intensity, because their medical conditions did not support the need for skilled

therapy services at the Ultra High level.  Compl. ¶ 170.  In fact, the patients' medical files

document their serious illnesses, fragility, and decline.  *Id.* ¶¶ 171-72, 175-77.

To qualify for the Ultra High level, Defendants had to render therapy to these patients for

a minimum of 720 minutes per week, with at least one discipline providing services for at least

five days per week.  *Id.* ¶ 52.  This means that, in a five-day period, Patients C and D would have

received over two hours of therapy services per day.  As noted above, even if a physician ordered

the type of therapy, Defendants' SNFs had to determine the amount of therapy that was

reasonable and necessary for their patients, including Patients C and D.  Therapy services that

are inconsistent with the nature and severity of the patient's illness or unreasonable in duration

and quantity are not reasonable or necessary.  *Id.* ¶ 46.  Given the serious medical conditions

suffered by Patients C and D, the United States plausibly alleges that the Ultra High level

therapy services provided to these patients by Defendants were not reasonable or necessary.

Finally, Defendants are also incorrect in their assertion that the Complaint fails to allege

any facts from which the Court may reasonably infer that speech therapy minutes provided to

Patients G and H were not reasonable or necessary.  The Complaint alleges that the Defendants

provided speech therapy to Patient G even though the patient communicated clearly and her

speech was not impaired.  *Id.* ¶ 191.  To support its argument that speech therapy was

appropriate, Defendants supply documentation showing that a nurse at Defendants' SNF

requested a physician order for a swallow study and a speech therapy evaluation and obtained a

physician order for speech therapy.  However, the same patient's medical record shows, and the

Complaint alleges, that hospital physicians performed a swallow study and determined that no

treatment was warranted other than indirect supervision while the patient ate meals.  *Id.* ¶ 192.

The Complaint alleges that Defendants provided *unskilled* services–indirectly supervising the patient while she ate–but billed for speech therapy.  *Id.*  Thus, Defendants inappropriately billed for services that did not require the skills of a rehabilitation therapist.  *Id.* ¶¶ 44-45 (alleging that only skilled therapy services are covered services).

With respect to Patient H, the Complaint alleges that the patient's medical record did not support the need for skilled speech therapy services.  Although Defendants' SNF may have secured a physician order for Patient H's speech therapy services, it is incumbent upon Defendants to provide treatment that is consistent with "the nature and severity of the patient's individual illness, injury or medical needs."  *Id.* ¶ 47.  The Complaint sufficiently alleges that the speech therapy services delivered to these patients were not reasonable or necessary, because the patients' medical needs did not require speech therapy.

In light of these facts, the Complaint's representative patient examples provide more than sufficient information to put Defendants on notice of the types of misconduct and fraudulent schemes alleged by the United States so that Defendants may respond to the Complaint.

### E.     The Complaint Alleges Both a Fraudulent Corporate Scheme and the Submission of Specific False Claims with Requisite Particularity

The Court should reject Defendants' argument that the Complaint does not "link" the allegations regarding the fraudulent scheme and alleged corporate pressure to any particular false claim.  Defs.' Mem. at 25-26.  The United States has no such obligation.  Rather, as Rule 9(b) requires, the Complaint alleges with particularity both details regarding HCR ManorCare's fraudulent scheme to inflate billings to Medicare and TRICARE and specific, representative false claims that were actually submitted for payment.

The Government's Complaint provides representative examples of false claims which HCR ManorCare submitted to Medicare and TRICARE for payment.  Compl. ¶ 214.  The

Complaint specifically alleges why each of these claims is false, as well as the location, date, and amount of the false claim. *Id.* ¶¶ 146-48, 152-58, 171-73, 175-79, 182-89, 191-95. The Complaint likewise provides detailed allegations of the methodologies HCR ManorCare used in its fraudulent scheme to subject SNF patients to unnecessary rehabilitation therapy in order to inflate its reimbursement from federal healthcare programs, *id.* ¶¶ 137-145, 149-151, 180-81, 190, and connects the representative false claims to these various means and methodologies. *Id.* ¶¶ 146-48, 152-58, 171-73, 182-84, 186-88, 191-93.

For example, as discussed in Section D above, the Complaint details how HCR ManorCare used excessive and unreasonable group therapy and modalities, and engaged in "ramping" (*i.e.*, increasing therapy during the assessment reference periods without clinical justification to increase the Medicare payment and then decreasing therapy outside of the assessment reference period) to increase minutes delivered to patients. *Id.* ¶¶ 137-145, 149-151, 180-81. The Complaint then provides specific examples of false claims whereby HCR ManorCare sought reimbursement for excessive and unreasonable group therapy provided to Patient A, *id.* ¶¶ 146-48, excessive and unreasonable use of modalities with Patient F, *id.* ¶¶ 186-89, and claims that were the result of "ramping" associated with Patient B. *Id.* ¶¶ 152-57. Similarly, the Complaint alleges that HCR ManorCare billed for services that did not qualify as *skilled* therapy services, *id.* ¶ 190, and then provides a specific example of false claims submitted for Patient G, for whom ManorCare billed therapy services that were not skilled. *Id.* ¶¶ 191-93.

Defendants rely on several cases to assert that Rule 9(b) requires the Complaint to plead with specificity a "link" between fraudulent conduct and specific false claims. However, Defendants misconstrue the holdings of these cases and quote them selectively in an effort to support their position. In the cases on which Defendants' purportedly rely, the complaints were

19

dismissed because the plaintiffs failed to plead *any* specific false claims at all.  *See e.g.*, *Sanderson v. HCA-The Healthcare Co.*, 447 F. 3d 873, 877 (6th Cir. 2006) (finding that the Complaint "does not identify any specific claims that were submitted to the United States or identify the dates on which those claims were presented to the government and relies exclusively on conclusory allegations of fraudulent billing").  The court in *Sanderson* explained that Rule 9(b) "does not permit a False Claims Act plaintiff . . . to describe a private scheme in detail [and] then to allege simply…that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government."  *Id.*  In contrast, here, the United States alleges specific false claims which were *actually* submitted.

Defendants' reliance on *United States v. Kernan Hosp.*, 880 F. Supp. 2d 676 (D. Md. 2012), is similarly unfounded.  Defs.' Mem. at 25-26.  The court in *Kernan* required a plaintiff to demonstrate "the crucial link between the alleged scheme and ultimate FCA liability" by "showing that the defendants *actually submitted* reimbursement claims for the services."  *Id.* at 687-88 (emphasis in original) (citing *United States ex rel. Atkins v. McInteer*, 470 F. 3d 1350, 1359 (11th Cir. 2006)).  In *Kernan*, the court found the complaint deficient because "the Complaint does not identify a single false claim actually submitted to the government for payment."  *Id.* at 686.  In short, Rule 9(b) requires that "some indicia of reliability" be given in the complaint to support the allegation that an actual false claim was submitted to the government.  *Id.* at 687 (citing *United States ex rel. Clausen v. Lab Corp. of Am.*, 290 F. 3d 1301, 1311 (11th Cir. 2002)).

Defendants also suggest that *United States ex rel. Nathan v. Takeda Pharm. N.A., Inc.*, 707 F.3d 451 (4th Cir. 2013) requires plaintiffs to plead with particularity that specific false claims were presented for payment "as a direct and proximate result" of an alleged fraudulent

scheme in order to satisfy Rule 9(b).  Defs.' Mem. at 26.[8]  However, nowhere in the *Nathan* opinion does the court discuss a requirement that a plaintiff plead facts sufficient to support a link between corporate practices and specific false claims.  Rather, the focus in *Nathan* is on the "absence of particularized allegations of specific false claims."  *Id.* at 457.  The *Nathan* court explained: "when a defendant's actions, as alleged and as reasonably inferred from the allegations, *could* have led, but *need not necessarily* have led, to the submission of false claims, a relator must allege with particularity that specific false claims actually were presented to the government for payment."  *Id.*  Here, the Complaint details a widespread scheme of corporate pressure to maximize revenue by billing federal healthcare programs at the Ultra High level without regard for patients' needs and alleges that "specific, identifiable claims actually were presented to the government for payment."  *Id.* at 458.  As such, the Complaint satisfies the requirements of Rule 9(b).

### F.   The Complaint Satisfies Rule 9(b) By Adequately Pleading Scienter

While Rule 9(b) imposes a heightened pleading requirement for allegations of fraud, it does not require the same level of particularity with respect to the knowledge element of an FCA claim.  Rather, Rule 9(b) provides that "malice, intent, knowledge, and other conditions of a person's mind may be alleged *generally*."  Fed. R. Civ. P. 9(b) (emphasis added).  *See also Iqbal*, 129 S.Ct. at 1954; *United States v. Bollinger Shipyards, Inc.*, 2014 WL 7335007, *4 (5th Cir.

---

[8] Defendants misrepresent what the court required in *United States ex rel. Hagood v. Riverside Healthcare Association, Inc.*, No. 11-0109, 2015 WL 1349982, *9 (E.D. Va. Mar. 23, 2015). Defendants suggest that the United States must establish a "connection" between an alleged fraudulent scheme and a specific claim for payment.  Defs.' Mem. at 26.  However, the court's analysis does not discuss any such requirement.  Rather, the "critical question" is whether plaintiffs have plausibly alleged that Defendants "caused a false claim to be presented to the government."  *Hagood*, at *9.  The court dismissed the complaint because it found that the plaintiff did not allege specific claims presented to the government.  *Id.*

Dec. 23, 2014) (district court erred by requiring the United States to plead the FCA's knowledge element with particularity under Rule 9(b)). Rule 9(b) is satisfied by alleging facts: (1) making it reasonable to believe that defendant knew of the wrong, (2) showing a motive, or (3) indicating "conscious behavior" on the part of the defendant. *See Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994). The Complaint more than meets this burden. As discussed in Section C above, the Complaint alleges specific facts that demonstrate that HCR ManorCare, and specific high-level corporate executives of HCR ManorCare, knew that the Company submitted false claims or at a minimum "act[ed] in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b).

*Harrison II* supplies the governing law in the Fourth Circuit; however, the Defendants misinterpret *Harrison II* by suggesting that an individual filing the claims on behalf of HCR ManorCare must be the individual with the requisite knowledge. Defs.' Mem. at 26-27. Rather, in *Harrison II*, the court declined to adopt the defendant's "single actor" argument with respect to scienter:

> In particular, we decline to adopt Westinghouse's view that a single employee must know both the wrongful conduct and the certification requirement. If we established such a rule, corporations would establish segregated 'certifying' offices that did nothing more than execute government contract certifications, thereby immunizing themselves against FCA liability.

352 F.3d at 918-19 & n. 9. Thus, the United States is not required to allege that the employees submitting the false claims had knowledge of the fraudulent conduct by others in the corporation because such a narrow rule would conflict with the broad purpose of the FCA to capture fraud against the Government. *See, e.g., United States v. Science Applications Int'l Corp.*, 626 F. 3d 1257, 1274 (D.C. Cir. 2010) ("[a]ccording to the Senate Committee Report to the 1986 amendments to the FCA, Congress adopted this definition of 'knowingly' to capture the 'ostrich-

like' conduct which can occur in large corporations' where 'corporate officers . . . insulate themselves from knowledge of false claims submitted by lower-level subordinates.'"  (quoting S. Rep. No. 99-345, at 7, 1986 U.S.C.C.A.N. 5266, 5272 (1986))).

Contrary to Defendants' arguments, the Complaint identifies, in detail, facts supporting the allegation that HCR ManorCare *knew* or *should have known* the Company was billing for unreasonable, unnecessary and unskilled services, which were not eligible for reimbursement under the SNF benefit.  Further, the Complaint identifies specific high-level corporate executives including Vice President of Rehabilitation, James Pagoaga, Vice President of Reimbursement, Barry Lazarus, and Former Chief Operations Officer, Stephen Guillard, who either knew or acted in reckless disregard of the fraudulent conduct and false claims.

For example, the Complaint details the specific mechanisms HCR ManorCare corporate leadership used to set targets for Ultra High therapy billing and length of stay, as well as to pressure, track, and enforce compliance with these targets.  Compl. ¶¶ 99-127.  Further, the Complaint alleges that VP of Rehab Pagoaga, VP of Reimbursement Lazarus and COO Guillard were aware of these practices.  *See id.* ¶¶ 102- 05 (alleging executives' knowledge of various "Power Ratings" the Company used to track the Ultra High reimbursement level); *id.* ¶¶ 109, 112-114 (listing specific presentations setting Ultra High billing goals, which were sent to VP Pagoaga); and *id.* ¶ 127 (detailing how HCR ManorCare, with VP Pagoaga's knowledge, used performance awards to compel compliance with these targets).

In addition, the Complaint discusses a number of complaints HCR ManorCare received from both inside and outside the company that corporate pressure to meet Ultra High and length of stay targets was undermining therapists' clinical judgment.  *Id.* ¶¶ 18, 136, 151, 159, 206, 208. Numerous therapists complained about the tremendous pressure that the Company put on them

to provide enough minutes to bill at the Ultra High level, and these complaints were passed along to HCR ManorCare's management. *Id.* ¶ 206 (describing email to vice president of reimbursement from a division rehab director noting: "[i]f therapists suggest planned levels of therapy delivery that are anything other than ultra high, they are labeled as 'uncooperative.'"); *id.* ¶ 210 (comments from therapist exit interview noting there was "pressure to constantly push [patients] into the highest possible rugs level *even if their clinical presentation doesn't justify it*," and "push to have every patient on modalities *for the sole purpose of getting more minutes in order to up the rugs level*.") (emphasis added).  Also, in 2011, a private organization sent a letter to HCR ManorCare's CEO urging him "to investigate the Company's disproportionate billing for the most highly reimbursed Medicare Resource Utilization Groups ('RUGs')" and HCR ManorCare's board discussed this letter. *Id.* ¶¶ 211-12.  The Complaint details how HCR ManorCare's corporate leadership, including VP of Rehab Pagoaga and VP of Reimbursement Lazarus, knew of concerns and complaints regarding pressure the Company placed on its employees to increase Ultra High billings.  *Id.* ¶ 206.  However, ManorCare made no changes in response to the complaints.  *Id.*

All of these factual allegations detailed in the Complaint amply support the United States' allegations that a number of HCR ManorCare's high-level corporate officials including VP of Rehab Pagoaga, VP of Reimbursement Lazarus and former COO Guillard, knew that HCR ManorCare submitted false claims or at least acted in "reckless disregard of the truth or falsity of the information."  31 U.S.C. 3729(b)(1).  The knowledge of a corporation's employees may be imputed to the corporation when the employees "acquire knowledge within the scope of their employment and are in a position to do something about that knowledge."  *United States v. Anchor Mortg. Corp.*, 711 F. 3d 745, 747-48 (7th Cir. 2013); *See also Grand Union Co. v.*

*United States*, 696 F. 2d 888, 891 (11th Cir. 1983) ("We have held in cases brought under the False Claims Act that the knowledge of an employee is imputed to the corporation when the employee acts for the benefit of the corporation and within the scope of his employment."). Although none of these corporate executives may have actually submitted the false claims, at least one of these individuals, VP of Reimbursement Lazarus, oversaw HCR ManorCare's billing function, had numerous interactions with the Medicare contractors regarding billing, and acted on behalf of Defendant HCR ManorCare Services, which had direct control over claims for services provided at HCR ManorCare's SNFs. Compl. ¶¶ 31-32, 89-93. As the facts demonstrate, Defendants' arguments regarding scienter fail to provide any basis for the Court to dismiss the Complaint and should be rejected.

### III. The Complaint Sufficiently Informs Each Defendant of Its Role in the Alleged Scheme

As this Court has held, in cases involving allegations against multiple defendants, a plaintiff must allege claims with particularity as to each defendant. *Ahumada,* 2013 WL 2322836, at *3 (dismissing complaint against multiple unrelated corporations). The purpose of this principle is to provide each "defendant with fair notice of the claim against him [and] to protect a defendant from harm to his reputation and goodwill." *Juntti v. Prudential-Bache Securities, Inc.*, 993 F.2d 228 (4th Cir. 1993). Here, Defendants assert that the Complaint fails Rule 9(b), because it "improperly attempts to blur together the alleged conduct of four legally distinct entities." Defs.' Mem. at 28. Considering the facts alleged in the Complaint, Defendants' assertion is disingenuous.

The Complaint alleges that each of the Defendants acted in concert through different roles to create and implement policies that resulted in the submission of false claims to Medicare and TRICARE. At different times during the relevant time period alleged in the Complaint,

Defendants HCR ManorCare, Inc. ("HCRMC, Inc.") and Manor Care, Inc. ("MCI") owned and oversaw the operations of SNFs that provided skilled rehabilitation therapy services to patients across the country.  Compl. ¶¶ 6, 26, 27. These Defendants also owned Defendant Heartland Employment Services, LLC ("Heartland") which leased employees to the SNFs and to other Defendants, as well as staffed the Central Billing Office ("CBO") which, for at least part of the time period, processed and submitted claims to Medicare and TRICARE.  *Id.* ¶¶ 28, 90-91. Several individuals responsible for making decisions at the SNFs, such as personnel decisions and certain funding decisions, were employed by Heartland.  *Id.* ¶¶ 34-35.  Defendant HCR ManorCare Services, LLC ("HCRMC Services") advised the SNFs on issues such as reimbursement and regulatory compliance, but also employed high-level executives and managerial employees who had a role in setting overall corporate goals and policies, including personnel and funding decisions at the SNFs.  *Id.* ¶¶ 29, 35.  In addition, HCRMC Services operates the CBO that submits claims to Medicare and TRICARE.  *Id.* ¶ 90.  The reporting structure established by Defendants appears to be purposefully complex, s*ee id.* ¶¶ 35, 76-88, and the Complaint clearly alleges that all of the Defendants undertook the actions described in the scheme.  *See United States ex rel. Carter v. Halliburton Co.*, Case No. 1:08-cv-1162, 2009 WL 2240331, at *15-16 (E.D. Va. July 23, 2009) (holding that relator's complaint sufficiently stated claim against four defendants especially when defendants "blurred their internal corporate lines").

In addition, the Complaint alleges that the Defendants acted as one unified entity for purposes of obtaining reimbursement from the government.  For example, HCRMC Services instructed CMS to use one point of contact and one central home office address in Ohio when corresponding with virtually all of the SNFs.  Compl. ¶¶ 31-32.  HCRMC Services coordinated

with CMS contractors regarding reimbursement issues relating to the SNFs.  *Id.* ¶¶ 93-94.

Indeed, Defendants continue to act as one unified entity in this case by filing a single motion

while represented by the same counsel.  In light of all these facts, it is disingenuous for any of

the Defendants to assert that they do not have fair notice of the claims against them or that a

particular Defendant may unfairly suffer harm to its reputation as a result of the allegations here.

## IV.   The United States has Made Cognizable Claims for Unjust Enrichment (Count III) and Payment by Mistake (Count IV)

The Court should reject Defendants' arguments for dismissing the United States' unjust

enrichment claim (Count III) and payment by mistake claim (Count IV), as each of these claims

state viable causes of action and meet the pleading standards articulated above.  The Defendants'

argument in favor of dismissal of the alternative common law causes of action rests on the same

grounds they advance in advocating dismissal of the United States' FCA claims.

Unjust enrichment consists of three elements: 1) a benefit conferred upon the defendant

by the plaintiff; 2) an appreciation or knowledge by the defendant of the benefit; and 3) the

acceptance or retention by the defendant of the benefit under such circumstances as to make it

inequitable for the defendant to retain the benefit without the payment of its value.  *Aloi v.*

*Moroso Investment Partners, LLC*, 2013 WL 6909151, at *13 (D. Md. Dec. 31, 2013).  To

succinctly summarize the allegations contained in the United States' 227-paragraph Complaint,

the Defendants were entitled to reimbursement for medical expenses that were both reasonable

and necessary.  However, they were reimbursed by the United States for expenses that were

neither reasonable nor necessary.  Defendants sought and accepted payment for unreasonable

and unnecessary services to benefit themselves financially.  The allegations pleaded in the

Complaint unquestionably establish a viable unjust enrichment claim, as an alternative ground

for recovery.  *See. e.g. United States v. Am. Heart Research Found.*, 996 F. 2d 7, 8 (1st Cir.

1993) (government asserted claims under FCA and, separately, for unjust enrichment).

Moreover, as the United States' claim for unjust enrichment is concerned, Defendants' argument that Rule 9(b)'s heightened pleading requirements apply to this claim is misplaced. "[A] claim for unjust enrichment is subject to Rule 9(b) only if it is 'premised on fraud.'" *United States v. Gericare Med. Supply Inc.*, 2000 WL 33156443, at *10 (S.D. Ala., Dec. 11, 2000) (quoting *Daly v. Castro Llanes*, 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998)). *See also Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1039 (N.D. Ill. 2007) (noting that Rule 9(b) applies to unjust enrichment claims only to extent those claims rely on theories of fraud). As plead alternatively, the United States' claim for unjust enrichment can succeed even if Defendants obtained the improper reimbursements innocently. Even if the Court were to find that the United States' unjust enrichment claim did not satisfy Rule 9(b), the claim would stand on its own. Unjust enrichment has no element that includes fraud, thus Rule 9(b) is inapplicable; rather, Rule 8(a) is the applicable standard. The United States has pled a viable unjust enrichment claim in that it has alleged that: the United States reimbursed the Defendants certain expenses; the Defendants certainly appreciated the benefits of the payments from the United States; and the circumstances make it inequitable for Defendants to retain the payments, because Defendants were only entitled to reimbursement for expenses that were reasonable and necessary.[9]

---

[9] Defendants devote a paragraph in their memorandum to arguing that the United States has not pled properly which Defendant received the unjust payment. Defs.' Mem. at 30. Defendants assert that because the United States seeks relief for its payment-by-mistake claim only against HCR ManorCare Services, the allegations in the Complaint are "inconsistent," "irreconcilable," and "cannot survive." *Id.* This argument is meritless. The United States has pled that HCR ManorCare Services received the payments at issue here. Compl. ¶ 95. There is no sense engaging in a "shell game" at this threshold review of the Complaint. If discovery and further inspection of the pleadings reveals that Count III should have been leveled only against HCR ManorCare Services, the United States may avail itself of Fed. R. Civ. P. 15(b), which provides that a party "may move – at any time, even after judgment – to amend the pleadings to conform them to the evidence[]."

Similar to unjust enrichment, a viable claim of payment by mistake requires that the complaint plead: that the plaintiff made a payment under a mistaken apprehension of fact, that the defendant derived a benefit as the result of the mistaken payment, and that equity demands restitution to the plaintiff. *United States ex rel. Ryan v. Lederman*, 2014 WL 1910096, at *9 (E.D. N.Y. 2014); *United States v. Assocs. in Eye Care, P.S.C.*, 2014 WL 414231, at *7 (E.D. Ky. 2014) ("If [the Defendants] did in fact make claims to Medicare of Medicaid for worthless, upcoded, or unnecessary services, and were reimbursed for those services, as the United States alleges, then the Defendants were unjustly enriched.  At this stage in the litigation, the plaintiff need only allege sufficient facts to support such a claim . . . .").  Here, the Complaint asserts that the United States paid the Defendants under the mistaken belief that the United States was reimbursing Defendants for medical care that was reasonable and necessary.  The United States further pleads that, because care that was provided was not reasonable or necessary, equitable considerations require the Defendants to provide restitution to the United States.  It is well settled that the United States can seek the recovery of monies wrongfully paid from the Treasury utilizing common law theories. *See,* e.*g., United States v. Wurts*, 303 U.S. 414, 416 (1938); *United States v. Lahey Clinic Hosp., Inc*.  399 F. 3d 1, 15-16 (1st Cir. 2005).

Defendants' argument that dismissal is appropriate because the United States "alleges that only HCR ManorCare, Inc. received alleged improper reimbursements," Defs.' Mem. at 30, is likewise meritless.  The United States has met the pleading standards announced by *Twombly* and *Iqbal* with respect to its common-law unjust enrichment and payment by mistake claims.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss should be denied.

Dated:   August 14, 2015                    Respectfully submitted,

                                            Benjamin C. Mizer
                                            Acting Assistant Attorney General


                                            _____/s/_____
                                            MICHAEL D. GRANSTON
                                            ANDY J. MAO
                                            DAVID B. WISEMAN
                                            JESSICA J. WEBER
                                            ALLISON CENDALI
                                            AMY L. LIKOFF
                                            Attorneys, Civil Division
                                            United States Department of Justice
                                            P.O. Box 261, Ben Franklin Station
                                            Washington, D.C. 20044
                                            Tel: (202) 353-8297
                                            Fax: (202) 514-0280
                                            Jessica.J.Weber@usdoj.gov


                                            DANA J. BOENTE
                                            United States Attorney


                                            _____/s/_____
                                            MONIKA L. MOORE
                                            KEVIN MIKOLASHEK
                                            Assistant United States Attorneys
                                            United States Attorney's Office
                                            2100 Jamieson Ave
                                            Alexandria, VA 22314
                                            Tel: (703) 299-3779
                                            Fax: (703) 299-3983
                                            Monika.Moore@usdoj.gov
                                            Kevin.Mikolshek@usdoj.gov

                                            Counsel for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing ("NEF") to the following:

Katherine J. Seikaly
Eric A. Dubelier
Carol C. Loepere
Daniel Z. Herbst
Reed Smith LLP
1301 K Street; Suite 1100
Washington, DC 2005
*Counsel for Defendants HCR ManorCare, Inc., ManorCare, Inc., HCR ManorCare Services, LLC, and Heartland Employment Services, Inc.*

Brent R. Gary
Reed Smith LLP
3110 Fairview Park Drive; Suite 1400
Falls Church, VA 22042
*Counsel for Defendants HCR ManorCare, Inc., ManorCare, Inc., HCR ManorCare Services, LLC, and Heartland Employment Services, Inc.*

Melissa A. Geist
Reed Smith LLP
136 Main Street; Suite 250
Princeton, NJ 08540
*Counsel for Defendants HCR ManorCare, Inc., ManorCare, Inc., HCR ManorCare Services, LLC, and Heartland Employment Services, Inc.*

Jeffrey J. Downey
Law Office of Jeffrey J. Downey
1225 I Street; Suite 600
Washington, DC 20005
*Counsel for Relator Christine A. Ribik*

Robert O. Wilson
Finkelstein Thompson LLP
1077 30th Street, NW; Suite 150
Washington, DC 20007
*Counsel for Relator Patrick Gerard Carson*

Ashish S. Joshi
Lorandos Joshi
2400 S. Huron Parkway
Ann Arbor, MI 48104-5152
*Counsel for Relator Marie Slough*

31

_____/s/_____
Monika L. Moore
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700 (tel)
(703) 299-3983 (fax)
monika.moore@usdoj.gov
Attorney for the United States