# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* GLENDA MARTIN and STATE OF TENNESSEE *ex rel.* GLENDA MARTIN, | ) ) ) ) | |
| *Plaintiffs / Relator*, | ) ) | Case No. 1:08-cv-251 |
| v. | ) ) | Judge Mattice |
| LIFE CARE CENTERS OF AMERICA, INC., | ) ) ) | |
| *Defendant.* | ) | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* TAMMIE JOHNSON TAYLOR, | ) ) ) | |
| *Plaintiff / Relator*, | ) ) | Case No. 1:12-cv-64 |
| v. | ) ) | Judge Mattice |
| LIFE CARE CENTERS OF AMERICA, INC., | ) ) ) | |
| *Defendant.* | ) | |

## ORDER

Before the Court is Defendant's Motion to File Memorandum of Law in Excess of 25 Pages (Doc. 79), Motion to Dismiss (Doc. 80), and Unopposed Motion for Extension of Time to File Response/Reply (Doc. 88), and the Government's Motion for Leave to File Excess Pages (Doc. 84).  For the reasons stated herein, Defendant's Motion to Dismiss (Doc. 80) will be **DENIED,** and Defendant's  Motion to File Memorandum of Law in Excess of 25 Pages (Doc. 79), Unopposed Motion for Extension of Time to File

Response/Reply  (Doc. 88), and Plaintiff's Motion for Leave to File Excess Pages (Doc. 84) will be **GRANTED**.

## I.    BACKGROUND

This consolidated *qui tam* action was filed separately by relators Glenda Martin and Tammie Taylor.  (Doc. 69 at 5).  Glenda Martin is a registered nurse and former staff development coordinator of Defendant Life Care Center ("Life Care") in Morristown, Tennessee, and she filed her claim on October 16, 2008.  (*Id.*).  Tammie Taylor is a former occupational therapist at Life Care in Lauderhill, Florida, and she filed her claim on February 23, 2012.  (*Id.*).  The Government moved to intervene as Plaintiff in this case on October 1, 2012, and the Court granted the Government's Motion on November 15, 2012.  (Docs. 60, 67).  In the same Order, the Court also ordered that Martin and Taylor's cases be consolidated.  (Doc. 67).  The Government filed a Consolidated Complaint in Intervention, which is the Complaint as to which the Court will consider the pending Motion to Dismiss.  (Doc. 69).

Life Care is a corporation that owns over 200 skilled nursing facilities and is headquartered in Cleveland, Tennessee.  (*Id.* at 5).  Life Care receives funds from Medicare, a health insurance program established and administered by the United States Government.  Between the period of January 2006 through December 2011, Medicare paid Life Care over $4.2 billion for its services, including "inpatient services at its nursing facilities."  (*Id.* at 5).

Each Life Care facility has a Rehab Manager who manages rehabilitation therapy staff and therapy services. (Doc. 69 at 17).  The Rehab Manager reports to that facility's Executive Director, who in turn reports to the Regional Vice President and Divisional Vice President.  (*Id.*).  Each facility has therapy staff, including physical therapists,

physical therapy assistants, occupational therapists, certified occupational therapy assistants, and speech-language and pathology therapists.  (*Id.* at 18).  Each facility also has a Minimum Data Set (MDS) coordinator who is responsible for collecting information needed for the MDS and determining the assessment reference date for Medicare purposes.  (*Id.*).

Medicare, Medicaid, and TRICARE

People of any age can qualify for Medicare in certain circumstances, but Medicare is commonly known as "our country's health insurance program for people who are 65 or older."  *Medicare*, SSA.Gov, http://www.ssa.gov/pgm/medicare.htm (last visited Feb. 3, 2014)("Medicare Overview").  Medicare is financed in part by taxes and in part by "monthly premiums deducted from social security checks." Medicare Overview. Medicare is broken up into four parts: (1) hospital insurance ("Part A"); (2) medical insurance ("Part B");  (3) Medicare advantage ("Part C"), which combines the health care services provided in Part A and Part B; and (4) prescription drug coverage ("Part D").  Medicare Overview.  Each part of Medicare has a list of requirements, which determine whether a person will be eligible to receive Medicare benefits.  Medicare Overview.

Part A includes coverage for "post-hospital extended care services for up to 100 days during any spell of illness."  42 U.S.C. § 1395d(a)(2)(A).  A physician, nurse practitioner, clinical nurse specialist, or a physician assistant must certify that: (1) services are required because the person needs skilled nursing care or other "skilled rehabilitation services" on a daily basis; (2) services "can only be provided in a skilled nursing facility on an inpatient basis;" and (3) services are provided to address the condition for which the patient was receiving care for when he was an inpatient.  42

3

U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).  Additionally, Medicare does not cover services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]" 42 U.S.C. § 1395y(a)(1)(A).  A "skilled service" is defined as a service that is "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel" such as a physician, registered nurse, physical therapist, occupational therapist, or speech pathologist.[1]   42 C.F.R. § 409.32(a); 42 C.F.R. § 409.31(a)(1-3).

Skilled nursing facilities such as Life Care are paid by Medicare through a prospective payment system ("PPS") based on provisions of the Balanced Budget Act of 1997 ("BBA").  *Medicare Program; Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities*, 63 Fed. Reg. 26252-01 (May 12, 1998).  The BBA "sets forth the formula for establishing [per diem Federal payment] rates as well as the data on which they are based.  *Id.*  The rates are created using the classifications of Resource Utilization Groups ("RUG"), which "uses measures of staff time and service frequency, variety, and duration" to classify patients at different levels. *Id*; *Medicare Program; Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities for Fiscal Year 2006*, 70 Fed. Reg. 45026-01 (Aug. 4, 2005).  In calculating RUG levels, there are three types of therapy disciplines: occupational therapy, physical therapy, and speech pathology.  63 Fed. Reg. 26252-01.  The structure of RUG groups and the daily PPS rate are adjusted from time to time; the RUG-III classification system was in place from January 1, 2006 until October 1, 2010, and the RUG-IV classification

---

[1] Many examples of skilled services and "personal care services," which are distinguished from skilled services, are listed in 42 C.F.R. § 409.33.

system has been in effect from October 1, 2010 until the present.[2] 70 Fed. Reg. 45026-01.

There are seven RUG-III categories: rehabilitation, extensive services, special services, clinically complex, impaired cognition, behavior, and physical. 63 Fed. Reg. 26252-01. The rehabilitation category is divided into five general sub-levels: (1) Rehab Ultra, which requires 720 minutes of treatment per week, two out of three rehabilitation therapy disciplines being used, and one discipline providing services 5 days of the week or more; (2) Rehab Very High, which requires 500 minutes of treatment per week and one discipline providing services 5 days of the week or more; (3) Rehab High, which requires 325 minutes of treatment a week with one discipline providing services 5 days of the week or more; (4) Rehab Medium, which requires 150 minutes of treatment from any of the 3 disciplines for at least 5 days of the week; and (5) Rehab Low, which requires 45 minutes of treatment a week from any of the 3 disciplines for at least 3 days of the week. *Id.*. The higher the RUG level, the more money a skilled nursing facility will receive from Medicare for providing the services. *See id.* ("The Ultra High Rehabilitation sub-category is intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time. This translates into higher charges for therapy services, both because treatment is more frequent and complex, and because length of stay is longer than for other skilled rehabilitation groups.")

---

[2] *Medicare Program; Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities for Fiscal Year 2010,* 74 Fed. Reg. 40288-01 (Aug. 11, 2009); *see* Doc. 69 at 11 ("CMS added new clinical RUG categories, modified the timeframe in which each assessment must be performed, required that nursing facilities assess changes in the level of therapy every 7 days, and revised certain rules pertaining to group therapy, among other changes").

RUG levels also consider a person's capacity to perform activities of daily living ("ADL") such as "bed mobility, toilet use, transfer from bed to chair, and eating." *Id.* ADL scores are broken into 5 different scores based on a person's capabilities ranging from categories of A, B, and C, which are for rehabilitation without extensive services, to categories L and X, which are rehabilitation with extensive services. Of these categories, the most capable patient in terms of ADL scores is an "A" patient, whereas the patient that will need the most assistance is an "X" patient. 74 Fed. Reg. 40288-01.

A skilled nursing facility assesses a patient's RUG level and completes a MDS on the 5th, 14th, 30th, 60th, and 90th days of the patient's stay at that facility. 42 C.F.R. § 413.343(b). These periodic assessments are significant because, as noted above, they determine the daily rate that Medicare will pay for the facilities' services during that period. 63 Fed. Reg. 26252-01; 70 Fed. Reg. 45026-01. Skilled nursing facilities submit a MDS and the accompanying forms to Medicare payment processors. From January 2009 through August 2009, BlueCross BlueShield of Tennessee was the processor for Life Care. (Doc. 69 at 13). From August 2009 through the present, Cahaba Government Benefit Administrators has been the processor for Life Care. (*Id.*).

In addition to Medicare, there is also the federal program TRICARE and the state program Medicaid, through which people can get medical benefits. TRICARE is another federal program that provides medical benefits to veterans, service members, and military families. 10 U.S.C. § 1071. TRICARE uses "Medicare's PPS and RUGs methodology and assessment schedule," and provides reimbursement to skilled nursing facilities in accordance with the rules that apply to Medicare. Doc. 69 at 14; 10 U.S.C. §1079(j)(2). Each state also has a Medicaid program for residents with low-income. *Medicaid*, Medicaid.Gov., http://www.medicaid.gov/index.html (last visited Feb. 3,

2014).   The individual states set the eligibility requirements for Medicaid within the federal guidelines, and "Medicaid . . . provide[s] health coverage to nearly 60 million Americans, including children, pregnant women, parents, seniors and individuals with disabilities." *Eligibility*, Medicaid.Gov.,http://www.medicaid.gov/ Medicaid -CHIP-Program-Information/By-Topics/Eligibility/Eligibility.html (last visited Feb. 3, 2014).

<u>Complaint Allegations</u>

In its Consolidated Complaint, the Government first claims that Life Care pressured its therapists to target Ultra High RUG levels and longer average length of stay periods for patients in order to maximize its Medicare revenue and exhaust "all 100 days of [a patient's] Medicare [skilled nursing facility] benefit."  (Doc. 69 at 15).  The Government asserts that Life Care provided therapy "that was not medically reasonable or necessary" by pressuring therapists to assign higher RUG levels.  (*Id*. at 16).

In support of its claim, the Government asserts that Life Care: (1) generated reports that tracked Ultra High RUG percentages, average length of stay levels, and productivity levels; (2) set targets at the corporate level for the amount of Medicare rehabilitation days it would bill at the Ultra High RUG level without knowledge of individual patient needs; (3) had its Chief Operating Officer "push for increased Medicare revenue;" (4) had at least one Regional Rehab Director contact Rehab Managers that did not have Ultra High RUG percentages above 61% to create an action plan to create higher RUG levels; (5) set a 2 hour minimum level of therapy per day "unless proven otherwise;" (6) had Rehab Managers submit their RUG level information to a Resource Utilization Specialist ("RUS") to "question facility employees" about failures to meet higher RUG levels; (7) created and used its Rehabilitation Opportunity Committee ("ROC") to identify and pressure "focus" facilities to meet corporate RUG

7

targets;  (8) had Life Care management create "action plans" based on ROC visits that focused on increasing the length of stay of patients at higher RUG levels;  (9) had Regional Rehab Directors visit facilities in their region and push facilities to increase Ultra High RUG levels;  (10) had certain divisions set targets to "double the Ultra High percentage of certain patients;" (11) had certain divisions establish a "$400 club" for employees who booked daily Medicare rates of $400;  (12) measured the performance of employees, including Regional Rehabilitation Directors, Rehab Managers, and therapists, in part, on "their ability to achieve Ultra High targets;" (13) had its Rehab Managers set therapy minutes based on meeting higher RUG levels; and (14) rewarded employees who met higher RUG levels.  (Doc. 69 at 18-32).  In support of these allegations, the Government provides examples of specific Life Care divisions, managerial employees, and/or time frames during which the alleged actions took place. (*Id.*).

The Government next claims that Life Care billed Medicare for services that were "medically unreasonable, unnecessary, and unskilled." (Doc. 69 at 33).  Specifically, the Government claims that the patients' therapy plans were not individualized to their needs, but rather consisted of "rote exercises that provided little clinical benefit."  (*Id.*). As part of this allegation, the Government has attached to its Complaint a list of allegedly false claims and false statements, which identifies specific patients and therapy amounts.  (*Id.* at 52-53).

In support of this claim, the Government provides several examples of patients who allegedly received unreasonable and unnecessary services, including: (1) Patient A, a 78-year-old "frail and rehabilitated" male who received 1,298 therapy minutes during his first week of treatment, received Ultra High levels of therapy for several weeks, was

8

readmitted to the hospital and returned to the nursing home (where he received 269 minutes of therapy), and ultimately died several days after returning to the nursing home; (2) Patient B, a 85-year-old non-ambulatory female with "significant heart problems and functional deficits due to long-term obesity and blindness" who received Ultra High levels of therapy for 77 days and had "unrealistic long-term goals;" and (3) Patient D, a 92-year-old patient who was "dying" of metastatic cancer and received Ultra High levels of therapy for the two weeks leading up to his death. (Doc. 69 at 33-35).

In further support of its claim that Life Care billed Medicare for "unnecessary" services, the Government alleges that Life Care increased therapy for patients without clinical justification. (Doc. 69 at 35). The Government asserts that Life Care "ramped up" the amount of therapy provided to patients during the Medicare assessment periods in order to receive the maximum Medicare payment. (*Id.*). The Government points to several examples in support of this allegation, including: (1) Patient E, whose occupational therapy was "nearly double" during the assessment period and whose physical therapy was increased by 15 minutes a day during his assessment period, both of which contributed to his classification as an Ultra High RUG level; and (2) Patient F, a 92-year-old patient who was provided more than 300 minutes of therapy on a single day during his assessment period, despite a physical condition that would have made him "unable to participate in or. . . harmed by such an excessive amount of therapy in a single day." For both Patient E and Patient F, their medical records did not reflect a clinical need that supported increased therapy. (*Id.*).

The Government's final factual allegations that Life Care billed for unnecessary therapy are that (1) Life Care used unnecessary modalities, such as heat, cold, and

9

electrical treatments, to increase the patient's number of therapy minutes; (2) Life Care billed Medicare for patients who should have been discharged; (3) Life Care improperly placed patients in group therapy that was unrelated to their plans of care; and (4) Life Care billed Medicare for services that did not require a rehabilitation therapist. (Doc. 69 at 38-40). In support of these allegations, the Government provides several examples, including: (1) Patient G, an 88-year-old patient with colon cancer who was provided with "an excessive level of electrical stimulation;" (2) Patient H, an 73-year-old patient who reached his maximum potential on day 59, but for whom Life Care continued his therapy until his 100-day Medicare benefit was exhausted; (3) Patient I, a 62-year-old male who did not walk and was totally dependent for many ADLs and for whom Life Care billed Medicare for therapy focused on standing exercises; and (4) Patient J, a 82-year-old female whose "physical therapy documentation show that her treatment largely consisted of unskilled services," but for whom Life Care billed Medicare at the Ultra High RUG level for 90 out of 100 days that she stayed at Life Care. (Doc. 69 at 38-40)

Finally, the Government claims that Life Care knew that it was billing for medically unreasonable, unnecessary, and unskilled services. (Doc. 69 at 41). The Government alleges that Life Care knew that it was billing for unnecessary services based on: (1) the numerous complaints filed by its employees about corporate targets and pressure; and (2) the fact that Life Care ignored and/or minimized complaints and retaliated against employees who complained. (*Id.* at 41-46). The complaints were sent to Life Care's compliance office (the Integrity Services Division) and Life Care's corporate Rehabilitation Services offices, and the complaining parties stated that the therapists provided medically unnecessary therapy, the supervisors directed employees to increase RUG levels, and the patients were not discharged from Life Care until they

exhausted their 100-day Medicare skilled nursing benefit.  (Doc. 69 at 43).   Life Care also received a complaint from an outside contractor regarding Life Care's "unnecessary rehab therapy designed primarily to increase Life Care's revenue rather than meet patient needs."  (*Id.*).

Life Care often responded to these complaints by having the Vice President of Rehabilitation Practice Standards and other corporate rehabilitation staff conduct investigations.  (*Id.*).  The Government alleges that, in investigating these complaints, Life Care sought to "root[] out the complainant" rather than "addressing the problem."  In an "informal study" done by Integrity Services, Life Care terminated 57% of employees who gave their name when filing their complaint within 3 weeks.  (*Id.* at 46).

On November 28, 2012, the Government filed its Consolidated Complaint and it identified claims for: false and fraudulent claims (Count I); false statements (Count II); unjust enrichment (Count III); payment by mistake (Count IV); and conversion (Count V).  (Doc. 69 at 47-48).  On March 1, 2013, Defendant moved for dismissal of all of these claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and 9(b) and also filed a Motion to File Memorandum of Law in Excess of 25 Pages.  (Docs. 79, 80).  In its Motion to Dismiss, Defendant alleges that the Government's claims should be dismissed because it has not pled the requisite elements of a false claim, it has failed to allege any false statements or records, it has not pled allegations of fraud with sufficient specificity, it has violated the procedural requirements of the False Claims Act by engaging in one-sided discovery and delaying Defendant's intervention, and it has failed to plead the requisite elements of unjust enrichment, payment by mistake, and conversion.  (Doc. 80 at 1-3).  On March 19, 2013, the Government filed a Motion for Leave to File Excess Pages and subsequently filed its response on March 22, 2013.  (Docs. 84, 86).  On March

28, 2013, Defendant filed an Unopposed Motion for Extension of Time to File Response/Reply and filed its Reply on April 8, 2013.  (Doc. 88).

## II.   LEGAL STANDARD

The Federal Rules of Civil Procedure provide, in relevant part, that all pleadings must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  *See* Fed. R. Civ. P. 8(a)(2).  While Rule 8(a) does not require plaintiffs to set forth detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  At a minimum, Rule 8(a) requires the plaintiff to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" – that is, Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 556 n.3 (2007).  A motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) is thus not a challenge to the plaintiff's factual allegations, but rather, a "test of the plaintiff's cause of action as stated in the complaint."  *Flanory v. Bonn*, 604 F.3d 249, 252 (6th Cir. 2010).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  The reviewing court must determine not whether the plaintiff will ultimately prevail, but whether the facts permit the court to infer "more than the mere possibility of misconduct," which is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679; *Twombly*, 550 U.S. at 570 (holding that a complaint is subject to dismissal where plaintiffs failed to "nudg[e]

their claims across the line from conceivable to plausible"). Although the Court must take all of the factual allegations in the complaint as true, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice," and a plaintiff's legal conclusions couched as factual allegations need not be accepted as true. *Iqbal*, 556 U.S. at 678; *see Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). Therefore, to survive a motion to dismiss under 12(b)(6), plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007) (citing *Twombly*, 550 U.S. at 555).

A complaint alleging violations of the False Claims Act must satisfy the pleading standard set forth in Federal Rule of Civil Procedure 9. Rule 9 of the Federal Rules of Civil Procedure addresses pleading special matters. Fed. R. Civ. P. 9. To plead a claim for fraud or mistake under Rule 9, "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Specifically, a plaintiff must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 551 (6th Cir. 2012). Although Rule 9 heightens the pleading standard for special pleadings, it "does not require a plaintiff to be omniscient, . . . . [and] the main purpose behind Rule 9(b) is to provide notice of a plaintiff's claim to a defendant so that the defendant may be able to prepare an informed responsive

pleading." *BAC Home Loans Servicing LP v. Fall Oaks Farm LLC*, 848 F. Supp. 2d 818, 827 (S.D. Ohio 2012) (citing *Coffey v. Foamex, L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993).

## III.   ANALYSIS

As a preliminary matter, both parties have filed Motions to exceed the page limit of 25 pages.  (Docs. 79, 84); *see* E.D. Tenn. L.R. 7.1(b) ("Briefs shall comply with the format requirements of Local Rule 5.1 and shall not exceed 25 pages in length unless otherwise ordered by the Court").  Defendant also filed an unopposed Motion for Extension of Time to File a Reply.  (Doc. 88).  Given the complex nature of this action and the length of the Government's Complaint, the Court will **GRANT** Defendant's unopposed Motion for Extension of Time to File a Reply (Doc. 88) and the parties' Motions to exceed the page limit of 25 pages (Docs. 79, 84).

### A.   *Count I and Count II: Claims under the FCA*

In its Motion to Dismiss, Defendant argues that the Government's claims under the False Claims Act ("FCA"), Count I and Count II,  should be dismissed for failure to plead "the requisite elements of a 'false claim'" and for failure to plead allegations of fraud with sufficient specificity.[3]  (Doc. 80 at 1, 2).  Specifically, Defendant argues that the Government fails to allege violations of statues and regulations that will ensure a facility's compliance with Medicare's necessity requirement, fails to allege an "objectively false" claim for payment, fails to specify which facilities are at issue, fails to identify actual false claims submitted to the Government as a result of corporate pressure,  fails to set forth the dates that false claims were made, fails to identify individuals engaged in false or fraudulent conduct, fails to identify examples of false

---

[3] The Court notes that, although the Government identifies TRICARE as well as Medicare for each of its claims, since TRICARE uses the same methodology and assessment at Medicare, the Court will use the term Medicare throughout this Order when discussing claims submitted to both programs.

claims, and fails to identify the specific falsities within Defendant's claims for payment to the Government.   (*Id.*). Defendant also argues more generally that the Complaint should be dismissed because it is immune from FCA liability because the therapy was provided by independent physicians, that claims based on medical judgments cannot be false because they involve subjective clinical determinations, that the Government's settlement in *Jimmo v. Sebelius*, 5:11-CV-17, 2011 WL 5104355 (D. Vt. Oct. 25, 2011) ("*Jimmo*"),  is also relevant to this action, and that the Government did not follow the FCA's procedures.

In response, the Government asserts that it "has more than met its burden" of pleading a plausible claim by citing details throughout the Complaint and using specific examples of patients and claims for payment that were allegedly false.  The Government also argues that Defendant is not immune from FCA liability because the therapists set the therapy minutes based on corporate pressure and corporate-set Ultra High RUG goals, the Complaint does not challenge the medical judgment of therapists but rather the policies of Life Care in preventing medical judgment from being exercised, this action is different from the *Jimmo* action, and dismissing this action based on the Government's actions would be an unwarranted, severe sanction.  (Doc. 86 at 9).

The FCA provides for civil liability for any person who submits false or fraudulent claims to the government.   31 U.S.C. § 3729(a)(1)(A).  The purpose of the FCA is "to enhance the government's ability to recover losses sustained as a result of fraud against the government." S. Rep. 99-345, at 1, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266.  "The statute requires only that the false or fraudulent claim be presented by a person with actual knowledge of the information submitted and who acts in deliberate ignorance, or

with reckless disregard as to the veracity of that information."[4]  *U.S. ex rel. Hobbs v. MedQuest Associates, Inc.*, 711 F.3d 707, 713-14 (6th Cir. 2013).  Although a person may bring a private civil action under the FCA, as in this case, the government can also bring a *qui tam* action and have the "primary responsibility for prosecuting the action."[5]  31 U.S.C. § 3730(c).

The United States Court of Appeals for the Sixth Circuit has been clear that, in pleading elements for a fraudulent or false claim under the FCA, the government "must allege the underlying facts with particularity as required by Rule 9(b)," as discussed *supra*.  *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 640 (6th Cir. 2003) ("Bledsoe I").; *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 562–63 (6th Cir. 2003); *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) ("Bledsoe II") ("pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation.").  In other words, "the fraudulent claim is the *sine qua non* of a False Claims Act violation." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (6th Cir. 2006)(internal quotations omitted).  However, as detailed above, so long as the government "pleads sufficient detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the

---

[4] On May 20, 2009, the Fraud Enforcement and Recovery Act of 2009 ("FERA") went into effect and amended the FCA. Fraud Enforcement and Recovery Act of 2009 , Pub. L. No. 111–21, § 386, 123 Stat. 1617 (2009).  Although FERA became law on that date, it also contained a retroactivity provision that stated that "subparagraph (B) of section 3729(a)(1) of title 31, United States Code, as added by subsection (a)(1), shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729 et seq.) that are pending on or after that date." FERA, Pub. L. No. 111–21, § 386, 123 Stat. 1617.  As relevant to the present case, FERA amended the liability standard under the FCA. *Sanders v. Allison Engine Co., Inc.*, 703 F.3d 930, 934 (6th Cir. 2012) *cert. denied*, 133 S. Ct. 2855 (2013).  "Although the FCA previously imposed liability for "knowingly mak[ing] ... a false record or statement to get a false or fraudulent claim paid or approved by the Government," 31 U.S.C. § 3729(a)(2) (2006), the amended liability standard imposes liability for "knowingly mak[ing] ... a false record or statement material to a false or fraudulent claim." *Id.* (citing 31 U.S.C. § 3729(a)(1)(B) (2012)).  Accordingly, as this action was filed on October 16, 2008, the Court will apply the amended standard set forth in FERA.

[5] The Court set forth in detail the responsibilities and procedural requirements imposed upon the government when proceeding with a *qui tam* action in its November 15, 2012 Order. *See* Doc. 67.

injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008). Thus, Rule 9(b) serves the purpose of providing "fair notice to the defendant so as to allow him to prepare an informed pleading responsive to the specific allegations of fraud. " *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999). In addressing Defendant's arguments, the Court will first discuss Defendant's general arguments, as described above, before moving to Defendant's challenges to the sufficiency of the Government's Consolidated Complaint.

In its Consolidated Complaint, the Government identifies claims under the FCA for both making a false record or statement material to a false or fraudulent claim and for making a false or fraudulent claim. For a person to be civilly liable for a false statement or record, he must (1) knowingly make, use, or cause to be used a false record or statement; (2) with actual knowledge, deliberate indifference, or reckless disregard of the information; and (3) the record or statement is material (having a tendency or being capable of influencing the payment or receipt of money or property) to a false or fraudulent claim.[6] 31 U.S.C. 3729(a)(1)(B).

Under § 3729(a)(1)(A) of the FCA, liability for a false or fraudulent claim is imposed when:

> (1) a person presents, or causes to be presented, a claim for payment or approval; (2) the claim is false or fraudulent; and (3) the person's acts are undertaken "knowingly," i.e., with actual knowledge of the information, or

---

[6] The Court notes that, while the Government brings two counts under the FCA, one for making a false statement or record that is material to a false or fraudulent claim and one for making a false or fraudulent claim, the parties frequently do not differentiate between the two claims. The Court recognizes the symbiotic nature of the two claims and will distinguish between the individual claims only when it is appropriate to do so.

with deliberate ignorance or reckless disregard for the truth or falsity of the claim.

*Bledsoe I,* 342 F.3d at 640.

### 1.    The Effect of Physician's Assessments on Medicare Compliance

First, Defendant alleges that the Government's claim should be dismissed because it does not allege a "false" claim and Life Care's actions were "consistent with regulatory requirements and guidance." (Doc. 81 at 21-23). Defendant specifically takes issue with the Government's position on what constitutes "medically necessary" services, and argues that physicians are the most appropriate figures to determine "necessary" services. (*Id.*). In response, the Government asserts that, based on Defendant's Motion to Dismiss, it is only disputing the "falsity element" of the FCA claims, therefore conceding that the claims were submitted knowingly and that the MDS forms submitted are material to the claims. (Doc. 86 at 5-6). Considering the parties' arguments, the Court agrees that the only element in dispute is the falsity of the claims. Accordingly, the Court will only discuss the falsity of both FCA claims.

As detailed above, Medicare regulations set forth the requirements for care within a skilled nursing facility. *See* 42 U.S.C. § 1395d(a)(2)(A); 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b). Based on these requirements, which set forth when a patient can be cared for and what care he should receive in a skilled nursing facility, a skilled nursing facility such as Life Care must evaluate the patient, determine which services are medically reasonable and necessary, and document the patient's levels in the periodic MDS assessment. In its Motion to Dismiss, Defendant claims that it has met all Medicare requirements because these determinations only require a "medical assessment and conclusion," which has been made in compliance with

Medicare by their physicians.  (Doc. 81 at 22-23).  Defendant claims that, since the Government has not alleged non-compliance with physician certification requirements, the Government's FCA claim must be dismissed.  (*Id.* at 23).  In response, the Government argues that, although the physicians certified the need for skilled therapy, Life Care management set the number of minutes received by a patient at levels that were not medically reasonable or necessary.  (Doc. 86 at 7).

The Court agrees with the Government's position that the Complaint contains sufficient factual allegations to plead a FCA claim, despite Defendant's argument.  The argument by Defendant implicitly invites the Court to interpret the Medicare regulations rather than attacking the sufficiency of the Government's Complaint. The Complaint does not appear to question the physicians' individual compliance with Medicare requirements, but rather alleges that the physicians' medical judgment was affected by corporate pressure by Life Care, resulting in Life Care filing false or fraudulent claims.  (Doc. 69 at 18-32).  Therefore, the argument Defendant raises here, that the individual physicians are the responsible parties, simply seeks to shift any liability from Defendant to its therapists, rather than speaking to the sufficiency of the Government's Complaint.

The Court agrees with Defendant that a determination of what services are medically necessary and reasonable must be made by a physician qualified to make those determinations.  (Doc. 81 at 22).  However, the Medicare requirement that a physician certify services performed does not insulate Defendant from liability resulting from noncompliance with Medicare regulations. The Complaint contains many allegations regarding Defendant's actions to influence and direct its therapists, including setting corporate targets at the Ultra High RUG level, pushing for increased

19

Medicare revenue, setting minimum therapy levels, measuring an employee's performance on his ability to bill at an Ultra High RUG level, and rewarding employees who billed at higher RUG levels. (Doc. 69 at 18-32). The Complaint alleges that these actions, directing and pressuring therapists to bill at higher RUG levels, resulted in Life Care submitting Medicare billings which were knowingly false. Further, for these allegations, the Complaint provides numerous examples of specific managerial employees who directed these actions and specific Life Care divisions in which these actions took place. Although the parties may dispute how the Medicare regulations should be interpreted, the Complaint itself provides sufficient detail regarding how Life Care allegedly effected FCA violations to survive Defendant's Motion to Dismiss.

### 2.    The Government's *Jimmo* Settlement

Second, Defendant claims that the Government's FCA claims should be dismissed because the "Government's recent settlement in *Jimmo* leaves this Court without a clear and unambiguous legal standard by which to judge the 'truth or falsity' of the claims for skilled therapy services submitted by [Life Care]." (Doc. 81 at 23). The Government distinguishes the present case from the *Jimmo* litigation and asserts that the *Jimmo* litigation contained "allegations that the [g]overnment denied and settled without any admission of liability." (*Id.*).

The Court finds Defendant's argument that the *Jimmo* settlement agreement "favor[s] dismissal," to be irrelevant at this stage of this litigation. (Doc. 81 at 23). In filing a motion to dismiss, Defendant seeks a determination whether the Government's claims should be dismissed based on the sufficiency and plausibility of its pleading. *See Iqbal*, 556 U.S. at 679. Without going into a detailed history of the *Jimmo* litigation, a settlement agreement entered into in another case in another district need not affect the

way the Government has pled the claims in this action and cannot be determinative of the way the Court decides Defendant's  instant Motion.  Even if Defendant found the factual and legal circumstances of this case and the *Jimmo* case to be similar, those arguments would be cognizable by this Court only if and when Defendant files a motion for summary judgment, not on this motion to dismiss.  Accordingly, the Court finds this argument premature at this juncture of the litigation.

In conjunction with its discussion of the *Jimmo* litigation, Defendant also asserts that there is an inherent issue with the Medicare regulations that state that services must be "reasonable and necessary" because they are "vague" and "confusing," and leave no clear standard for Defendant to follow.  (Doc. 81 at 24-25).  However, it appears to the Court that, throughout its brief, Defendant takes two inconsistent positions regarding the Medicare regulations: (1) arguing that the Medicare regulations are "confusing" and ambiguous; and (2) arguing that the Medicare regulations depend on "individual assessments" by the patient's physician, which have resulted in a "difference of medical opinion" between the Government and Defendant.  (Doc. 81 at 25-27).  To the Court, these arguments appear to be in direct conflict with one another.

Although Defendant first argues that the regulations were ambiguous and confusing, leaving Defendant unable to follow them, it then argues that the regulations were followed by Defendant, but that they depend on the individual assessments given by a patient's therapist.   (*Id.*).  Given the inherently conflicting nature of Defendant's own position, which are partially dependent on factual allegations, the Court is reluctant to decide this issue at this juncture of the litigation.  If Defendant wishes to challenge the constitutionality of the Medicare regulations as being overly broad or vague, it may file a motion to that effect, specifying whether it wishes to assert a facial or as-applied

challenge to the Medicare regulations.  *See Simon v. Cook*, 261 F. App'x 873, 882 (6th Cir. 2008); *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 556 (6th Cir. 1999).

### 3.    MDS Forms Constituting a False Statement or Record

Third, Defendant claims that the Government's Complaint must be dismissed because it fails to allege any false statements or records.  (Doc. 81 at 29).  Specifically, Defendant claims that (1) the data contained in the MDS was not false because Defendant provided those therapy minutes to the patients; and (2) the Government does not claim that Defendant did not comply with Medicare regulations regarding the collection of the data contained in the MDS and so the Government must agree that Defendant complied with these Medicare regulations.  (*Id.* at 30).  In response, the Government asserts that the MDS forms "included minutes for medically excessive, unnecessary, and unreasonable therapy" and were material to the falsity of the claims. (Doc. 86 at 16).  The Government argues that, since the MDS forms contained "non-billable minutes," Life Care "made, used, or caused to be made or used false statements material to false or fraudulent claims" when it knowingly submitted them.  (*Id.*).

The Court agrees with the Government's argument that Defendant's focus on how the minutes were collected is misplaced given the language of the regulation and the allegations in the Government's Complaint.  Defendant focuses on the requirements for the collection process, but does not address the allegations set forth within the Government's Complaint.  (Doc. 81 at 30).  In its Complaint, the Government claims that Defendant submitted false claims by knowingly submitting MDS forms that included therapy minutes for medically unnecessary and unreasonable services.  (Doc. 86 at 16).  The MDS forms are material to any claim being submitted to the Government

for payment because they determine the amount that the submitter will be paid.  63 FR 26252-01; 70 FR 45026-01.  Therefore, based on the Government's allegations that Defendant submitted false claims by billing unnecessary and unreasonable services, the data contained within the MDS would necessarily be material to the false claim because it would influence the amount of payment the person submitting the claim would receive.  Accordingly, the Court finds Defendant's argument to be without merit.

### 4.   Defendant's Claims Regarding the Sufficiency of the Government's Complaint under Rule 9(b)

Fourth, Defendant argues that the Government's Complaint does not satisfy Federal Rule of Civil Procedure 9(b) because it does not specify "the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." (Doc. 81 at 32)(quoting *Bledsoe II*, 501 F.3d at 509).  The Government argues in response that it has fully satisfied the standard set forth in Rule 9(b), and it is not required to prove its allegations or meet a summary judgment standard before proceeding to discovery.  (Doc. 86 at 18-19).

In support of this argument, Defendant first asserts that the Government has stated conclusory allegations in its Complaint rather than identifying specific false representations.  (Doc. 81 at 32).  Specifically, Defendant argues that the Government does not use a standard to explain why the therapy services prescribed by certified physicians were not reasonable or necessary.  (*Id.* at 33).  Defendant claims that this is significant because the Government's alleged falsities would not affect the Government's payment, therefore failing to satisfy the FCA's "materiality" prong.  (*Id.*).

23

At the outset of this discussion, the Court notes the complexity of the Complaint and factual allegations. As Defendant states in its Motion, there are many patients allegedly affected, most receiving therapy at different Life Care locations with varying therapy minutes and therapy disciplines. (*Id.*). However, as a preliminary matter, the Court does not find that the combination of these factors make it impossible for the Government to plead its claims with the required specificity of Rule 9(b). The crux of the Government's Complaint concerns general allegations that "Life Care engaged in a nationwide scheme to pressure therapists into submitting claims for rehab therapy that included medically unnecessary and unskilled minutes." (Doc. 86 at 20; Doc. 69 at 3). The approach that the Government has taken in pleading this claim with specificity is explaining the billing structure for Medicare and the corporate structure for Life Care, alleging how Life Care was submitting false or fraudulent claims based on false statements or records, and listing specific locations, managerial employees, and representative patients involved in the false or fraudulent claims. (Doc. 69).

In its Motion to Dismiss, Defendant takes issue with the Government's Complaint by highlighting an example patient identified as "Patient D." (Doc. 81 at 33). In its Complaint, the Government describes Patient D as a 92-year-old patient who was "dying" of metastatic cancer, received Ultra High levels of therapy for the two weeks leading up to his death, and received 941 minutes of therapy on the MDS. (Doc. 69 at 33-35; Doc. 81 at 33). Considering that the Ultra High RUG level only requires 720 minutes, Defendant argues that, even if 200 of Patient D's minutes were unskilled, he would "still exceed the 720 minute threshold to qualify for the 'Ultra High' category–and the alleged 'falsity' would not be material because it would not influence the amount of the Government's reimbursement to [Life Care] in any way." (Doc. 81 at 33-34).

24

However, while it is possible that Defendant's assertions are true, the Court is not to weigh evidence or make credibility determinations when considering a Motion to Dismiss, but rather evaluate the sufficiency of the pleadings. *See Iqbal*, 556 U.S. at 679. *Twombly*, 550 U.S. at 570. Based on this consideration as well as the detailed nature of the Government's Complaint, the Court finds Defendant's argument to be lacking in merit.

Defendant next argues that the Government has failed to "provide factual support linking the allegedly improper schemes to the submission of an *actual* false claim for payment to the Government." (Doc. 81 at 34). In support of its argument, Defendant cites *U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*, which states that "[a] plaintiff may not describe an alleged fraudulent billing scheme in detail but then allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government."[7] 525 F.3d 439, 446 (6th Cir. 2008) (quoting *United States ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F.Supp.2d 1027, 1034 (S.D.Fla. 2007)). Defendant specifically takes issue with the fact that "the Complaint tellingly fails to specify a single claim that was influenced by these purported practices and submitted to the Government as a result." (Doc. 81 at 35).

Unlike the cases that Defendant relies on in its brief, the Government has sufficiently supported its claims that Defendant violated the FCA by submitting false or

---

[7] The Court notes that Defendant also cites and discusses a District of Maryland case, *United States v. Kernan Hosp.*, 880 F. Supp. 2d 676 (D. Md. 2012). In *Kernan*, the Court stated that, "[h]ere, the primary failure of the Government's Complaint is its lack of specificity as to the precise false claims at issue in this litigation—in fact, the Complaint does not identify a single false claim actually submitted to the government for payment." *Id.* at 686. Unlike the *Kernan* complaint, the government has provided the Court and Defendant with a list of Medicare claim numbers from various Life Care facilities on numerous dates for a representative class of patients. *See* Doc. 69 at 52-53. Therefore, the present case is easily distinguishable from *Kernan* and, in any case, the *Kernan* decision is not binding precedent on this Court.

fraudulent claims with factual allegations which make reference to representative patients. Although the Government has not provided a detailed analysis of each and every claim and patient affected by the alleged "inflated therapy minutes," it is not required to do so at this stage of litigation.  (Doc. 86 at 27).  As discussed above in the Court's overview of motions to dismiss under Rule 9(b), Rule 9(b)"does not require a plaintiff to be omniscient, . . . . [and] the main purpose behind Rule 9(b) is to provide notice of a plaintiff's claim to a defendant so that the defendant may be able to prepare an informed responsive pleading." *BAC Home Loans Servicing LP,* 848 F. Supp. 2d at 827.  In the Government's pleading, it does not limit its arguments to a discussion of Defendant's alleged fraudulent scheme regarding inflated therapy minutes.  (Doc. 69). Instead, the Government discusses the billing scheme along with the minutiae of that scheme: the corporate directives, the relevant forms, and the process by which an allegedly false claim is created.  Further, the Government uses a representative class of patients that were allegedly affected by Defendant's fraudulent practices to illustrate how Defendant's actions knowingly created false claims.  (Doc. 69 at 52, 53).  The factual allegations provided in the Government's Complaint permit the Court to draw a reasonable inference that Defendant's billing practices resulted in fraudulent or false claims being submitted to the Government.  *See Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

Defendant's next argument is that the Government fails to set forth the timing of any fraudulent conduct, the identification of individuals involved with submitting false claims, and the location of the alleged fraud.  (Doc. 81 at 36-38).  The Government responds that it has met the requirements of Rule 9(b) because it alleged a "rough" time period of the conduct and satisfied the pleading standard for a corporate defendant.

(Doc. 86 at 28).  In arguing that the Government's claims should be dismissed on these grounds, Defendant once again focuses on the general overview of the Government's claims.  *See* Doc. 81 at 36 ("[t]he Complaint here vaguely alleges that [Life Care] has 'engaged in a systematic scheme' to submit false claims 'from at least 2006 to the present'").  By parsing out broad phrases from the Complaint, Defendant argues that the entire Complaint is based on "[v]ague assertions of time frames" and gives Defendant insufficient notice to defend itself against these claims.  (*Id*. at 36-38).

The Court finds Defendant's arguments to be unpersuasive.  Although the Government's overarching theory of its case is that Defendant had a corporate scheme to perpetuate false or fraudulent claims, the Government sets forth details and factual allegations within its Complaint sufficient to satisfy the elements of both of its FCA claims.  The Government does assert that Defendant was filing false or fraudulent claims for a significant period, but it also details specific dates, locations, and persons supporting its claims.  *See* Doc. 69 at 18 ("in 2006, Antoinette Muelke, then the Regional Rehab Director for the Sun States region in Florida, sent an email on June 8 to all the Rehab Managers in her region asking those managers whose facilities had Ultra High percentages below 61 percent to create an action plan on 'how you will make it happen' that month"); Doc. 69 at 24 ("a May 2006 Facility Visit Summary for Life Care's Bridgeview Estates facility in Twin Falls, Idaho, stated that the '[Regional Rehab Director] encouraged a trend where RU was a greater focus including over the next 3 months doubling to tripling RU and halving the RV trends'"); Doc. 69 at 25 ( stating that in a "December 2006 Facility Visit Summary, the Regional Rehab Director urged the facility to utilize 'Saturday and Sundays to assign [patient] treatment in order to capture RU or 720 minutes (especially 5 and 14 day assessments)'"); Doc. 69 at 26 ("[i]n April

2007, a regional vice president in the Heartland Division told Life Care during his exit interview that the $400 club 'placed enormous stress on the executive directors to do whatever was necessary (but not always legal or ethical) to be members of this club.'"). In addition to providing specific examples of Defendant's alleged actions, the Government also attached a list of representative patients, their claim numbers, the Life Care facility at which they received services, and the date the Government received their claims. (Doc. 69 at 52-53). Accordingly, the Court finds that the Government's factual allegations sufficiently plead the individuals involved and the timing of the fraudulent conduct.

Defendant next argues that the Government's FCA claims should be dismissed because it fails to plead each fraudulent scheme with particularity and fails to identify examples of specific false claims representative of a broader class of claims. (Doc. 81 at 39-42). Specifically, Defendant quotes *Bledsoe II*, in which the court concluded that "the concept of a false or fraudulent scheme should be construed as narrowly as is necessary to protect the policies promoted by Rule 9(b)." *Bledsoe II*, 501 F.3d at 510. However, the Court then holds that "the examples that a relator provides will support more generalized allegations of fraud only to the extent that the relator's examples are *representative samples* of the broader class of claims." *Id.* (emphasis in original). As the Court has already thoroughly discussed the Government's representative patients throughout this Order and the *Bledsoe II* court is clear that representative patients can support more general allegations, the Court will not further discuss Defendant's argument and finds that the Government has sufficiently pled each fraudulent scheme with particularity.

Defendant's final argument that the Government's FCA claims should be dismissed is that the Government used the FCA investigation phase to conduct unilateral discovery, which violated statutory requirements.  (Doc. 81 at 42-48).  The Government argues that it did comply with the procedural requirements of the FCA, and that dismissal of its claims too severe a sanction considering the factual circumstances of this case.  (Doc. 86 at 34).

The Court discussed this issue in depth in its November 15, 2012 Order.  (Doc. 67).  In the Court's November 15, 2012 Order, it discussed the procedural requirements of filing a *qui tam* complaint and discussed the legislative history from which the FCA should be interpreted.  (*Id.* at 8-12).  From that analysis, the Court concluded that the Government's actions thus far in the proceedings were "approach[ing] the abusive," overreach[ing,] and "wholly inappropriate."  (*Id.* at 9-10).  The Court also denied the Government's Motion to retain certain documents under seal and stayed the unsealing of this case until November 30, 2012.  (*Id.* at 16).  Finally, the Court ordered that:

> the Government is put **ON NOTICE** that, in all future *qui tam* proceedings under the False Claims Act, the Court will expect the Government to provide notice regarding its intervention within the statutorily mandated 60-day period.  Should the Government seek to extend the period in which it may elect to intervene (and, thus, the period in which the case remains under seal), the Court will expect it to delineate a clear rationale for the extension in view of the statute's substantive "good cause" requirement.  Given the Government's conduct in this action and other *qui tam* cases before this Court, such requests will be met with significant scrutiny – allegations regarding a lack of resources or manufactured complexity simply will not suffice.

(*Id.* at 13).  As the Court has already discussed this issue at length and the Government has not perpetuated any further inappropriate actions regarding the procedural progress of this case, the Court does not find that dismissal on these grounds would be appropriate.  The Court has now discussed all of Defendant's arguments for dismissal of

29

the Government's FCA claims and has found each to be without merit.  Accordingly, Defendant's Motion to Dismiss (Doc. 30) will be **DENIED**.

### B        *Count III: Unjust Enrichment*

In its Motion to Dismiss, Defendant argues that the Government's claim for unjust enrichment should be dismissed "because it has not been recognized as a stand-alone claim for relief," it fails to show that Life Care was not entitled to reimbursement for the therapy services provided, and it fails to establish that the Government's reasonable expectations were defeated by Life Care's level of care.  (Doc. 81 at 49).

Under Tennessee Law, the elements of a claim for unjust enrichment are "(1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of such benefit under such circumstances that it would be inequitable for him or her to retain the benefit without payment of the value thereof."  *United States v. Goforth*, 465 F.3d 730, 733 (6th Cir. 2006) (citing *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005).  The Government often brings claims for unjust enrichment in order "to recover Government monies which are wrongfully obtained."  *United States v. Houston*, 2011 WL 4899983, at *7 (M.D. Tenn. Oct. 14, 2011).

Defendant argues that the claim of unjust enrichment is not a stand-alone claim for relief based on a footnote in *United States v. Houston*, 2011 WL 4899983, at *6 n.3 (M.D. Tenn. Oct. 14, 2011).  In *Houston*, the Court noted that "whether unjust enrichment is a stand-alone claim is subject to debate, at least under the laws of various states."  *Id.*  However, the *Houston* court does not discuss Tennessee common law or cite to binding precedent for this Court.  *Id.*  Accordingly, the Court does not find this to be a compelling argument. Additionally, the Sixth Circuit has recognized and discussed

unjust enrichment claims under Tennessee law, which further refutes Defendant's argument. *See Goforth*, 465 F.3d at 733.

Considering Defendant's arguments in conjunction with the elements of a claim for unjust enrichment under Tennessee law, the Court finds that the Government has sufficiently pled a claim for unjust enrichment. Based on the allegations in the Complaint, there was a benefit conferred upon Defendant when it allegedly submitted false or fraudulent bills for services that were at a medically unreasonable and unnecessary RUG level, Defendant appreciated and accepted this benefit, and it would be inequitable for Defendant to retain money that was given to it based on false or fraudulent claims. Accordingly, Defendant's Motion to Dismiss the Government's claim for unjust enrichment will be **DENIED**.

C.     *Count VI: Payment by Mistake*

Defendant also argues that the Government's claim for payment by mistake should be dismissed because the Complaint "fails to allege the Government was mistaken about any fact." (Doc. 81 at 50)(internal quotations omitted). The Government responds that the misrepresentations Life Care made in the billings it submitted to the Government are sufficient to satisfy the elements of a claim for payment by mistake. (Doc. 86 at 38).

Under the common-law theory of payment by mistake, the Government may "recover money it mistakenly, erroneously, or illegally paid from a party that received the funds without right." *Houston*, 2011 WL 4899983, at *6 (quoting *United States v. Medica Rents Co. Ltd.*, 2008 WL 3876307, at *3 (5th Cir. 2008)). Further, it is well-settled that "[t]he Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid." *United States v. Wurts*, 303 U.S. 414,

415 82 L. Ed. 932 (1938); United States v. The Estate of Williams Cole, 620 F.Supp. 126, 128-29 (W.D.Mich. 1985) ("'[i]t is well established that parties receiving monies from the Government under mistake of fact or law are liable . . . to refund them, and that no specific statutory authorization upon which to base a claimed right of set-off or an affirmative action for recovery of these monies is necessary"). Therefore, the elements for a common law payment by mistake claim are (1) a payment was made; (2) the payment was made based on a mistake, error, or it was illegally made; and (3) the party receiving the payment did not have the right to the payment. *Houston*, 2011 WL 4899983, at *6.

The Court disagrees with Defendant's interpretation of the common law claim of payment by mistake. Based on the factual allegations in the Government's Complaint, the Government made a payment to Defendant, the payment was based on a fraudulent or false claim, and Defendant did not have a right to the payment. *See* Doc. 69. Although the Government has not stated that they were specifically mistaken about certain facts, the Court concludes that the allegedly false or fraudulent data submitted in Defendant's billing is sufficient to satisfy the element of this claim that Defendant disputes. Accordingly, Defendant's Motion to Dismiss regarding the Government's claim for payment by mistake will be **DENIED**.

D.    *Count V: Conversion*

Defendant claims that the Government's final claim, conversion, should be dismissed because the Government fails to set forth a *prima facie* case for conversion and it does not identify who exercises control over the money paid by the Government to Life Care and its facilities. (Doc. 81 at 50). In response, the Government asserts that the Complaint "expressly indicates that the Government paid funds to Life Care and its

facilities" and any issues regarding whether the funds were "diverted to other entities that Life Care does not control" is a matter for discovery.  (Doc. 86 at 38).

The common law claim for conversion "involves an act of control or dominion over the property that seriously interferes with the owner's rights." *Houston*, 2011 WL 4899983, at *6 (citing *United States v. Stockton*, 788 F.3d 210, 215 (4th Cir. 1986)).  As discussed by the court in *Houston*,  "[t]he notion that the act of dominion or appropriation is contrary to the wishes of the owner, or at least without clear permission from the owner, is inherent in the concept of conversion, but conversion can also occur following the lawful entrustment of property to the defendant." *Id.* (internal quotation omitted).

The Court finds that the Government's pleading sufficiently sets forth a claim for conversion.  The Complaint states factual allegations that the Government paid funds based on a fraudulent or false claim to Life Care that was then controlled by Life Care "in defiance of the United States' rights."  (Doc. 69 at 49).  Therefore, because the Complaint sets forth adequate facts to plead the elements of a plausible claim for conversion, Defendant's Motion to Dismiss the Government's claim for conversion will be **DENIED**.

## IV.    CONCLUSION

Accordingly, and for the reasons stated herein, Defendant's Motion to Dismiss (Doc. 80) is hereby **DENIED,** and Defendant's  Motion to File Memorandum of Law in Excess of 25 Pages (Doc. 79) and Unopposed Motion for Extension of Time to File Response/Reply  (Doc. 88), and Plaintiff's Motion for Leave to File Excess Pages (Doc. 84) is hereby **GRANTED**.

**SO ORDERED** this 26th day of March, 2014.


_____/s/ Harry S. Mattice, Jr._____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE