1

1      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF VIRGINIA
2            ALEXANDRIA DIVISION

3

    UNITED STATES OF AMERICA *ex rel.*)
4   RIBIK                             )
                                      )
5        VS.                          )    1:09-CV-13
                                      )
6                                     )  ALEXANDRIA, VIRGINIA
                                      )  OCTOBER 27, 2017
7                                     )
    HCR MANORCARE, INC., *et al.*     )
8   _____ )

9

10

11

12

13  _____

14            **TRANSCRIPT OF MOTION HEARING**
        **BEFORE THE HONORABLE THERESA CARROLL BUCHANAN**
15            **UNITED STATES MAGISTRATE JUDGE**

16                  *FTR GOLD*

17  _____

18

19

20

21

22

23

24  **Proceedings reported by stenotype, transcript produced by**

25  **Julie A. Goodwin.**

2

1                          A P P E A R A N C E S

2

3    FOR THE UNITED STATES:
             UNITED STATES ATTORNEY'S OFFICE
4            By:  MR. RICHARD SPONSELLER
             Assistant United States Attorney
5            2100 Jamieson Avenue
             Alexandria, Virginia  22314
6            703.299.3700

7
             UNITED STATES DEPARTMENT OF JUSTICE
8            By:  MS. ALLISON CENDALI
                       -AND-
9            MR. DAVID B. WISEMAN
             Attorneys, Civil Division
10           P.O. Box 261, Ben Franklin Station
             Washington, D.C.  20044
11           202.353.8297
             david.wiseman@usdoj.gov

12

13

14   FOR RELATOR CHRISTINE RIBIK:
             THE LAW OFFICE OF JEFFREY J. DOWNEY, PC
15           By:  MR. JEFFREY J. DOWNEY
             8270 Greensboro Drive, Suite 810
16           McLean, Virginia  22102
             703.564.7318
17           jdowney@jeffdowney.com

18

19

     FOR DEFENDANTS HCR MANORCARE, INC., MANOR CARE, INC.,
20   HCR MANOR CARE SERVICES, LLC, AND HEARTLAND EMPLOYMENT
     SERVICES, LLC:
21           REED SMITH LLP
             By:  MR. ERIC A. DUBELIER
22                     -AND-
             MS. KATHERINE J. SEIKALY
23           1301 K Street, N.W.
             Suite 1100 - East Tower
24           Washington, D.C.  20005
             202.414.9200
25           edubelier@reedsmith.com
             kseikaly@reedsmith.com

                                      ─ Julie A. Goodwin, CSR, RPR

3

1                          **A P P E A R A N C E S**

2

3   OFFICIAL U.S. COURT REPORTER:
          MS. JULIE A. GOODWIN, CSR, RPR
4         United States District Court
          401 Courthouse Square
5         Eighth Floor
          Alexandria, Virginia  22314
6         512.689.7587
          JGoodwinEgal@gmail.com
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1  (OCTOBER 27, 2017, *FTR GOLD*, 2:02 P.M., OPEN COURT.)

2          THE COURTROOM DEPUTY:  *Ribik versus Manor Care, Inc.,*

3  *et al.*; Case Number 09-CV-13.

4          Counsel, please note your appearances for the

5  record.

6          MR. SPONSELLER:  Good afternoon, Your Honor.  Richard

7  Sponseller, Assistant U.S. Attorney.

8          THE COURT:  Good morning, Mr. Sponseller.

9          MR. SPONSELLER:  Here with my Department of Justice

10  colleagues, Allison Cendali, who is going to be addressing the

11  Court this afternoon.

12          THE COURT:  All right.

13          MR. SPONSELLER:  And David Wiseman.  I believe you're

14  familiar with both of them.

15          THE COURT:  All right.  Thank you, Mr. Sponseller.

16          MR. DUBELIER:  Good afternoon, Your Honor.  Eric

17  Dubelier --

18          THE COURT:  Good afternoon.

19          MR. DUBELIER:  -- and Katherine Seikaly for the

20  defendants.

21          MR. DOWNEY:  Good morning, Your Honor.  Jeff Downey

22  for Relator Ms. Ribik.  We filed a brief to augment the

23  Government's argument.  And if the Court is inclined, we'd like

24  a few minutes of Your Honor's time.

25          THE COURT:  All right.

1          MR. DOWNEY:  But understand that this matter has been

2    briefed.

3          THE COURT:  All right.  This is on the defendants'

4    motion for sanctions.

5               Mr. Dubelier, I've read all of the briefs and I've

6    looked at all of the transcripts.  And is there anything that

7    you want to add?  I regard your reply brief as well.

8          MR. DUBELIER:  No, there's not, Your Honor, unless you

9    have any specific questions.

10         THE COURT:  I do not.

11         MR. DUBELIER:  Thank you.

12         THE COURT:  I'd like to hear from the Government.  And

13   I do have some questions for the Government.

14         MS. CENDALI:  Of course, Your Honor.  I'm prepared to

15   answer any questions that you have today.

16              Your Honor, there are two issues before the Court.

17   One is the late production of Dr. Clearwater's notes; and, two,

18   is the production of the draft beneficiary profiles that became

19   the final expert report that was submitted by Dr. Clearwater.

20   And I'd like to address both of those with you today.

21              With respect to Dr. Clearwater's notes, it is

22   regrettable that the notes were produced late, Your Honor.  As

23   soon as the United States counsel learned that the notes

24   existed, we informed defense counsel that there were additional

25   notes consistent with our obligations under the rules.

6

1          THE COURT:  But why did you wait a month to produce

2     them until after the motion in limine and after the motion for

3     summary judgment was filed?

4          MS. CENDALI:  Your Honor, that was not intentional.

5          THE COURT:  You had to know how important these were.

6          MS. CENDALI:  We did, Your Honor.  And the ex -- we

7     tried to expedite the production of the notes as quickly as

8     possible.

9          THE COURT:  What -- what could have taken so long

10    to -- to review?  I mean, we -- you admit that all of these

11    should have been turned over.

12         MS. CENDALI:  Yes, Your Honor.

13         THE COURT:  So why would it take weeks to turn them

14    over?  If they're -- if they are discoverable and the

15    defendants have a right to them, why would it -- why would you

16    have to take weeks to look at them before you turned them over?

17         MS. CENDALI:  Your Honor, there were some issues that

18    were technical issues with the processing of the documents into

19    the database, so they were put into a review platform for us to

20    review and that did take some time, Your Honor.  And that --

21         THE COURT:  What do you mean --

22         MS. CENDALI:  -- again is regrettable.

23         THE COURT:  What do you mean it took some time to put

24    into a review platform?

25              Was it your review that took weeks or was it

7

1  putting into this platform, whatever that is?

2          MS. CENDALI:  It was both, Your Honor.

3          THE COURT:  And so did you --

4          MS. CENDALI:  We received --

5          THE COURT:  -- ever inform -- and I take it you did

6  not.  You never informed defendants or the Court that there

7  were these notes out there that had not been produced, and

8  perhaps it would make sense that the defendants would have a

9  right to see that before they filed the motions.  You knew the

10 motions were coming.

11         MS. CENDALI:  Your Honor, we did, and we did inform

12 counsel on September 20th, the day that we learned about the

13 notes --

14         THE COURT:  Right.

15         MS. CENDALI:  -- that the notes existed --

16         THE COURT:  But you never --

17         MS. CENDALI:  -- and that we were --

18         THE COURT:  -- told them the volume of the notes --

19         MS. CENDALI:  We did not --

20         THE COURT:  -- or --

21         MS. CENDALI:  -- know the volume of the notes at that

22 time -- at that point in time, Your Honor.

23         THE COURT:  When did you -- you learned of the

24 documents on the 20th of September.  Correct?

25         MS. CENDALI:  That is correct.  We learned from

1   AdvanceMed's counsel who was responsible for collecting

2   documents from AdvanceMed, and Dr. Clearwater --

3            THE COURT:  When did you --

4            MS. CENDALI:  -- is an employee of AdvanceMed.

5            THE COURT:  -- receive them?

6            MS. CENDALI:  We received them on September 27th.

7            THE COURT:  Okay.  So you still didn't inform

8   Mr. Dubelier how many there were, did you?

9            MS. CENDALI:  We did not know how much that there were

10  until they were put into the platform, Your Honor.

11           THE COURT:  Well, wait a minute.  We're first talking

12  about a handwritten set of notes in a notebook.

13           MS. CENDALI:  That is correct, Your Honor.

14           THE COURT:  That didn't take --

15           MS. CENDALI:  They're scanned copies.

16           THE COURT:  -- any uploading or platforming or

17  anything else.  Correct?

18           MS. CENDALI:  That is correct, Your Honor.

19           THE COURT:  So, why weren't those promptly produced?

20  Why would they take weeks to produce?

21           MS. CENDALI:  Your Honor, again, we had the notes.  We

22  were trying to review them as quickly as we could so that we

23  could determine whether or not the patients in there were

24  indeed ManorCare patients or whether or not there were notes

25  with discussions from counsel on there, Your Honor.

9

1    THE COURT:  Well, you knew when they were taken, did

2    you not?  Didn't Ms. Clearwater tell you when she took these

3    notes?

4              Wasn't it evident that they were notes about the

5    patients?

6         MS. CENDALI:  It was notes about patients, but

7    Dr. Clearwater conducts reviews for other -- for other projects

8    for DOJ.

9         THE COURT:  But she told you, and you understood as of

10   September 20th at the latest, that these were notes related to

11   this case and these patients.  Isn't that correct?

12        MS. CENDALI:  That is correct, but I -- we had not

13   seen the notes to confirm that, Your Honor.

14        THE COURT:  All right.

15        MS. CENDALI:  Nor did we know whether or not

16   Dr. Clearwater -- and she could -- she did not tell us whether

17   or not the notes also contain notes from discussions with

18   counsel, so we wanted to make sure that those notes did not

19   contain those discussions.

20        THE COURT:  All right.  Anything else?

21        MS. CENDALI:  Yes, Your Honor.  We relied on

22   Dr. Clearwater's representations regarding the fact that she

23   did not have notes.

24        THE COURT:  Well, let me --

25        MS. CENDALI:  And I know --

10

1          THE COURT:  Let me ask you this.

2          MS. CENDALI:  Sure.

3          THE COURT:  Because it's clear that the defendants

4    requested notes, such as these, in their requests for

5    production of documents a year ago.  And these notes were

6    responsive to that request for production of documents.  Yet,

7    it appears as though the Government didn't actually ask

8    Dr. Clearwater about notes until her deposition subpoena was

9    issued.  Is that correct?

10          MS. CENDALI:  That is not correct, Your Honor.  And if

11   that's --

12          THE COURT:  Well, that's what your brief --

13          MS. CENDALI:  -- not clear --

14          THE COURT:  -- says.

15          MS. CENDALI:  I'm sorry.

16          THE COURT:  That's what your brief says.  And that's

17   what your declaration from Ms. Reed says.

18          MS. CENDALI:  That wasn't the first time that we had

19   asked for notes, Your Honor.  Over the course of our work with

20   Dr. Clearwater, and especially when it became clear that the

21   case was going into litigation, we had discussed and requested

22   notes from Dr. Clearwater, notes relating to the review.  And

23   we asked that she confirm with her team of whether or not any

24   notes existed.

25          THE COURT:  But she apparently never did that, did

1   she?  Because Ms. Jessee testified that she was never asked

2   about notes until the day before her deposition.  And I take it

3   that that was probably the Department of Justice attorneys who

4   asked her about that.

5           MS. CENDALI:  That is correct, Your Honor.  We --

6           THE COURT:  So that's in -- that's not true.  If she

7   told you that she had asked her nurses about notes, then that

8   was not true.  Is that correct?

9           MS. CENDALI:  Um --

10          THE COURT:  How could I come to any other conclusion?

11          MS. CENDALI:  That is correct.  Dr. Clearwater

12   represented that the reviewers used the beneficiary profiles,

13   those electronic documents, to track the information that they

14   were doing in the medical review to take notes.

15          THE COURT:  Okay.  So she never -- but she never asked

16   her nurses, as she told you she did, that there -- were there

17   any notes.

18          MS. CENDALI:  I don't know that for certain, Your

19   Honor.

20          THE COURT:  But we do know that, because Ms. Jessee

21   testified that no one asked her about any notes until the day

22   before her deposition.

23          MS. CENDALI:  That's correct --

24          THE COURT:  Right?

25          MS. CENDALI:  -- Your Honor.  Yes.

1        THE COURT:  So, why also -- I'm having trouble

2   reconciling her testimony that there were no electronic notes.

3   She testified that they never used the comment feature of the

4   Word documents to communicate or to make notes.  And she, I

5   assume -- did you ask her about electronic notes as well?

6        MS. CENDALI:  I did, Your Honor.  We did --

7        THE COURT:  And she said there were none?

8        MS. CENDALI:  She said that the only notes were those

9   from the drafts of her -- that what became her final report.

10  And we had seen those drafts, and those comments were for the

11  most part discussions about rewording things or typos or

12  citations --

13       THE COURT:  So she --

14       MS. CENDALI:  -- to the record.

15       THE COURT:  -- never disclosed to you all of these

16  electronic notes that were the communication method between the

17  nurse reviewers and Dr. Clearwater.  Is that correct?

18       MS. CENDALI:  No, that's not correct.  She disclosed

19  to us that there were the drafts of her report, and so we knew

20  that those existed.  And I believe in her testimony --

21       THE COURT:  So you never looked at them to see that

22  there were indeed -- and I can see in here as the exhibits that

23  were produced to me, that there were questions and comments by

24  various people on these -- on this Word document.  Correct?

25       MS. CENDALI:  That is correct, Your Honor.

13

1        THE COURT:  And so that would have been discoverable

2   by the defendants, as you now concede.  Correct?

3        MS. CENDALI:  Well, Your Honor --

4        THE COURT:  And should have been turned over to them

5   prior to the deposition in compliance with the discovery

6   requests.  Isn't that correct?

7        MS. CENDALI:  Well, Your Honor, the United States

8   relied on the Rule 26(b)(4) that these were drafts of the

9   expert report.  Because in fact, Your Honor, if you can look at

10  the -- those documents and if a comparison is made --

11       THE COURT:  But you've conceded now that they are

12  discoverable by the defendants, because they were draft reports

13  before they were turned over to you.  They're not drafts

14  between you and the -- and Ms. Clearwater.  They were drafts

15  between she and her nurse reviewers that contained comments,

16  questions, judgments, re-judgments, changing of times that were

17  appropriate - all kinds of back and forth prior to the report

18  being produced.  And they had specifically asked in the request

19  for production of documents for any documents that were -- that

20  reflected a difference of opinion between the reviewers.

21  Correct?

22       MS. CENDALI:  That is correct, Your Honor.

23       THE COURT:  So this -- you've conceded that this was

24  entirely discoverable.  You've turned it over to them now.  So

25  my question is, you now represent to me as an officer of the

14

1  Court that you were -- that you asked Ms. Clearwater about

2  those notes, and that she's telling -- she told you that there

3  were none others than these drafting kind of errors or changes.

4  Is that correct?

5          MS. CENDALI:  That is correct, Your Honor.

6          THE COURT:  So that is another untruth that she told

7  you then.  Is that correct?

8          MS. CENDALI:  That is something that --

9          THE COURT:  It's correct.  Say it as --

10          MS. CENDALI:  That's correct, Your Honor.

11          THE COURT:  Okay.

12              Now, I have some more questions.

13          MS. CENDALI:  Sure.

14          THE COURT:  As I understand it from your declaration

15  and your brief, Department of Justice attorneys never asked the

16  nurses directly about their notes.  You relied on Clearwater

17  and Bogan.

18          MS. CENDALI:  And counsel for AdvanceMed, Your Honor.

19  Yes, that is correct.  Those were the two people that the

20  United States engaged --

21          THE COURT:  Isn't that -- isn't Bogan counsel for

22  AdvanceMed?

23          MS. CENDALI:  No, that's Brandy Reed.  She

24  submitted --

25          THE COURT:  Okay.

1          MS. CENDALI:  -- a declaration as well.

2          THE COURT:  All right.  I had that backwards then.

3             Okay.

4          MS. CENDALI:  Sure.

5          THE COURT:  So who is Bogan?

6          MS. CENDALI:  Ms. Bogan is one of the nurse reviewers

7    who assisted Dr. Clearwater, but she's --

8          THE COURT:  So you didn't ask all the nurses

9    yourselves.  You relied on them?

10          MS. CENDALI:  We did, Your Honor.  We didn't think

11    that that was unreasonable to rely on them --

12          THE COURT:  I'm just --

13          MS. CENDALI:  -- for their representations.

14          THE COURT:  -- clarifying.

15          MS. CENDALI:  That is correct.

16          THE COURT:  Now, at the deposition, Ms. Clearwater

17    represented and stated that she would ask her nurses then if

18    they had any notes.  Correct?

19          MS. CENDALI:  That is correct.

20          THE COURT:  But Ms. Jessee, again, said she was never

21    asked about notes until the day before the deposition when

22    Department of Justice attorneys asked her.

23             So, she apparently, even though she represented

24    that she would -- in fact, later in the deposition she said she

25    had sent and e-mail I guess during a break.  That apparently

16

1    did not happen.  Is that correct?

2              MS. CENDALI:  So, Your Honor, I think that there's

3    some confusion in the exchange.  What was asked of

4    Dr. Clearwater was whether or not she had notes or whether any

5    of the reviewers took notes during meetings or discussions

6    between the reviewers.  And so that is the question that she

7    posed to the reviewers.

8              THE COURT:  Well, she was asked about notes

9    repeatedly.

10             MS. CENDALI:  Yes, she was, Your Honor.

11             THE COURT:  And she repeatedly said, I do not recall.

12   Which in and of itself is -- that's another subject.

13                  But, if I look at her transcript...

14                  All right.  She asked about notes:  Did the nurse

15   reviewers take any notes?

16                  I don't know.

17                  Did you ask them whether they took notes?

18                  No.

19                  So that's directly contrary to what they

20   told -- she told you.

21                  Do you know whether or not they have any notes of

22   any of the discussions?

23                  I don't.

24                  Okay.  Is there a way, could you find out?

25                  I don't think so.

1           Then they ask, You mean there's no way we

2    could -- you could ask?

3           She said, I could call them, yes.

4           Are you going to do that tonight?

5           I don't know.

6           I'm going to ask you to do it.  Are you going to do

7    it?

8           I'll call and ask, I suppose.

9           Well, you suppose?  Yes or no?

10          Yes, I will.  Yes, I will call and ask them if

11   that's what you would like.

12          Then later, she said, on page 82 to 83:

13          Did you ever take a note ever with

14   pace -- piece -- pen or a piece of paper about questions that

15   was asked to you by one of the reviewers?

16          I don't recall.

17          Did any of your reviewers do that?

18          I do not know.

19          Have you asked them?

20          Yes.

21          And what did they say?

22          They didn't recall.

23          So, she never asked Jessee.

24          Let's see.  Then later, she says -- hold on a

25   minute.

1          Here it is.  Page 502:

2          Do you know whether or not your other reviewers

3  have notes that they kept during these reviews to indicate

4  specifically what they've put their eyes on?

5          I don't know.

6          You don't know?

7          I don't know.

8          Have you ever asked them?

9          Yes.  I've asked to send me an e-mail as you had

10  asked.

11          Okay.  So when you asked them whether or not they

12  had any notes indicating what specifically they had looked at

13  in the medical charts, did they answer?

14          And it's repeated.

15          She said, The information that we looked at is

16  tracking.

17          So she never -- she says that she sent an e-mail to

18  them, but she apparently did not.  So that was not truthful.

19  Correct?  Because Jessee said she was never asked about notes.

20          MS. CENDALI:  That is correct.  I think there was some

21  confusion, though, on the part of --

22          THE COURT:  Well, how was --

23          MS. CENDALI:  -- Dr. Clearwater, Your Honor.

24          THE COURT:  -- there an e-mail asked about notes if

25  Jessee said she was never asked for her notes until the day

1   before?

2        MS. CENDALI:  Um --

3        THE COURT:  Jessee never testified, I was asked about

4   different notes.  She said, I was never asked about notes until

5   the day before.

6             That's -- so that's incorrect, isn't it?

7        MS. CENDALI:  According to that transcript, that is

8   incorrect, Your Honor.

9        THE COURT:  I'm having a lot of trouble understanding

10  how someone could forget a whole notebook full, 131 pages of

11  notes, which is a lot of writing if you ask me.  It's like a

12  book.  How could she forget that she had these notes?

13       MS. CENDALI:  I share that, Your Honor, as well.

14  And I believe --

15       THE COURT:  And how could she not recall --

16       MS. CENDALI:  -- that she misunder -- I think she

17  misunderstood, though, the notes.

18       THE COURT:  But she obviously never even looked for

19  them, as she represented she had, if she so easily found them

20  in one filing cabinet in her home.

21       MS. CENDALI:  Your Honor, I think she was focused on

22  the filing cabinet that included the ManorCare file where that

23  is where she kept her records that she had for the ManorCare

24  case.

25       THE COURT:  How can I possibly find her credible --

1          (RECORDING SKIPS, THEN CONTINUES)

2          THE COURT:  -- comment section of the Word documents

3     when clearly -- and Jessee testified that that was how the

4     nurses communicated.  How can I find that she was credible at

5     all in her testimony when she has now, we know at least three

6     times, said untruthful statements in her deposition and to

7     Government lawyers?

8               How can I find any of her testimony credible when

9     we have, and you agree, that she was not truthful with you and

10    she was not truthful in her deposition?

11         MS. CENDALI:  Your Honor, I think that there was some

12    confusion on Dr. Clearwater's part.  And I think even the trial

13    tran -- the deposition transcript shows that there were

14    inconsistent statements in her testimony --

15         THE COURT:  You've told me that you agree that she had

16    to have lied to you about whether she asked nurses for notes,

17    that she had to have said untruths in her deposition about

18    whether she asked the nurses for notes, that she had to have

19    been untruthful in her deposition about whether or not they

20    used the comment section of the Word document.  And that's,

21    frankly, very clear.

22              Even if you can somewhat excuse or try to excuse or

23    come up with some theory to excuse her not producing her

24    handwritten notes, how can you possibly reconcile her testimony

25    in the deposition about the comment section of the Word

1  document?  How am I ever supposed to conclude anything other

2  than the fact that she's untruthful?

3          MS. CENDALI:  Your Honor, I think that she just didn't

4  recall.  I don't think her memory was very good with the

5  situation --

6          THE COURT:  5,000 pages?

7          MS. CENDALI:  Those comments were --

8          THE COURT:  5,000 pages of comments, and Jessee

9  testifies that that was the way they communicated was through

10 the notes.  How could somebody not remember that?  If that's

11 the way she's communicating with her notes -- her nurses, as

12 they're reviewing these files, over a long period of time, and

13 this is the way they communicate is through the notes, how

14 could she possibly not recall that?

15          And I've got to tell you, I find suspect that the

16 fact that she repeats over and over and over when they try to

17 pin her down about notes, "I don't recall, I don't recall, I

18 don't recall," how am I supposed to find that that's anything

19 other than evasion?

20          MS. CENDALI:  Your Honor, I just don't think her

21 memory was that good about what was happening during the review

22 period.  It -- she started the review in 2013, and it continued

23 on through 2016.

24          There were hundreds of pages of medical records.

25 She had conversations with the nurse reviewers on multiple

1  occasions.  They communicated a lot by phone, and not just in

2  the comment bubbles that you see there.  And I really do

3  believe that Dr. Clearwater just was somebody who is not a

4  professional witness.  I think three days of deposition

5  testimony was hard on her, and I just don't think that she

6  performed --

7           THE COURT:  Well, you would think after she was asked

8  a half a dozen times that it might occur to her that maybe she

9  did.  It wasn't one question and one answer and she forgot.

10 She was asked repeatedly over a number of days.

11           Don't you think she might have gone home at night

12 and thought, wow, you know, I wasn't really thinking about the

13 notes comment of this on the words -- on the Word document.

14 You know, that wasn't accurate.  Maybe I should correct my

15 testimony when I go in tomorrow.

16           That never happened, did it?

17           MS. CENDALI:  No, it didn't, Your Honor.

18           THE COURT:  Okay.

19           And she also testified that there was no reviewed

20 protocol that the nurses used when, in fact, there was one, a

21 numerical rating system, wasn't there?

22           MS. CENDALI:  No, Your Honor.  I think that there's

23 some misapprehension about what that is.  That was -- those

24 numeric numbers were used by the reviewers to track how many or

25 what types of denials they made.  That wasn't a review protocol

1   in the respect that it was a guidance to show the reviewers the

2   step-by-step review process.  And I think the --

3         THE COURT:  Well, she was asked repeatedly about the

4   process, and she said that they just relied on the manuals.

5   She never testified that they used a numerical system for

6   scoring.

7         MS. CENDALI:  It wasn't for scoring though, Your

8   Honor.  It was to keep track of the -- the types of denials

9   that were being made.  It wasn't --

10        THE COURT:  Hold on just a minute.

11        MS. CENDALI:  It wasn't used as a review --

12        THE COURT:  I'm sorry.  You're going --

13        MS. CENDALI:  I'm sorry.

14        THE COURT:  -- to have to stop because our recording

15  system stopped working.

16        When did it stop?

17        We've got to get it up and running before we go

18  further.

19        MS. CENDALI:  Sorry.  Yes, Your Honor.

20        THE COURT:  Can we get Lance up here?  All right.

21        I'm going to take a brief recess because I want

22  this to be on the record.

23        THE LAW CLERK:  All rise.  The Court takes a brief

24  recess.

25     (RECESS TAKEN.)

24

1          THE LAW CLERK:  Please be seated and come to order.

2          THE COURT:  All right.  So I don't know at what point

3    the recording process stopped, but to recap, Ms. Cendali, we've

4    reviewed the deposition transcript of Ms. Clearwater together,

5    and we've talked about Ms. Jessee's transcript excerpts.  And

6    the Government's briefed some of the exhibits, and the

7    Government has agreed that Clearwater was not truthful with the

8    Government on several occasions during the course of the

9    discovery when she represented that she looked for notes and

10   had none, that she had asked her nurses about notes when she

11   had not, and that they did not make electronic notes to

12   communicate when they did.  Correct?

13         MS. CENDALI:  Your Honor, I believe that those were

14   all honest mistakes by Dr. Clearwater --

15         THE COURT:  I understand.  But you have conceded that

16   that's correct.

17         MS. CENDALI:  I will not concede that she lied.  I

18   think that she --

19         THE COURT:  Well, I --

20         MS. CENDALI:  -- honestly did not --

21         THE COURT:  Ms. Cendali.

22         MS. CENDALI:  Yes, Your Honor.

23         THE COURT:  You and I had a direct back and forth, and

24   you agreed that she was not truthful with the Government, at

25   least, and on some of her statements in the deposition.  Isn't

25

1   that correct?

2          MS. CENDALI:  Your Honor, I think in --

3          THE COURT:  Don't --

4          MS. CENDALI:  -- in reflecting --

5          THE COURT:  Don't prevaricate.  I'm asking you about

6   our exchange.

7          MS. CENDALI:  Our exchange previously, yes, Your

8   Honor.

9          THE COURT:  Okay.

10         MS. CENDALI:  Up --

11         THE COURT:  And the Government --

12         MS. CENDALI:  Uh-huh.

13         THE COURT:  -- you conceded that she was untruthful in

14  her deposition when she said she would call and had e-mailed

15  nurses about their notes, and she did not; the fact that she

16  had no handwritten notes, and she did; and that there were no

17  electronic notes made by her and her nurses in the comment

18  section, the Word documents, but they did use that as their

19  method of communication.  And you and I agreed that that was

20  untruthful.  Correct?

21         MS. CENDALI:  Your Honor, with one clarification.

22  Dr. Clearwater did contact the nurses, at least Marna Bogan,

23  and asked her --

24         THE COURT:  Right.

25         MS. CENDALI:  -- to contact everyone to determine

1   whether or not there were notes.

2        THE COURT:  But apparently that never happened, and

3   Ms. Jessee was never contacted.  Correct?

4        MS. CENDALI:  I believe that, but I do believe that

5   there may still be some miscommunication about what notes were

6   asked for, what notes were requested.

7        THE COURT:  Well, Ms. Jessee said she was never asked

8   for any notes.  Correct --

9        MS. CENDALI:  I think she was --

10       THE COURT:  -- until you asked for them?

11       MS. CENDALI:  -- never asked for -- I think Ms.

12   Jessee's testimony is that she wasn't asked for the notes that

13   she was -- had produced at the deposition.

14       THE COURT:  All right.  I'm -- you know what, I'm not

15   going to -- I don't want you to dig yourself a hole, but that's

16   what we discussed and that she -- I understand you're trying to

17   come up with excuses for her, but it's apparent, I believe, and

18   I think you agreed, that Ms. Jessee was not asked about notes,

19   because that was her testimony that she was not asked about

20   notes until you asked her or her Government lawyer asked her

21   the day prior.  Correct?

22       MS. CENDALI:  That is Ms. Jessee's testimony, Your

23   Honor.  Correct.

24       THE COURT:  Okay.

25        So, is there anything else that you want to say?

1          MS. CENDALI:  Yes, Your Honor, a few points.

2          I know Your Honor believes that Dr. Clearwater was

3   not being truthful, and I agree that the deposition testimony

4   looks as if there were inconsistencies in what Dr. Clearwater

5   had believed to be with respect to the notes.

6          I still believe, Your Honor, that this was an

7   honest mistake by Dr. Clearwater.  I don't think that there was

8   any intention to mislead the Court or mislead the Government,

9   and I don't think that there was any malfeasance on

10  Dr. Clearwater's part.  And, in fact, all of this goes to the

11  weight of her testimony, Your Honor.

12         And we're not saying that these late productions

13  were not a mistake, but the question I think before the Court

14  today is whether or not the level of conduct here is

15  sanctionable, and if so, what is the appropriate remedy in

16  light of the defendants' rights here.

17         And, Your Honor, I would submit that there was no

18  bad faith on the part of the Government.  There was no bad

19  faith on part -- on the part of Dr. Clearwater.  And this case

20  does not merit sanctions, let alone dismissal or exclusion of

21  Dr. Clearwater.

22         Defendants can make arguments in their *Daubert*

23  briefing, or have made arguments in their *Daubert* briefing.

24  And, Your Honor, the United States would not object to

25  supplemental briefing by the defendants to bolster any

1  arguments that they might have regarding Dr. Clearwater's

2  credibility, but Dr. Clearwater's credibility goes to the

3  weight of her testimony, not to whether or not she's qualified

4  to testify as an expert.

5           And, Your Honor, this is not the case where the

6  Government knew of notes and failed to turn them over or a case

7  where the Government failed to give any discovery or any

8  discovery orders, and any prejudice to the defendants can be

9  ameliorated by additional deposition testimony to elucidate

10 information concerning the notes or the draft profiles.

11          Those draft profiles were, the United States

12 believed at the time, to be drafts of the expert report, which

13 they were.  A lot of the comments, Your Honor, are comments

14 about questions, but some of the questions are whether or not

15 there's -- the date is correct or the Bates number is correct.

16          And so, Your Honor, I would submit that any

17 sanctions in this case be short of dismissal or exclusion of

18 the expert.

19          THE COURT:  Well, we're not talking about weight of

20 testimony.  We're talking about credibility.

21          There were so many repeated, I think, untruths.

22 You call them mistakes now, but you agreed previously that they

23 were not truthful comments or representations to the Government

24 as well as in her deposition, that I can't find anything

25 other -- I can come to no other conclusion that she -- other

1   than she was untruthful in her deposition, when there's

2   repeated questioning about the same topics over and over again

3   and she says over the course of three days that she doesn't

4   recall, I can't find anything other than that's untruthful.

5   And you've agreed.

6            I also can't find when she says that she asked her

7   nurses about notes, and Jessee testified that she was never

8   asked about any notes until the day before, that that's

9   anything other than untruthful.

10           And I could go on and on, but I'm not going to

11  review everything that we've said here.  But I will review --

12  and you can have a seat, Ms. Cendali.

13           MS. CENDALI:  Thank you, Your Honor.

14           THE COURT:  I will review what I have found here today

15  from the briefs and from the exhibits, from the deposition

16  transcripts.

17           First, that discovery closed on September 1.  And

18  the Government's, I think, e-mail after that to defense counsel

19  that in compliance with their rolling production of documents

20  that things were being produced after that date is just a

21  nonstarter.  There's no rolling production of documents after

22  discovery closes.

23           It's clear that -- clear -- it's clear that

24  Ms. Clearwater's notes should have been produced as well as

25  the -- her handwritten notes -- as well as the electronic

1   comment boxes and the drafts of the reports, the ones that were

2   made prior to being provided to Department of Justice, which

3   the Department of Justice concedes were discoverable and should

4   have been produced to the defendants in the course of the

5   discovery requests.  The Department of Justice has also

6   conceded that, of course, by now producing all of these

7   documents.

8           The Department of Justice's expert reports were

9   first due on November 4th, 2016.  The rebuttal experts were due

10  on January 13, 2017.  The deposition of Ms. Clearwater was

11  August 23 to 25, and she was at that time, in addition to the

12  request for production of documents, in the deposition notice

13  directed to produce her notes, and she did not.

14          The defendants obviously should have had these

15  prior to the deposition being taken of Ms. Clearwater pursuant

16  to the discovery requests.  And even if not produced prior,

17  which they should have been, they should have been produced at

18  the time of the deposition, and they were not.

19          During the deposition, Ms. Clearwater was asked

20  about whether she took notes.  She repeatedly said she did not

21  recall.  She never said that -- she said she searched right

22  before the deposition, but she never said that -- anything

23  about any confusion about what she was searching for with notes

24  or anything else.

25          She clearly said that she asked -- that she didn't

1   ask the nurses for notes, but represented on August 23 that she

2   would send an e-mail and do so or call and do so.  Apparently,

3   that did not happen, according to Jessee's deposition.

4          She also repeatedly told the Department of Justice

5   and her attorneys that there were no notes and that she had

6   never asked the nurse -- that she had asked the nurses about

7   notes, and she apparently never did.  She also said that she

8   didn't recall using the comment boxes on the Word document, the

9   beneficiary profiles, which I find totally not credible.

10         At the September 13 Jessee deposition, Ms. Jessee

11  testified that no one asked her for her notes until the day

12  before the deposition, which was Department of Justice's

13  attorneys.  Even though on August 23 Clearwater promised to do

14  that.  She also testified -- and had told the Department of

15  Justice attorneys that she had previously done that.

16         She also testified, Jessee did, that the comment

17  boxes on the Word file was how the reviewers in Clearwater

18  communicated, which is directly contrary to Clearwater's

19  testimony.  And I don't really think that there's any ambiguity

20  about that at all in her deposition transcript to Clearwater's.

21         On September 14th, the defendants again asked for

22  the notes after Ms. Jessee's deposition.  Then for the first

23  time on September 20th, the Department of Justice says that

24  there are notes.  There's no details about them.

25         They also then said that there was the beneficiary

1    profile Word document notes that would be produced by August 2.

2    Yet, the Clearwater handwritten notes were not produced until

3    August 15th after the motions in limine were filed, a month

4    after Ms. Jessee's deposition.  And, they didn't produce the

5    comment boxes on the Word documents until October 20th, not

6    October 2nd.  October 20th.  These were produced after the

7    motions in limine and after the motions for summary judgment.

8    They still have not produced the notes of the other reviewers.

9              I don't think that there's really any confusion

10   here on Ms. Clearwater's part as to what she was being asked in

11   terms of the notes, in terms of the comment boxes on the Word

12   document.  I understand the Department of Justice's inclination

13   to try to somehow repair this, but I don't think that this is

14   reparable.

15             I think it's clear that she never actually looked

16   for her own notes.  She repeatedly said she didn't call.  But

17   the first time she ever actually looked for notes in the one

18   file cabinet in her own office, she found them, so I don't

19   think she ever looked.  And this was conveniently after Ms.

20   Jessee's deposition, which means that that obviously was the

21   trigger for her having to look.

22             The Department of Justice never communicated to the

23   nurse reviewers directly.  They only communicated through

24   Clearwater and in-house counsel.  They never -- as far as I

25   have heard and what you've represented to me and in what the

33

1   brief and the declaration say, the Department of Justice never

2   specifically asked Ms. Clearwater where she looked for her

3   notes or if she looked for her notes specifically, how she

4   looked for her notes.  They just asked if there were notes.

5   But there were no, from what I see, details in terms of their

6   questioning of Ms. Clearwater about notes.

7           I find it inconceivable and incredible that

8   Ms. Clearwater wouldn't remember making 131 pages of patient

9   notes, handwritten notes.  As I said, it's a whole -- it's like

10  writing a book.  It's a whole notebook full.

11          I file it -- find it utterly perplexing that she

12  could testify several times that she didn't recall using the

13  comment boxes in the Word documents when Jessee testified that

14  that was how they communicated, and the Government eventually

15  produced 5,000 pages with those notes.  The only conclusion

16  that I can come to, because it defies explanation otherwise, is

17  that she was untruthful.

18          As far as the harm to the defendants, this should

19  have been produced, as I said, months ago if not a year ago.

20  This Government -- this discovery has been ongoing for a long

21  time.  I am sure it's cost the defendants hundreds of thousands

22  of dollars, if not millions of dollars in legal fees and other

23  expert fees.  They should have had it prior to the deposition

24  in response to the requests for production of documents.

25          They should have had it before the deposition.

1    They should have had it immediately after the deposition.  The

2    notes contain significant differences and discrepancies from

3    the expert report:  Changing times of therapy or not --

4    allowing the therapy and then not allowing therapy, and back

5    and forth.

6              There was obviously changing of minds, differences

7    of opinions between the nurse reviewers and Ms. Clearwater, and

8    none of that was produced to the defendants.  They had no

9    opportunity to depose her about that or no opportunity to

10   depose the other nurse witnesses about that.

11             It also had to have affected their own expert

12   reports.  Their expert reports were based on her expert

13   reports.  And given what I think is now somewhat obvious from

14   the notes on there, that there's a sort of random nature of her

15   conclusions.  And their experts, the defendants' experts, never

16   had an opportunity, because they didn't have these notes, to

17   comment on that in their expert reports.

18             I think that the Government's suggestion that a

19   remedy, the remedy that's appropriate here is a do over, is

20   ridiculous.  We're not redoing a deposition that lasted three

21   days, that took hundreds of attorney hours to -- to prepare

22   for.  We're not redoing motions in limine.  We're not redoing

23   motions for summary judgment.

24             And the Department of Justice is not off the hook

25   here either in their conduct because I don't believe that they

1  adequately questioned Ms. Clearwater during the course of this

2  year about her lack of notes.  I don't think that it was -- I

3  think that they should have asked the nurse reviewers directly

4  about it.  But even if they -- even if that was excusable, what

5  I find inexcusable is the fact that they took a month to

6  produce her handwritten notes, one notebook, handwritten notes,

7  131 pages - they took a month to do that.  They took over a

8  month, five weeks, to produce the electronic notes without

9  telling the defendants or even the Govern -- or the judge the

10 importance of these notes and suggesting that the motions be

11 held off until after they're produced.

12          I can't understand how it took so long to produce

13 them.  And they were, in fact, not produced until after the

14 motions in limine were filed and after the summary judgment

15 motions were filed.  Something that I am sure, again, cost not

16 probably tens of thousands, probably hundreds of thousand

17 dollars to produce.  There's a lot of motions that are pending

18 before the Court.

19          So, as I mentioned before, the problem that I have

20 is not weight.  It's credibility.  And when I find -- and I do

21 find, now, that in many respects Ms. Clearwater's

22 testimony -- and seriously, pertinent respects in terms of

23 there not being any notes, because I think that's very

24 pertinent and I think it's obviously a huge issue on which they

25 could have cross-examined at her deposition.  I think she just

1   didn't want to give them up, quite frankly.  But, when I come

2   to the conclusion that she was untruthful to the Department of

3   Justice's attorneys and untruthful in her deposition, as the

4   Government attorneys have conceded, then -- then I can

5   find -- I cannot find that her testimony is credible or that

6   any do over would be an appropriate remedy.

7            I have come to the conclusion that Clearwater's

8   entire report must be stricken and that she must not be allowed

9   to testify because of her utter lack of credibility.  It is

10  apparent to me, moreover, that the Government's case here was

11  frankly resting -- house of cards that was resting on

12  Ms. Clearwater's testimony.  I think that her testimony and

13  what I've seen of the notes here reveal that -- that this was

14  a -- I think that this was a huge waste of money.  I don't

15  think this case should have ever been brought.

16           I have -- I have looked at this stuff, and I'm

17  appalled, I'm embarrassed, I'm ashamed that the Department of

18  Justice would rely on this kind of nonsense by a nurse reviewer

19  to get involved in a *qui tam* case and cost these defendants

20  millions of dollars in legal fees.

21           So, her report is stricken.  She's not allowed to

22  testify.  I know you filed this notice that you were going to

23  file an amended expert report.  I mean, not only is that moot

24  now, I don't know how you ever thought that you'd have the

25  ability to do that on the day that all of your exhibits are

1    due.  That's -- that ship sailed long ago.  Even if I didn't

2    find her credible, you would never have that opportunity again.

3              Under Rule 37, I, of course, am going to award

4    counsel fees and costs for bringing this motion.  Frankly, I

5    wish, but I can find no vehicle for awarding counsel fees for

6    their preparation for the deposition of Ms. Clearwater and the

7    deposition itself and their costs involved in all of that.  I

8    cannot find a method for awarding those costs now, but I think

9    that the defendants should be entitled to it because it's

10   obvious that her -- her deposition was a waste of time.  But,

11   I'll leave that up to Mr. Dubelier, if he wants to bring

12   another motion later on in the case.

13             I know that Judge Hilton still has those motions

14   under consideration.  I know he's going to be ruling on them,

15   but your motion is granted.

16             MR. DUBELIER:  Thank you, Your Honor.

17             THE COURT:  Court stands in recess.

18             MS. CENDALI:  Thank you, Your Honor.

19             (PROCEEDINGS CONCLUDED AT 2:51 P.M.)

20                          -o0o-

21

22

23

24

25

38

1  UNITED STATES DISTRICT COURT    )

2  EASTERN DISTRICT OF VIRGINIA    )

3

4          I, JULIE A. GOODWIN, Official Court Reporter for

5  the United States District Court, Eastern District of Virginia,

6  do hereby certify that the foregoing is a correct transcript

7  from the recorded proceedings of FTR Gold in the above matter,

8  to the best of my ability.

9          I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action in

11  which this proceeding was taken, and further that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14          Certified to by me this 30TH day of OCTOBER, 2017.

15

16

17

18          ___/s/_____
            JULIE A. GOODWIN, RPR
19          CSR #5221
            Official U.S. Court Reporter
20          401 Courthouse Square
            Eighth Floor
21          Alexandria, Virginia  22314

22

23

24

25

Julie A. Goodwin, CSR, RPR